# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE:  WHOLESALE GROCERY PRODUCTS ANTITRUST LITIGATION | Civil Action No. 09-md-02090 ADM/AJB MDL No. 2090 |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | JURY TRIAL DEMANDED |

1.     This is an antitrust case in which the two largest full-line wholesale grocers in the United States, SuperValu Inc. ("SuperValu") and C&S Wholesale Grocers, Inc. ("C&S") (collectively, "Defendants"), secretly agreed to allocate customers and territories in their respective home markets: (1) the Midwest, where SuperValu is headquartered and which it calls its "heartland operations," and (2) New England, where C&S is headquartered and its business is concentrated.  C&S and SuperValu accomplished this through a sham "Asset Exchange Agreement," which purported to exchange all of Defendants' distribution facilities and customer contracts in New England and the Midwest, respectively.  However, all of the distribution facilities "exchanged" by Defendants were shut down by Defendants at or shortly after the "Asset Exchange Agreement" closed.  Defendants in fact had no intention of operating the distribution facilities they "exchanged" with each other – indeed, SuperValu had decided

416822.1

to shut down the Midwest facilities it was to receive from C&S even <u>before</u> the "Asset Exchange Agreement" had closed – a fact which Defendants concealed from the Federal Trade Commission (the "FTC"), from their customers and from the public.

2.    As part of their "Asset Exchange Agreement," Defendants also secretly agreed not to compete with each other with respect to the New England and Midwest customers they exchanged.  The net effect was simply a naked agreement between competitors not to compete for over a thousand customers in New England and the Midwest.  Defendants' "Asset Exchange Agreement" is thus more accurately described as a "Customer and Territorial Allocation Agreement" given the reality of the transaction.

3.    Defendants' illegal customer and territorial allocation has caused substantial harm to competition.  As a result of Defendants' illegal agreement, Plaintiffs and members of the class have been injured in their business or property in that prices for full-line wholesale grocery goods and related services purchased by Plaintiffs and members of the class have been artificially inflated and capacity and output for full-line wholesale grocery goods and services have been artificially reduced.

4.    SuperValu's October 21, 2009 10-Q SEC filing revealed that on September 14, 2009, the FTC issued a subpoena to SuperValu for documents relating to the "Asset Exchange Agreement" as part of the FTC's current investigation into whether SuperValu and C&S engaged in unfair methods of competition.

### The Parties

5.    Plaintiff Blue Goose Super Market, Inc. ("Blue Goose") is an Illinois

corporation with its principal place of business in Saint Charles, Illinois.  Blue Goose operates a retail grocery store in St. Charles, Illinois and purchased wholesale grocery products and related services directly from one or more of the Defendants during the Class Period (as defined below).

6.      Plaintiff Charles W. Prather Company, Inc. d/b/a Prather's IGA ("Prather's") is an Ohio corporation with its principal place of business in West Union, Ohio.  Prather's operated a retail grocery store in West Union, Ohio and purchased wholesale grocery products and related services directly from one or more of the Defendants during the Class Period (as defined below).

7.      Plaintiff D&G, Inc. d/b/a Gary's Foods ("Gary's Foods") is an Iowa corporation with its principal place of business in Mount Vernon, Iowa.  Gary's Foods operates a retail grocery store in Mount Vernon, Iowa and purchased wholesale grocery products and related services directly from one or more of the Defendants during the Class Period (as defined below).

8.      Plaintiff DeLuca's Corporation ("DeLuca's") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  DeLuca's operates retail grocery stores in Boston, Massachusetts and purchased wholesale grocery products and related services directly from one or more of the Defendants during the Class Period (as defined below).

9.      Plaintiff Robert Warren Wentworth Jr., Inc. d/b/a Rangeley IGA ("Rangeley IGA") is a Maine corporation with its principal place of business in

Rangeley, Maine.  Rangeley IGA operates a retail grocery store in Rangeley, Maine and purchased wholesale grocery products and related services directly from one or more of the Defendants during the Class Period (as defined below).

10.     Defendant SuperValu is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  SuperValu is a full-line grocery wholesaler with revenues in 2009 in excess of $9 billion.  SuperValu is the second largest full-line grocery wholesaler by dollar volume in the United States, supplying approximately 5,000 stores from distribution centers in 21 states.

11.     Defendant C&S is a Vermont corporation with its principal place of business in Keene, New Hampshire.  C&S is a full-line grocery wholesaler with revenues in 2009 in excess of $19 billion.  C&S is the largest full-line grocery wholesaler by dollar volume in the United States, supplying approximately 5,000 stores from distribution centers in 12 states.

### *Jurisdiction, Venue and Interstate Commerce*

12.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337(a) (commerce and antitrust regulation), because certain claims in this action arise under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

13.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. §§ 15 and 22 in that Defendants inhabit, transact business, reside, are found or have an agent in this district; a significant portion of the affected interstate trade and

commerce described below has been carried out in this District; and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

14.     Defendants' anticompetitive activities were within the flow of, and had a proximate, direct, substantial and reasonably foreseeable effect on, interstate commerce.

### The Wholesale Grocery Industry

15.     Grocery wholesalers purchase products directly from consumer goods manufacturers, store the products in distribution facilities and then resell the products to grocery retailers like Plaintiffs.  Grocery wholesalers also provide related services such as transportation, administrative and other services.  Some wholesalers, including C&S and SuperValu, specialize in providing a "full line" of grocery products and related services to grocery retailers.  Full-line grocery wholesalers stock tens of thousands of different products, including produce, meat, dairy products, deli products, bakery items, health and beauty aids and candy.

16.     Leading full-line wholesalers (including C&S and SuperValu) serve multi-state areas through a network of distribution centers and trucking fleets.

17.     Full-line grocery wholesalers compete for retail accounts principally on the basis of price and service.  Prices that grocery wholesalers charge retailer customers include a price for the purchase of a product, transportation fees, fuel surcharges, warehouse fees and other fees.  Product costs depend in turn on discounts, allowances, fees, payments and other economic concessions (collectively "discounts") given or made to wholesalers by manufacturers of grocery products.  These discounts can be reflected

directly on manufacturers' invoices to wholesalers, or indirectly in wholesaler "bill backs" or other forms of rebates.

18.     As the largest full-line grocery wholesalers in the United States, C&S and SuperValu have been particularly aggressive and effective in securing discounts from manufacturers.  For example, C&S requests that large manufacturers that sell product to C&S participate in C&S' Crossroads program, a program designed to maximize manufacturer discounts to C&S.  Manufacturers that do not participate in Crossroads typically suffer significant financial penalties from C&S in the form of deductions (with little or no basis) or other discounts imposed by C&S.

19.     By virtue of their size and associated leverage over grocery manufacturers, C&S and SuperValu were uniquely positioned to compete with one another.

### SuperValu's Growth, Pricing and Competition with C&S

20.     SuperValu's full-line grocery wholesale business grew substantially in the 1990's and early 2000's.  Two business strategies generated this growth.

21.     First, SuperValu expanded into new geographic territories by acquiring wholesalers within those territories.  For example, in 1994, SuperValu acquired Sweet Life Foods, Inc., a full-line grocery wholesaler that served hundreds of retailers in New England.  This acquisition gave SuperValu an immediate and competitively significant foothold in New England, an area that had been dominated by C&S.  SuperValu maintained large distribution facilities in Portland, Maine, Andover, Massachusetts and Cranston, Rhode Island.

22.     Each year – from 1995 to 2003 – SuperValu took accounts and market share from C&S and grew its New England-based grocery wholesale business.  By 2003, SuperValu had achieved sales of roughly $1.5 billion in New England.  While C&S remained the market leader in New England, competition from SuperValu benefited retailers in the form of lower prices.

23.     Second, in an effort to improve revenues and margins, in the late 1990's SuperValu implemented a new pricing approach it referred to as Activity Based Sell ("ABS").  Under ABS, SuperValu stated that it would charge retailers fees that would enable SuperValu to "earn an adequate profit margin."  SuperValu 1998 10-K at 5.

24.     As SuperValu implemented ABS in the Midwest, where SuperValu was the dominant grocery wholesaler, SuperValu's prices increased substantially.  Facing competition from C&S, SuperValu did not implement ABS in New England.

### C&S' Entry Into the Midwest

25.     In the early 2000's, C&S was looking to expand the geographic territories in which it sold full-line wholesale grocery products and related services.  C&S' business was concentrated primarily in New England and the wholesaler sought growth opportunities in other geographic areas.  In 2003, an opportunity presented itself to C&S: Fleming Companies, Inc. ("Fleming") – a major full-line grocery wholesaler with operations in many parts of the country – filed for bankruptcy and sought to sell its wholesale operations, including its operations in the Midwest.  Fleming operated three Midwestern distribution facilities, one in each of the following locations: La Crosse,

Wisconsin, Waukesha, Wisconsin, and Massillon, Ohio.  Fleming used these distribution facilities to serve retailers throughout the Midwest.  Purchasing Fleming's Midwest distribution facilities provided C&S an efficient means for entering the Midwest.

26.     In late June 2003 – roughly three months after Fleming filed for bankruptcy – C&S announced that it would purchase Fleming's assets.  According to Mike Gross, the C&S Executive Vice President at that time, buying Fleming's assets allowed C&S to expand its grocery wholesale business into new territories:

> The purchase of Fleming's wholesale grocery operations would allow us to expand our business into parts of the country where we do not presently operate.  We are excited about working with Fleming and its chain and independent supermarket customers in a mutually beneficial transition for all parties.

Fleming's June 27, 2003 Form 8-K at 1 (quoting Mark Gross).

27.     C&S stated that it expected to operate Fleming's Wisconsin-based distribution facilities:

> Last week, C&S Executive Vice President Mark Gross told the Tribune his company expects to operate Fleming distribution facilities in La Crosse and Waukesha if its bid for Fleming's wholesale grocery business succeeds.

"Fleming Auction Moves Forward," La Crosse Tribune (July 19, 2003).

28.     In order to retain the business of Fleming's retailers, C&S agreed to immediately supply Fleming with consumer goods products so that Fleming had a sufficient inventory to supply retailers.  C&S also began meeting with retailers to secure the retailers' business by promising to offer wholesale goods and services at low prices.

C&S met with retailers in and around La Crosse and retailers in and around Milwaukee. Also as part of its entry into the Midwest, C&S met with Fleming employees working in the La Crosse and Waukesha distribution facilities to discuss the employees transitioning to C&S to service retailers that purchased product from C&S.  Using the Fleming distribution facilities to enter the region, competition between C&S and SuperValu in the Midwest had commenced.

29.     C&S' expansion into the Midwest – where SuperValu's ABS pricing prevailed – was a substantial threat to SuperValu, particularly considering the intense price competition between the wholesalers in New England.  When C&S announced that it would acquire Fleming's assets, SuperValu's stock declined ten percent on the news that "a stronger rival" was to acquire "an immediate stronghold in certain Midwest states, key areas for SuperValu:"

> Shares of SuperValu (SVU) tumbled 10 percent as investors worried that a stronger rival was stepping into the wholesale grocery picture.  Bankrupt Fleming said Friday it was selling its wholesale business to privately held C&S, a large regional player in the grocery business.   The sale gives C&S an immediate stronghold in certain Midwest states, key areas for SuperValu.

"Monday's Decliners," CBS MarketWatch.com (June 30, 2003).

### *SuperValu and C&S' Conspiracy to Suppress Competition*

30.     Faced with the prospect of competing against C&S in the Midwest, SuperValu had one of two options: either embrace that competition, which would have

meant substantially reduced prices for retailers, or conspire with C&S to eliminate that competition.  SuperValu (and C&S) chose the latter option.

31.    Competition-limiting arrangements with competing wholesalers were not a novel concept for SuperValu.  At the same time that C&S began its entry into the Midwest, SuperValu was negotiating a joint venture with Associated Grocers, Inc., a wholesaler that competed against SuperValu in the Pacific Northwest.  Negotiations between SuperValu and Associated Grocers abruptly ended when Associated Grocers won a contract to supply SuperValu's largest retailer in the Pacific Northwest by offering lower prices than SuperValu.

32.    SuperValu then sued Associated Grocers in this Court, claiming Associated Grocers had an obligation to notify SuperValu of any intent to compete for SuperValu's customers while their joint venture negotiations were ongoing.  Associated Grocers responded that SuperValu's position would violate the antitrust laws.  This Court agreed, noting that any agreement by the wholesalers not to compete for each other's customers would be *per se* illegal under the antitrust laws:

> An agreement to notify one another of any intent to compete for each other's customers or to refrain from such competition altogether would have been a per se violation of the Sherman Act.  See United States v. Topco Assocs., Inc., 405 U.S. 596, 612 (1972) (holding that territorial and customer allocation scheme among sellers of private label groceries violated antitrust laws).

*SuperValu Inc. v. Associated Grocers, Inc.*, 428 F. Supp. 2d 985, 992 (D. Minn. 2006) (Davis, J.).

33.     While SuperValu's efforts to agree to eliminate competition with

Associated Grocers were unsuccessful, SuperValu found that C&S was more receptive to

a similar agreement.  Shortly after C&S began its entry into the Midwest, SuperValu and

C&S started negotiating an arrangement that would prove devastating to retailers.

34.     Negotiations did not take long.  On or about September 6, 2003,

Defendants entered into a written "Asset Exchange Agreement" whereby SuperValu

acquired all of C&S' distribution facilities in the Midwest in exchange for C&S acquiring

all of SuperValu's distribution facilities in New England.  The only other significant

assets exchanged by Defendants were the customers served by the Midwest and New

England distribution facilities.  The "Asset Exchange Agreement" was signed on

September 6, 2003 and closed on September 13, 2003.

35.     The real point of Defendants' "Asset Exchange Agreement" was

eliminating each other as a competitor in the Midwest and New England, allocating the

Midwest to SuperValu and New England to C&S.  The "Asset Exchange Agreement"

contained a secret, written agreement that Defendants would not compete with each other

with respect to the customers they exchanged.  The non-compete agreement included two

blatantly anticompetitive restraints: (1) each Defendant agreed to an absolute ban on

supplying the Midwest and New England customers that were served out of the

exchanged distribution facilities for a period of two years following the closing date of

the "Asset Exchange Agreement" (from September 6, 2003 through September 13,

2005); and (2) each Defendant agreed to an absolute ban on soliciting these customers for

a period of five years following the closing date of the "Asset Exchange Agreement" (from September 6, 2003 through September 13, 2008). Defendants' non-compete agreement also covered customers served by Fleming's former Massillon, Ohio facility, which was not exchanged but simply shut down before the "Asset Exchange Agreement" was closed. Thus, Defendants explicitly agreed not to compete with each other in the Midwest and New England for the business of over one thousand customers for at least five years.

36.     Defendants took affirmative steps to conceal their secret non-compete agreement, for example, by removing any mention of it in Defendants' public disclosures regarding their "Asset Exchange Agreement." Plaintiffs first learned of Defendants' secret, non-compete agreement from a former SuperValu executive in or about November 2008, shortly before this lawsuit was initially filed.

37.     Defendants' "Asset Exchange Agreement" had no legitimate business purpose and was simply a sham transaction used by Defendants to conceal their secret, illegal non-compete agreement allocating the New England market and customers to C&S and the Midwest market and customers to SuperValu. Defendants entered into the "Asset Exchange Agreement" with the purpose and intent of closing the very distribution facilities they were acquiring, thereby reducing capacity and output, raising prices and eliminating competition. SuperValu has admitted to making the decision to shut down the Midwest facilities it was acquiring even <u>before</u> the "Asset Exchange Agreement" closed. Within eight months of entering into the "Asset Exchange Agreement," all of the

distribution facilities Defendants had exchanged with each other were closed.  Over two

thousand people lost their jobs.

38.     Defendants' customer and territorial allocation was a naked restraint of

trade.  Its purpose and effect was to limit or eliminate competition between Defendants in

order to allow Defendants to charge supra-competitive prices in the Midwest and New

England.

39.     Defendants actively used their secret customer and territorial allocation to

harm retailers in a number of ways.  For example, Defendants charged retailers higher

prices for grocery wholesale goods and related services than they would have paid if

SuperValu and C&S had competed.  SuperValu ensured the continuation of ABS pricing

in the Midwest rather than having to engage in aggressive price competition like that

which it experienced in competing with C&S in New England, and C&S no longer had to

engage in intense price competition in New England with SuperValu.  As a result, retail

customers both in the Midwest and in New England have sustained overcharges in their

purchases of grocery wholesale products and services from Defendants.  These

overcharges continue to the present (with retailers' repeated purchases of grocery

wholesale products and services from Defendants at inflated prices) and constitute

independent acts injuring Plaintiffs and the class.

40.     These overcharges created a windfall for SuperValu and C&S, both of

which enjoyed higher margins from their territorial and customer allocation than they

would have earned had the Defendants competed in the Midwest and New England.  For

example, in the year following their territorial and customer allocation, SuperValu's grocery wholesale sales volume declined by $100 million but its net income rose 26.2 percent, as the wholesaler sacrificed its less profitable sales volume in New England to increase profitable sales volume in the Midwest.  Not surprisingly, SuperValu's president was hopeful that SuperValu could find other opportunities like the territorial and customer allocation with C&S to improve SuperValu's gross margins:

> Supervalu here said last year's asset swap with C&S Wholesale Grocers resulted in a sales decline of about $100 million for the second quarter ended Sept. 11, but net income rose 26.2% compared with the year-ago period.  Jeff Noddle, chairman, president and chief executive officer, pointed out that gross margins improved since the swap, "and we hope we can find more opportunities like that, though nothing is imminent."

"Supervalu's Sales Decline as Earnings Rise 26.2%," Supermarket News (Oct. 18, 2004).

41.    Second, Defendants eliminated substantial capacity and output for full-line grocery wholesale goods and services in the Midwest and New England by closing the distribution facilities.  The closed distribution facilities were sold and all or portions of them were redeveloped for use in non-grocery wholesale industries.  This reduction in the supply of full-line grocery wholesale goods and services to retailers helped SuperValu and C&S maintain higher prices (as capacity was limited) and perpetuate their dominance in the Midwest and New England, as competing wholesalers no longer had an ability to efficiently enter territories through acquisition.

42.    Further, by closing distribution facilities in the Midwest and New England,

the co-conspirators increased transportation fees for a number of retailers that received

product from the closed facilities.  Transportation fees are generally assessed to retailers

based on the retailers' proximity to distribution facilities.  Nearby retailers that had

received product from these facilities were forced to pay higher transportation fees

following the closure of the facilities.

43.     The increased prices and reduced capacity and output described above all

constitute actual detrimental effects resulting from the Defendants' territorial and

customer allocation agreement.

### *Fraudulent Concealment*

44.     The running of any statute of limitations has been suspended with respect to

any claims which Plaintiffs and members of the class or subclasses have sustained as a

result of the unlawful contract, combination or conspiracy alleged herein by virtue of the

federal doctrine of fraudulent concealment.

45.     Defendants fraudulently concealed the existence of their contract,

combination or conspiracy to unlawfully suppress competition.  First, Defendants

affirmatively acted to ensure that their secret non-compete agreement would be concealed

from public disclosure by agreeing in writing through a provision in the "Asset Exchange

Agreement" that Defendants would not disclose to the public the terms of the "Asset

Exchange Agreement," including the terms of the non-compete agreement, without prior

written agreement of both parties.  This non-disclosure agreement effectively kept

Defendants' non-compete agreement a secret from the public.

46.     Second, Defendants also affirmatively concealed their non-compete agreement from the FTC in their Hart-Scott-Rodino ("HSR") filings.  For example, although Defendants disclosed to the FTC in their HSR filings that "their final agreement, yet to be negotiated, would contain a non-compete agreement," Defendants never disclosed the terms of the non-compete agreement to the FTC, although they had a duty to do so.  Additionally, Defendants disclosed to the FTC that they would acquire each other's "wholesale distribution business," which comprised six *operating* distribution facilities and a seventh distribution facility that had been closed.  While Defendants told the FTC that a non-compete agreement was needed "to protect and preserve the value" of these operational assets, nowhere did Defendants disclose to the FTC that their non-compete agreement was part of a transaction in which the operating facilities to be exchanged would be closed.  Defendants omitted this critical fact because the FTC would otherwise have objected to the transaction as a cover for an illegal agreement not to compete just as the Department of Justice ("DOJ") earlier that year condemned a similar "asset swap" as *per se* unlawful.  *See United States v. Village Voice Media, LLC,* No. 1:03 CV 0164, 2003 WL 21659092, at *17-18 (N.D. Ohio Feb. 12, 2003) (found that non-compete provisions and non-solicitation provisions in an asset swap were *per se* unlawful where two competing newspapers swapped newspaper operations in two markets and shut down the actual operations).  On or about September 14, 2009, following the initial filing of this lawsuit, the FTC issued a subpoena to SuperValu seeking documents relating to the "Asset Exchange Agreement."  The FTC is now

investigating whether Defendants engaged in unfair methods of competition.

47.     Third, at or about the time Defendants entered into their territorial and customer allocation (specifically, for example, on August 10, 2003, September 8, 2003 and September 17, 2003), Defendants intentionally issued incomplete and misleading press releases that described an "asset exchange" between the organizations.  Nowhere in any of Defendants' press releases – or in any other way – did Defendants reveal the highly material fact that they had entered into an agreement not to compete with each other with respect to more than 1,000 customers in New England and the Midwest.

48.     Fourth, Defendants misrepresented their transaction as an "asset exchange," concealing the fact that Defendants exchanged their respective distribution facilities in the Midwest and New England for the express purpose of shutting them down and eliminating capacity from the markets.  For example, rather than acknowledging that SuperValu had already made the decision to close the Midwest distribution facilities, SuperValu falsely represented that these facilities were being closed by Fleming.  *See* SuperValu Sept. 8, 2003 Press Release ("The three facilities located in La Crosse and Waukesha, Wisconsin, and Massillon, Ohio currently operated by Fleming will be closed by Fleming.").  It was not until after this lawsuit was filed that SuperValu admitted that it was in fact SuperValu that made the decision to close the Wisconsin facilities, which was therefore before the "Asset Exchange Agreement" had even closed on September 13, 2009.  *See* Decl. of B. Bostwick, ¶ 13 ("The decision to close the distribution facilities located at Waukesha and La Crosse was made at SuperValu's Eden Prairie, Minnesota

headquarters by SuperValu personnel located in Minnesota.").  Similarly, C&S

spokesman Carl Wistreich was reported by the Boston Globe on or about March 4, 2004,

as saying that "the company did not plan to close the [exchanged SuperValu Andover,

Massachusetts distribution facility] when it acquired it last fall," concealing the fact that

Defendants' express purpose in exchanging the distribution facilities was to shut them

down and to eliminate competition from the market.

49.     Fifth, Defendants represented publicly, both to customers and otherwise,

that their pricing activities and business strategies were unilateral, rather than collusive,

and based upon legitimate business purposes.  In making those false representations,

Defendants misled Plaintiffs and members of the class or subclasses as to the existence

and true collusive and coordinated nature of their agreement to suppress competition.

50.     Plaintiffs exercised due diligence in investigating the conduct alleged

herein and in bringing this lawsuit.  Given the secret nature of Defendants' contract,

combination or conspiracy to unlawfully suppress competition and Defendants' efforts to

fraudulently conceal their unlawful conduct, Plaintiffs could not, and did not, discover

the existence of Defendants' unlawful contract, combination or conspiracy until in or

about November 2008, when a former SuperValu executive with knowledge of

Defendants' agreement not to compete provided information concerning the existence of

that agreement.  Shortly after learning this information, Plaintiffs filed this lawsuit.

51.     Any efforts to discover Defendants' unlawful conduct prior to November

2008 would have been (and were) futile given the secret nature of Defendants' agreement

to suppress competition.  For example, from 2003 through 2005, Plaintiff Gary's Foods repeatedly questioned the high prices it was paying to SuperValu for full-line grocery wholesale services.  Concealing that it had entered into an agreement with its principal competitor (C&S) to suppress competition in the Midwest and charge supra-competitive prices for its products and services, SuperValu's response to Gary's Foods was:

> [If Gary's Foods] felt it could get lower prices from a supplier other than the SUPERVALU Northern Region it could and should have changed to that supplier.

Jan. 4, 2005 Letter from T. Darling to M. Roberts, p. 2 n. 2.

52.     Gary's Foods conducted due diligence to assess available competitive alternatives to SuperValu in the Midwest.  In conducting this due diligence, Gary's Foods did not discover – and was not told by SuperValu – that SuperValu and C&S had entered an agreement not to compete in the Midwest, which would have explained why C&S (which received substantial discounts from manufacturers and could therefore compete aggressively on price) was not a competitive alternative in the Midwest and how SuperValu could get away with charging the supra-competitive prices it did.

53.     Similarly, Plaintiff DeLuca's conducted due diligence after experiencing increases in the prices C&S charged it in 2004-2005.  DeLuca's questioned C&S about these price increases during this time.  C&S, however, concealing that it had entered into an agreement with its principal competitor (SuperValu) to suppress competition in New England and charge supra-competitive prices for its products and services, responded that the increase in prices was caused by unavoidable business conditions and there was

nothing that DeLuca's could do to change the prices.

54.     In conducting due diligence, DeLuca's did not discover – and was not told by C&S – that SuperValu and C&S had entered an agreement not to compete in New England, which would have explained why SuperValu (which received substantial discounts from manufacturers and could therefore compete aggressively on price) was not a competitive alternative in New England and how C&S could get away with charging the supra-competitive prices it did.

### *The Market for Full-Line Grocery Wholesale Goods and Related Services*

55.     SuperValu and C&S compete in the market for full-line grocery wholesale goods and related services.  Defendants and other full-line wholesale grocery businesses that compete in the market for full-line grocery wholesale goods and related services offer a cluster of goods and services to grocery retailers.  From the standpoint of retailers, the cluster of products and services offered by different full-line grocery wholesalers able to serve their facilities are reasonably interchangeable and have a high cross-elasticity of demand.

56.     Full-line grocery wholesale goods and services constitutes a separate product market that is significantly different from, and appeals to buyers on a different basis than, partial-line grocery wholesale goods and services.  This is because full-line grocery wholesalers provide purchasers with the benefit of certain economies of scale and scope that are not available from partial-line grocery wholesalers.  Specifically, by purchasing in bulk and taking advantage of a larger distribution network, full-line

wholesalers are able to deliver a broader range and volume of goods and services more cheaply, quickly and efficiently than partial-line grocery wholesalers. Thus, the goods and services offered by partial-line wholesalers generally are not reasonable substitutes for the wholesale grocery products and services offered by full-line wholesalers and are not reasonably interchangeable.

57.     Grocery retailers generally strongly prefer dealing with full-line suppliers. For example, Plaintiffs Blue Goose, Gary's Foods, Prather's and Rangeley IGA use full-line grocery wholesalers as their primary wholesalers and will not use partial-line wholesalers as primary wholesalers due to the disparity in the volume and range of products, services and efficiencies offered by the two different types of wholesalers.

58.     New England constitutes a relevant geographic market for full-line grocery wholesale goods and services. The New England market includes the states of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont ("New England"). New England is the geographic area in which Defendant C&S operates and draws an overwhelmingly large percentage of its business. The distribution facilities in New England that were closed by C&S are all located in New England and served each of the states included in this market. New England is the geographic area in which the Defendants competed prior to Defendants' customer and territorial allocation agreement. Full-line grocery wholesalers located in New England sell only a very small percentage of their full-line wholesale grocery products and related services to grocery retailers outside of New England.

59.     New England is also the only geographic area where grocery retailers located in New England can practicably turn for sources of full-line wholesale grocery products and related services.  Grocery retailers in New England do not, to any significant degree, have economically viable choices among full-line wholesalers located outside of New England.  Grocery retailers located in New England thus purchase the overwhelming majority of their wholesale grocery products and related services from within New England.  Only a very small percentage of grocery retailers located in New England have suppliers located outside of New England to which the retailers could practicably turn for full-line wholesale grocery products and services.  Grocery retailers located in New England cannot practicably turn to suppliers outside of New England for more than a very small percentage of their purchases of full-line wholesale grocery products and services.  Plaintiffs Rangeley IGA and DeLuca's, for example, have purchased grocery wholesale products and services only from wholesalers in New England.  Rangeley IGA and DeLuca's have never purchased grocery wholesale products and services from wholesalers located outside of New England.

60.     The Midwest also constitutes a relevant geographic market for full-line grocery wholesale goods and services.  The Midwest market includes the states of Illinois, Indiana, Iowa, Michigan, Minnesota, Ohio and Wisconsin ("the Midwest").  The Midwest is the geographic area in which Defendant SuperValu operates and draws an overwhelmingly large percentage of its customers.  The distribution facilities in the Midwest that were closed by SuperValu are all located in the Midwest and served each of

the states included in this market.  The Midwest is the geographic area in which the

Defendants competed prior to Defendants' customer and territorial allocation agreement.

Full-line grocery wholesalers located in the Midwest sell only a very small percentage of

their full-line wholesale grocery products and related services to grocery retailers outside

of the Midwest.

61.     The Midwest is also the only geographic area where grocery retailers

located in the Midwest can practicably turn for sources of full-line wholesale grocery

products and services.  Grocery retailers in the Midwest do not, to any significant degree,

have economically viable choices among full-line wholesalers located outside of the

Midwest.  Grocery retailers located in the Midwest purchase the overwhelming majority

of their wholesale grocery products and services from within the Midwest.  Only a very

small percentage of grocery retailers located in the Midwest have suppliers located

outside the Midwest to which the retailers could practicably turn for full-line wholesale

grocery products and services.  Grocery retailers located in the Midwest cannot

practicably turn to suppliers outside of the Midwest for more than a very small

percentage of their purchases of full-line wholesale grocery products and services.

Plaintiffs Gary's Foods and Blue Goose, for example, have purchased grocery wholesale

products and services only from wholesalers in the Midwest.  Gary's Foods and Blue

Goose have never purchased grocery wholesale products and services from wholesalers

located outside of the Midwest.

62.     At the time SuperValu and C&S entered their territorial and customer

allocation agreement, they had market power as reflected by (a) SuperValu having the largest market share in the Midwest, more than three times the market share of the second largest competitor in the Midwest (Spartan Stores, Inc.); (b) SuperValu and C&S having the largest combined market share in New England, more than eight times the market share of the second largest competitor in New England (Bozzuto's Inc.); (c) Defendants' ability to reduce the supply of grocery wholesale goods and services in the Midwest and New England; and (d) their ability to price their products and/or services in the Midwest and New England above competitive levels.

63.     The territorial and customer allocation greatly enhanced the market power of each Defendant in its respective geographic market, enabling it to secure its dominance in that market.  For example, but for the territorial and customer allocation, C&S would have been the second largest competitor in the Midwest after acquiring Fleming's operations there.  By entering into the territorial and customer allocation with C&S, however, SuperValu was able to avoid such competition.  Similarly, as a result of the territorial and customer allocation, C&S increased its market share in New England, ensuring its dominance there.

64.     High entry barriers exist in full-line grocery wholesale goods and services markets.  Entry requires substantial investments in resources and time to, *inter alia*, (i) build distribution facilities and services (including transportation services) that can successfully compete with established distribution networks, (ii) hire and train employees, and (iii) secure retail accounts.  Securing retail accounts is particularly

challenging in this industry since retailers are often bound by long-term exclusive

contracts and depend upon loans or lines of credit from their current wholesaler.  Also,

retailers are often reluctant to switch wholesalers because switching can force them to

undergo undesirable operational changes, such as changes in delivery schedules.

Defendants' economies of scale resulting from their large size and financial strength also

act as high entry barriers in the Midwest and New England markets.

65.     Additionally, full-line grocery wholesalers in the United States, including

C&S and SuperValu, have expanded into new territories by acquiring other wholesalers,

which requires substantial resources.  Since the 1990's, the grocery wholesale industry

has experienced substantial consolidation, and limited opportunities currently exist for

substantial expansion through acquisition.  By closing the distribution facilities in the

Midwest and New England, SuperValu and C&S have increased barriers to entry into

those territories.

### Class Action Allegations

66.     Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23, on behalf of a

class or subclasses of all entities located in the Midwest or New England that purchased

full-line wholesale grocery products or related services directly from Defendants in the

Midwest or New England markets from September 6, 2003 through the present (and

continuing until the effects of Defendants' unlawful conduct ceases) (the "Class Period").

The subclasses consist of direct purchasers located in (a) the Midwest and (b) New

England, respectively.

67.     Excluded from the class or subclasses are the Court and its officers, employees and relatives, Defendants and their parents, subsidiaries, affiliates, shareholders, employees and co-conspirators, and government entities.

68.     Members of the class or subclasses are so numerous and geographically dispersed that joinder is impracticable.  While the exact number of class or subclass members is unknown to Plaintiffs, it is believed to be in the thousands.  Members of the class or subclasses are readily identifiable from information and records in possession of the Defendants.

69.     Questions of law and fact common to members of the class or subclasses predominate over questions, if any, that may affect only individual class or subclass members because Defendants have acted on grounds generally applicable to the class or subclasses.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.  Common questions of law or fact include, but are not limited to:

a. Whether the Defendants combined, agreed or conspired to allocate territories or customers for full-line grocery wholesale goods and services in order to suppress competition and charge supra-competitive prices in the Midwest and New England;

b. Whether the contract, combination or conspiracy caused the prices for full-line grocery wholesale goods and services to be higher than they would have been in the absence of Defendants' conduct;

c. Whether Defendants' conduct violates the Clayton and Sherman Acts;

d. Whether Plaintiffs and class or subclass members have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

e.   Whether Defendants fraudulently concealed their unlawful activities.

70.    Plaintiffs' claims are typical of the claims of the members of the class or subclasses.  Plaintiffs and all members of the class or subclasses were damaged by the same wrongful conduct by the Defendants, *i.e.,* they have paid artificially inflated prices for full-line grocery wholesale goods and services as a result of Defendants' wrongful conduct.  Plaintiffs Blue Goose, Gary's Foods, and Prather's are located in Illinois, Iowa and Ohio, respectively, and are members of the Midwest subclass.  Plaintiffs DeLuca's and Rangeley IGA are located in Massachusetts and Maine, respectively, and are members of the New England subclass.

71.    Plaintiffs will fairly and adequately protect the interests of other class and subclass members because they have no interest that is antagonistic to or which conflicts with those of any other class or subclass member, and Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent Plaintiffs and other members of the class and subclasses.

72.    The prosecution of separate actions by individual members of the class or subclasses would create the risk of inconsistent or varying adjudications with respect to individual members of the class or subclasses, which could establish incompatible standards of conduct for Defendants.

73.    This class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly-

situated entities to prosecute their claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would produce. The damages sustained by individual class or subclass members, although substantial, do not rise to the level where they would have a significant interest in controlling the prosecution of separate actions against these well-financed corporate defendants.

74.     This case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### Count I:  Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act (*Per Se* Unlawful and Rule of Reason)

75.     Plaintiffs repeat and reallege the allegations in Paragraphs 1 – 74 above as if fully set forth herein.

76.     Defendants have entered a contract, combination or conspiracy in restraint of trade and commerce, the purpose and effect of which is to allocate customers and territories for full-line grocery wholesale goods and services, to suppress competition and to allow Defendants to charge supra-competitive prices in the Midwest and New England. The contract, combination or conspiracy consisted of continuing agreements, understandings and a concert of action between Defendants, in particular including Defendants' secret agreement not to compete.

77.     The acts done by each of the Defendants as part of, and in furtherance of,

their contract, combination or conspiracy were authorized, ordered or done by their officers, agents, employees or representatives while actively engaged in the management of Defendants' affairs.

78.     The contract, combination or conspiracy is a naked restraint of trade that is illegal *per se* under Section 1 of the Sherman Act, 15 U.S.C. § 1.

79.     Alternatively, Defendants' contract, combination or conspiracy constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, under the Rule of Reason or "Quick Look" because:

a.      Defendants' contract, combination or conspiracy constitutes a naked restraint of trade;

b.      Defendants' contract, combination or conspiracy has caused significant anti-competitive effects in the markets for full-line grocery wholesale goods and services.  These actual detrimental effects include, but are not limited to:

(1)     actual elimination of significant competition in the Midwest (*i.e.*, but for the territorial and customer allocation, C&S would have entered the market and assumed Fleming's place as the second largest competitor in the Midwest);

(2)     actual elimination of significant competition in New England (*i.e.*, but for the territorial and customer allocation, C&S would not have been able to eliminate its second largest competitor and increase its market share in New England);

(3)     actual increases by Defendants in margins and/or prices to supra-competitive levels with respect to full-line grocery wholesale goods and related services; and

(4)     actual reduction of capacity and output resulting from Defendants' exchange and closing of facilities in their respective markets pursuant to their territorial and customer allocation agreement.

c.     During the relevant time period, Defendants, individually and collectively, possessed market power in the markets for full-line grocery wholesale goods and services in the Midwest and New England.

80.     The territorial and customer allocation resulting from Defendants' contract, combination or conspiracy has no legitimate business purpose. It achieves no legitimate efficiency or pro-competitive benefit to counterbalance the substantial anticompetitive effects it has caused in the markets for full-line grocery wholesale goods and services.

81.     Defendants' conduct substantially and adversely affects interstate commerce in the markets for full-line grocery wholesale goods and services.

82.     As a direct and proximate result of Defendants' violations of the Sherman Act, Plaintiffs and each class or subclass member have been damaged (i) in their business or property by paying more for full-line grocery wholesale goods and services than they would have but for Defendants' unlawful agreements; (ii) in an amount of ascertainable damages to be established at trial, pursuant to 15 U.S.C. § 15(a). Plaintiffs' injury is of the type that the antitrust laws were intended to prevent.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs, on their own behalf and on behalf of the class or subclasses, demand a trial by jury of all claims asserted in this Consolidated Amended Class Action Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment:

a.     Certifying this action as a class action with subclasses for each market

affected by Defendants' unlawful conduct, and appointing Plaintiffs as respective class representatives and their counsel as class counsel;

b.      Awarding Plaintiffs and the class or subclasses full monetary damages to be proved at trial;

c.      Awarding Plaintiffs and the class or subclasses treble their monetary damages, pursuant to 15 U.S.C. § 15;

d.      Awarding Plaintiffs and the class or subclasses pre-and post-judgment interest on their damages as allowed by law;

e.      Awarding Plaintiffs and the class or subclasses the costs of this action and reasonable attorneys' fees pursuant to 15 U.S.C. § 15; and

f.      Awarding Plaintiffs and the class or subclasses such other and further relief as the Court deems just and proper.

Dated: January 4, 2010.                    LOCKRIDGE GRINDAL NAUEN P.L.L.P.


/s/ W. Joseph Bruckner
W. Joseph Bruckner (#147758)
Elizabeth R. Odette  (#0340698)
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel: (612) 339-6900
Fax: (612) 339-0981
E-mail: wjbruckner@locklaw.com
            erodette@locklaw.com

*Liaison Counsel for Plaintiffs and the Direct Purchaser Class*

Richard B. Drubel
Kimberly H. Schultz
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH  03755
Tel: (603) 643-9090
Fax: (603) 643-9010
E-mail: rdrubel@bsfllp.com
         kschultz@bsfllp.com

Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Tel: (518) 434-0600
Fax: (518) 434-0665
E-mail: anardacci@bsfllp.com

Daniel A. Kotchen
Daniel L. Low
KOTCHEN & LOW LLP
2300 M Street, NW
Suite 800
Washington, D.C.  20037
Tel: (202) 416-1848
Fax: (202) 280-1128
E-mail: dkotchen@kotchen.com
         dlow@kotchen.com

Joel C. Meredith
Steven J. Greenfogel
Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL
 & SKIRNICK PC
1521 Locust Street
8th Floor
Philadelphia, PA  19102
Tel: (215) 564-5182
Fax:(215) 569-0958
E-mail: jmeredith@mcgslaw.com
        sgreenfogel@mcgslaw.com
        dallanoff@mcgslaw.com

*Co-Lead Counsel for Plaintiffs and the
Direct Purchaser Class*

Douglas A. Kelley
Kevin M. Magnuson
KELLEY, WOLTER & SCOTT, P.A.
431 S. Seventh St., Suite 2530
Minneapolis MN 55415
Tel: (612) 371-9090
Fax: (612) 371-0574
E-mail: dkelley@kelleywolter.com
        kmagnuson@kelleywolter.com

Robert M. Foote
Matthew J. Herman
FOOTE, MEYERS, MIELKE
 & FLOWERS, LLC
3 North Second Street, Suite 300
St. Charles, IL  60174
Tel: (630) 232-6333
Fax:(630) 845-8982
E-mail: rmf@foote-meyers.com
        mherman@foote-meyers.com

Richard L. Creighton, Jr.
William A. Posey
W. Jeffrey Sefton
KEATING, MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Tel: (513) 579-6400
Fax: (513) 579-6400
E-mail: rcreighton@kmklaw.com
        wposey@kmklaw.com
        jsefton@kmklaw.com

Edward T. Dangel, III
DANGEL AND MATTCHEN, LLP
Ten Derne Street
Boston, MA  02114
Tel: (617) 557-4800
Fax: (617)557-4827
E-mail: tdangel@danmatllp.com

Ira Neil Richards
Jennifer Agnew
TRUJILLO RODRIGUEZ
  & RICHARDS, LLC
1717 Arch Street, Suite 3838
Philadelphia, PA  19103
Tel: (215) 731-9004
Fax: (215) 731-9044
E-mail: ira@trrlaw.com
        jagnew@trrlaw.com

Kathleen C. Chavez
CHAVEZ LAW FIRM, P.C.
3 North Second Street, Suite 300
St. Charles, IL  60174
Tel: (630) 232-4480
Fax:(630) 845-8982
E-mail:    gkeg4@aol.com

Peter L. Currie
THE LAW FIRM OF PETER L. CURRIE, P.C.
536 Wing Lane
St. Charles, IL  60174
Tel: (630) 862-1130
Fax: (630) 845-8982
E-mail: plclaw05@aol.com

John B. Caldwell
YOUNG & CALDWELL, LLC
225 North Cross Street
West Union, OH  45693
Tel: (937) 544-2152
Fax: (937) 544-9770
E-mail: jbcaldwell01@aol.com

Christopher Cole
Karyl Roberts Martin
SHEEHAN, PHINEY, BASS
 & GREEN, P.A.
1000 Elm Street, 17th Floor
Manchester, NH  03101
Tel: (603) 668-0300
Fax:(603) 627-8121
E-mail: ccole@sheehan.com
         kmartin@sheehan.com

***Counsel for Plaintiffs***