# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE:  WHOLESALE GROCERY PRODUCTS ANTITRUST LITIGATION | Civil Action No. 09-md-02090 ADM/AJB<br>MDL No. 2090<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | |

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 3

STATEMENT OF UNDISPUTED MATERIAL FACTS .............................................. 6

SUMMARY JUDGMENT STANDARD ...................................................................... 8

ARGUMENT ............................................................................................................. 9

I.      Defendants' Agreement Not to Compete is *Per Se* Illegal Under
        Section 1 of the Sherman Act.................................................................... 9

        A.      Certain Categories of Agreements are *Per Se* Unlawful ............ 10

        B.      Horizontal, Naked Customer and Territorial Allocation Agreements
                Are *Per Se* Unlawful ............................................................... 11

        C.      Application of the *Per Se* Rule to Defendants' Agreement Not to
                Compete..................................................................................... 15

                1.      Defendants' Agreement Not to Compete is Horizontal ................. 15

                2.      Defendants' Agreement Not to Compete is an Agreement
                        to Allocate Customers and Territories........................................... 16

                3.      Defendants' Agreement Not to Compete is a Naked Restraint
                        of Trade...................................................................................... 17

II.     Summary Judgment on the Issue of *Per Se* Illegality Will Promote Judicial
        Economy...................................................................................................... 22

CONCLUSION ......................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Cases**

*Arizona v. Maricopa County Med. Soc'y*,
   457 U.S. 332 (1982)........................................................................ 10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)......................................................................... 3

*Compact v. Metro. Gov't of Nashville & Davidson County, Tenn.*,
   594 F. Supp. 1567 (M.D. Tenn. 1984)............................................. 22

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)...................................................................... 9, 14

*Hammes v. AAMCO Transmissions, Inc.*,
   33 F.3d 774 (7th Cir. 1994)...........................................................13, 14

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 682 (E.D. Mich. 2000), *aff'd*, 332 F.3d 896 (6th Cir. 2003),
   *cert. denied sub nom. Andrx Pharms., Inc. v. Kroger Co.*, 543 U.S. 939 (2004)
   ...................................................................................................... 3, 8

*In re Terazosin Hydrochloride Antitrust Litig.*,
   352 F. Supp. 2d 1279 (S.D. Fla. 2005)...........................................3, 8, 9

*Krenik v. County of Le Sueur*,
   47 F.3d 953 (8th Cir. 1995)............................................................... 8

*Marathon Petroleum Co. v. Chronister Oil Co.*,
   687 F. Supp. 437 (C.D. Ill. 1988)..............................................18, 19, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).......................................................................... 8

*Minn. Ass'n Nurse Anesthetists v. Unity Hosp.*,
   5 F. Supp. 2d 694 (D. Minn. 1998)................................................... 8

*Nat'l Soc'y of Prof'l. Eng'rs v. United States*,
   435 U.S. 679 (1978)........................................................................ 10

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990)............................................................ 2, 9, 11, 12, 16, 17

*Palmer v. BRG of Georgia, Inc.*,
    874 F.2d 1417 (11th Cir. 1989).......................................................... 12

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985)..........................................................12, 17

*Porous Media Corp. v. Pall Corp.*,
    173 F.3d 1109 (8th Cir. 1999)............................................................ 18

*SuperValu Inc. v. Associated Grocers, Inc.*,
    428 F. Supp. 2d 985 (D. Minn. 2006) (Davis, J.)............................................11, 14

*United States v. Cadillac Overall Supply Co.*,
    568 F.2d 1078 (5th Cir. 1978)..........................................................15, 16

*United States v. Consol. Laundries Corp.*,
    291 F.2d 563 (2d Cir. 1961)............................................................ 14

*United States v. Coop. Theaters of Ohio, Inc.*,
    845 F.2d 1367 (6th Cir. 1988)..........................................................14, 16

*United States v. Koppers* Co.,
    652 F.2d 290 (2d Cir. 1981)............................................................ 14

*United States v. Misle Bus & Equip. Co.*,
    967 F.2d 1227 (8th Cir. 1992)..........................................................10, 11, 13

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)............................................................ 10

*United States v. Suntar Roofing, Inc.*,
    897 F.2d 469 (10th Cir. 1990)..........................................................14, 16

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)............................................................*passim*

*United States v. Topco Assocs., Inc.*,
    319 F. Supp. 1031 (N.D. Ill. 1970)............................................................ 13

iii

*United States v. Village Voice Media, LLC*,
      1:03 CV 0164, 2003 WL 21659092 (N.D. Ohio Feb. 12, 2003) ... 14, 15, 17, 20, 21

*Utah v. Stericycle, Inc.*,
      2:03 CV 0049, 2003 WL 24137036 (D. Utah Jan. 13, 2003) .............................. 21

*Utah v. Stericycle, Inc.*,
      2:03 CV 0049, 2003 WL 21748940 (D. Utah Jan. 21, 2003) .............................. 21

## **Statutes**

15 U.S.C. §1 ............................................................................................................ 10

Fed. R. Civ. P. 56(c) ................................................................................................ 8

## **Secondary Sources**

U.S. Dep't of Justice & Federal Trade Comm'n, Antitrust Guidelines for
Collaborations Among Competitors (Apr. 2000) ....................................................*passim*

ABA, Model Jury Instructions in Civil Antitrust Cases (2005) ................................14, 16

## INTRODUCTION

Plaintiffs' motion for partial summary judgment presents this Court with an undisputed, written agreement between the two largest grocery wholesalers in the United States, Defendants SuperValu Inc. ("SuperValu") and C&S Wholesale Grocers, Inc. ("C&S"), not to compete for more than one thousand customers located in their respective home territories, the Midwest and New England, thereby allocating these customers and territories to each other in a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

Defendants used an "Asset Exchange Agreement" ("AEA") as window dressing for their agreement not to compete. Under the AEA, SuperValu transferred all of its operating distribution facilities and customer contracts in New England to C&S in exchange for C&S transferring all of its operating distribution facilities and customer contracts in the Midwest to SuperValu. However, all of the distribution facilities so "exchanged" were promptly shut down by Defendants at or shortly after the AEA closed. The net result was simply an agreement by Defendants not to compete for one another's Midwest and New England customers, thereby allocating the New England territory and customers to C&S and the Midwest territory and customers to SuperValu. Defendants appear to believe that it is permissible for competitors to agree not to compete for each other's customers so long as they exchange them first. Defendants are mistaken.

Defendants' agreement not to compete constitutes an express agreement between competitors to allocate customers and territories that has long been held *per se* illegal

1

under Section 1 of the Sherman Act. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50 (1990) (*per curiam*) (agreements between actual or potential competitors to allocate territories "are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other"); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) ("[H]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.") (internal quotation omitted) (omission in original); U.S. Dep't of Justice & Federal Trade Comm'n, Antitrust Guidelines for Collaborations Among Competitors ("DOJ/FTC Guidelines") at 8 (Apr. 2000) (attached as Ex. A) ("Types of agreements that have been held per se illegal include agreements among competitors to . . . share or divide markets by allocating customers, suppliers, territories or lines of commerce."). *See* Section I.B, *infra*.

Under the *per se* rule, Defendants' agreement is conclusively presumed unreasonable and no further analysis of the agreement's purported purpose or effect is appropriate. *See Topco*, 405 U.S. at 605-06, 608 (reversing district court's inquiry into purpose and effect of customer and territorial restraints between potential competitors as "improper analysis" where *per se* rule applied); DOJ/FTC Guidelines at 8 (Ex. A) ("The courts conclusively presume such agreements [including territorial and customer allocations], once identified, to be illegal, without inquiring into their claimed business purposes, anticompetitive harms, precompetitive benefits, or overall competitive effects."). *See* Section I.A, *infra*.

2

The application of the *per se* rule to Defendants' agreement not to compete can be resolved as a matter of law applied to the undisputed material facts. *See, e.g., In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 682, 694-95 (E.D. Mich. 2000), *aff'd*, 332 F.3d 896 (6th Cir. 2003), *cert. denied sub nom. Andrx Pharms., Inc. v. Kroger Co.*, 543 U.S. 939 (2004) (granting plaintiffs' motion for partial summary judgment applying the *per se* rule to defendants' agreement to allocate the entire United States to brand-name drug manufacturer); *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1294, 1319 (S.D. Fla. 2005) (same). The result will be to establish the existence of an antitrust violation by Defendants, one of the elements of Plaintiffs' cause of action under Clayton Act Section 4.[1]

## FACTUAL BACKGROUND

Defendants C&S and SuperValu are the two largest suppliers of wholesale grocery products and services in the United States. SuperValu is headquartered in the Midwest, which it calls its "heartland operations". C&S is headquartered in New England, where it is the largest grocery wholesaler in the region.

Until on or about September 6, 2003, when the AEA was signed, SuperValu competed with C&S in New England. Prior to 2003, C&S did not compete with SuperValu in the Midwest. However, in the summer of 2003, C&S agreed to acquire the

---

[1] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486, 489-490 (1977) (In order to prevail on Clayton Act claims, plaintiffs must prove: (1) violation of the antitrust laws by the defendant; (2) causing injury to plaintiffs' business or property; and (3) cognizable damages. Plaintiffs' injury must also be of the type the antitrust laws were intended to prevent (antitrust injury).).

Midwest business of bankrupt grocery wholesaler Fleming Companies, Inc. ("Fleming").

This allowed C&S to expand into the Midwest and compete with SuperValu.

On or about September 6, 2003, C&S and SuperValu entered into an "Asset

Exchange Agreement" pursuant to which SuperValu agreed to exchange its operating

grocery wholesale facilities and customers in New England for the operating grocery

wholesale facilities and customers in the Midwest that C&S was acquiring from Fleming.

(AEA, attached as Ex. B, at §§ 1.1, 1.3, SV00000010-15.) [2]   Under the AEA, SuperValu

received three operating distribution facilities from C&S, two of which were located in

La Crosse, Wisconsin and one in Waukesha, Wisconsin, and approximately 537 retail

customer contracts.  (Ex. B at § 1.1, SV00000010-12; AEA Schedule 1.1(f), SV00000629

(attached as Ex. B-1); AEA Schedule 3.11, SV00000716-744 (attached as Ex. B-2).)

C&S received three operating distribution facilities from SuperValu in Andover,

Massachusetts, Cranston, Rhode Island, and Portland, Maine, and approximately 583

retail customer contracts.  (Ex. B at § 1.3, SV00000012-15; AEA Schedule 1.3(f), SV

00000687 (attached as Ex. B-3); AEA Schedule 4.9, SV00000751-768 (attached as Ex.

B-4).)

Under the AEA, Defendants also secretly agreed not to compete with each other

for the Midwest and New England customers that they had exchanged.[3]  (Ex. B at §§

_____

[2] Defendants also agreed to exchange trade names to several small retail grocery stores.

[3] Defendants were careful to keep their agreement not to compete a secret.  They agreed
that neither could disclose its existence without the consent of the other.  (Ex. B at § 7.6,
SV00000068.)  In none of the publicity Defendants generated regarding their "Asset
Exchange" was there ever any hint that Defendants had also agreed not to compete with

3.11, 4.9, 5.8, 6.2, SV00000039, SV00000041, SV00000053-54, SV00000056-57; Ex. B-2; Ex. B-4).  Defendants' agreement not to compete comprised two anti-competitive restraints: (1) each Defendant agreed to an absolute ban on supplying the Midwest and New England customers, respectively, that were exchanged for a period of two years following the closing date of the AEA (from September 6, 2003 through September 13, 2005); and (2) each Defendant also agreed to an absolute ban on soliciting these customers for a period of five years following the closing date of the AEA (from September 6, 2003 through September 13, 2008).  *Id.* (Defendants' non-compete agreement also covered customers served by Fleming's former Massillon, Ohio facility, which was not exchanged but simply shut down on or before the date the AEA was closed.  (Ex. B at §§ 3.11, 5.8, SV00000039, SV00000053-54; Ex. B-2 at SV00000725-740).)  Thus, Defendants explicitly agreed not to compete with each other for the business of over one thousand customers (*i.e.*, approximately 1,120 customers) in the Midwest and New England for a total of five years.  (Ex. B-2; Ex. B-4.)

Defendants' AEA was simply window dressing for Defendants' illegal agreement not to compete for each other's customers in the Midwest and New England.  Defendants entered into the AEA with the intent of closing the very distribution facilities they were acquiring.  SuperValu has admitted to making the decision to shut down the Midwest distribution facilities it acquired <u>before</u> the AEA even closed.  Within 8 months of

---

each other for their former Midwest and New England customers.  Plaintiffs discovered the existence of Defendants' agreement not to compete from a former SuperValu employee shortly before the filing of Plaintiffs' original complaint.

entering into the AEA, all of the distribution facilities Defendants had exchanged with each other were closed.  Over two thousand people lost their jobs.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      At the time Defendants entered into their agreement not to compete, Defendants were actual competitors in New England.  (*See* Timothy C. Barman, *Grocery Warehouse to Close, Lay Off 266*, THE PROVIDENCE JOURNAL, Feb. 10, 2004, at E-01 (reporting that C&S then owned approximately 10 wholesale grocery distribution centers in New England), attached to July 27, 2009 Beckett Aff. at Ex. P, Dkt. #109-16 (09-CV-00983); SuperValu Inc. Form 10-K, at 6 (Apr. 25, 2003) (listing three operating SuperValu New England grocery wholesale distribution centers) (attached as Ex. C).)

2.      At the time Defendants entered into their agreement not to compete, Defendants were actual or potential competitors in the Midwest.  (*Highlights of Monday's Big Price Moves by U.S.-Listed Stocks*, CBS.MARKETWATCH.COM, June 30, 2003 (reporting 10% drop in SuperValu share price on news that, as a result of Fleming acquisition, "stronger rival" C&S would have "an immediate stronghold in certain Midwest states, key areas for Supervalu") (attached as Ex. D); *Fleming Auction Moves Forward*, LA CROSSE TRIBUNE, July 19, 2003 ("Last week, C&S Executive Vice President Mark Gross told the Tribune his company expects to operate Fleming distribution facilities in La Crosse and Waukesha if its bid for Fleming's wholesale grocery business succeeds.") (attached as Ex. E).)

3.      Pursuant to the AEA, SuperValu exchanged with C&S all of SuperValu's operating distribution facilities and customer contracts in New England for all of C&S'

operating distribution facilities and customer contracts in the Midwest that C&S had acquired from Fleming.  (Ex. B at §§ 1.1, 1.3, SV00000010-SV00000015.)

4.     Defendants agreed not to supply the customers in the Midwest and New England that they exchanged with each other for a period of two years following the closing date of the AEA (from September 6, 2003 through September 13, 2005); and (2) Defendants agreed not to solicit these customers for a period of five years following the closing date of the AEA (from September 6, 2003 through September 13, 2008).  (Ex. B at §§ 3.11, 4.9, 5.8, 6.2, SV00000039, SV00000041, SV00000053-54, SV00000056-57; Ex. B-2; Ex. B-4.)

5.     Before the AEA even closed, SuperValu planned to shut down the distribution facilities in the Midwest that it acquired from C&S.  (SuperValu and C&S Press Release, *Supervalu and C&S Wholesale Grocers Announce Asset Exchange Agreement*, Sept. 8, 2003, attached to July 27, 2009 Beckett Aff. at Ex. E, Dkt. #109-5 (09-CV-00983); February 2, 2009 Declaration of Bruce Bostwick in Support of Defendants' Joint Motion to Transfer Venue, at ¶ 13, No. 08-C-761 (W.D. Wis.) (attached as Ex. F) ("The decision to close the distribution facilities located at Waukesha and La Crosse was made at SuperValu's Eden Prairie, Minnesota headquarters by SuperValu personnel located in Minnesota".)  SuperValu shut these distribution facilities down on or about September 13, 2003.  (Steve Cahalan, *SuperValu, C&S Confirm Shutdown*, LACROSSE TRIBUNE, Sept. 9, 2003, at A-1, attached to July 27, 2009 Beckett Aff. at Ex. I, Dkt. #109-9 (09-CV-00983).)

6.     In or about April and May 2004, C&S shut down the facilities in New

England that it acquired from SuperValu. (Matt Wickenheiser, *C&S Wholesale Grocers to Close Portland, Maine Warehouse*, KNIGHT RIDDER/TRIBUNE BUSINESS NEWS, March 5, 2004 (attached as Ex. G).)

## SUMMARY JUDGMENT STANDARD

"There is no different or heightened standard for summary judgment in a complex antitrust case." *Minn. Ass'n Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 701 (D. Minn. 1998) (Montgomery, J.)**.** Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party "must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The non-moving party may not "rest on mere allegations or denials." *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.").

Here, the existence and terms of Defendants' agreement not to compete are not in dispute. *See* Ex. B at §§ 5.8(a), 6.2(a), SV00000053-54, SV00000056-57. Determining whether the agreement is *per se* illegal raises only questions of law applied to undisputed material facts and is properly decided on partial summary judgment. *See, e.g., Cardizem*, 105 F. Supp. 2d at 694-95 (granting partial summary judgment of *per se* illegality where existence of agreement was not in dispute and its terms were "unambiguous"); *Terazosin*,

352 F. Supp. 2d at 1294, 1319 (granting partial summary judgment of *per se* illegality based on written agreement).

**ARGUMENT**

**I.     Defendants' Agreement Not to Compete Is *Per Se* Illegal Under Section 1 of the Sherman Act.**

Defendants agreed not to compete for more than 1,000 retailers located in the Midwest and New England, thereby allocating these customers and territories between themselves.  Defendants' agreement is a straightforward customer and territorial allocation agreement that has long been held illegal *per se* under Section 1 of the Sherman Act.  *See Palmer,* 498 U.S. at 49-50 (agreements between actual or potential competitors to allocate territories "are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other"); *Topco,* 405 U.S. at 608, 612 ("[H]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.") (internal quotation omitted) (omission in original); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708 (1962) ("an allocation of customers [is a] per se violation[] under § 1 of the Sherman Act"); DOJ/FTC Guidelines at 3 ("Types of agreements that have been held per se illegal include agreements among competitors to  . . . share or divide markets by allocating customers, suppliers, territories or lines of commerce.") (Ex. A).

A.      **Certain Categories of Agreements are *Per Se* Unlawful.**

Section 1 of the Sherman Act provides that "every contract, combination . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has limited the prohibition created by Section 1 to unreasonable restraints of trade. *Topco*, 405 U.S. at 606-07.

Two types of antitrust analysis are used by the Supreme Court to determine the lawfulness of an agreement among actual or potential competitors under Section 1 of the Sherman Act: *per se* and "rule of reason." DOJ/FTC Guidelines at 3 (Ex. A); *Nat'l Soc'y of Prof'l. Eng'rs v. United States*, 435 U.S. 679, 692 (1978). Certain types of restraints are so likely to harm competition and to have no significant pro-competitive benefit that they do not warrant the time and expense required for particularized inquiry into their effects. *See* DOJ/FTC Guidelines at 3 (Ex. A); *Topco*, 405 U.S. at 607. Once identified, such restraints are categorized as *per se* unlawful. 405 U.S. at 607-08. The courts "conclusively presume such agreements, once identified, to be illegal, without inquiring into their claimed business purposes, anticompetitive harms, procompetitive benefits, or overall competitive effects." DOJ/FTC Guidelines at 3 (Ex. A).[4] Indeed, as

---

[4] *See, e.g., Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 351 (1982) (rejecting alleged pro-competitive justifications); *Topco,* 405 U.S. at 610-11 (rejecting argument that territorial restrictions promoted competition with non-members); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) (stating that "no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense"); *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1235 & n.4 (8th Cir. 1992) (sustaining jury instructions describing *per se* agreements as being "conclusively presumed to be unreasonable restraints of trade without inquiry about the precise harm they have caused or the business excuse for their use").

the Supreme Court held in *Topco*, it is reversible error for a court to do so.  405 U.S. at

608.

> **B.      Horizontal, Naked Customer and Territorial Allocation Agreements
> Are *Per Se* Unlawful.**

Naked agreements between actual or potential competitors to allocate territories or

customers have long been held to be *per se* illegal.  *See, e.g.*, *Palmer,* 498 U.S. at 49-50

("The defendants in *Topco* had never competed in the same market, but had simply

agreed to allocate markets . . . .  such agreements are anticompetitive regardless of

whether the parties split a market within which both do business or whether they merely

reserve one market for one and another for the other."); *Topco*, 405 U.S. at 608

("[H]orizontal territorial limitations . . . are naked restraints of trade with no purpose

except stifling of competition.") (internal quotation omitted) (omission in original)

(collecting cases); *Misle*, 967 F.2d at 1235 & n.4 ("We hold that the jury instructions

[including instruction regarding the *per se* illegality of customer allocations] . . . fairly

and accurately stated the government's burden of proof"); *see also SuperValu Inc. v.

Associated Grocers, Inc.*, 428 F. Supp. 2d 985, 992 (D. Minn. 2006) (Davis, J.) ("An

agreement to notify one another of any intent to compete for each other's customers or to

refrain from such competition altogether would have been a *per se* violation of the

Sherman Act.").

"Horizontal" restraints are those "between competitors at the same level of the

market structure . . . in contradistinction to combinations of persons at different levels of

the market structure, e.g., manufacturers and distributors, which are termed 'vertical'

restraints." *Topco*, 405 U.S. at 608.  "Naked" restraints are typically those that are "unaccompanied by new production or products," and are otherwise not ancillary to some type of efficiency-enhancing economic integration, such as a joint venture or partnership. *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) (Easterbrook, J.); DOJ/FTC Guidelines at 4 (Ex. A) ("naked" agreements are those which are not "reasonably related to, and reasonably necessary to achieve procompetitive benefits from, any efficiency-enhancing integration of economic activity.").

In *Palmer v. BRG of Georgia, Inc.*, the Supreme Court held that a horizontal agreement between two providers of bar review courses to allocate territories was *per se* illegal.  498 U.S. at 49-50.  BRG offered bar review courses in Georgia and had never competed outside of Georgia.  *Palmer v. BRG of Georgia, Inc.,* 874 F.2d 1417, 1424 (11th Cir. 1989), *rev'd and remanded by* 498 U.S. 46 (1990).  Harcourt Brace Jovanovich ("HBJ"), offered bar review courses throughout the United States, including Georgia. 498 U.S. at 47.  BRG and HBJ competed in Georgia until, in early 1980, they entered into an agreement that gave BRG an exclusive license in Georgia to use HBJ's course preparation material and trade name.  *Id.*  The parties further agreed that HBJ would not compete with BRG in Georgia, and that BRG would not compete with HBJ in any other state.  *Id.*  The Supreme Court held that the agreement was *per se* illegal on its face, relying on the Supreme Court's prior decision in *Topco* striking down customer and territorial allocation agreements as *per se* violations of the Sherman Act.  *Id.* at 49-50.

In *Topco*, the Supreme Court held that a horizontal territorial division among 25 small and medium-size grocery chains was *per se* unlawful.  Topco was a cooperative

association of independent regional grocery chains that was formed to act as a purchasing

agent and to develop private label merchandise in order to allow its members to better

compete against larger grocery retail chains. Each Topco member was granted a license

to sell Topco brand products only in an exclusive territory, and was generally prohibited

from selling such products to other retailers. The district court applied a "rule of reason"

analysis, finding no antitrust violation in that the pro-competitive benefits of defendants'

agreement outweighed any anticompetitive effects. *United States v. Topco Assocs., Inc.*,

319 F. Supp. 1031, 1043 (N.D. Ill. 1970), *rev'd and remanded by* 405 U.S. 596 (1972).

The Supreme Court reversed, finding that the territorial restraint was "clear[ly] . . . a

horizontal one, and, therefore, a per se violation of § 1." 405 U.S. at 608 ("This Court

has reiterated time and time again that '(h)orizontal territorial limitations . . . are naked

restraints of trade with no purpose except stifling of competition' . . . . Such limitations

are per se violations of the Sherman Act.") (citations omitted) (omission in original). By

failing to apply the *per se* rule, the district court used "an improper analysis". *Id.* at 606.

The Supreme Court also struck down Topco's restrictions preventing members

from selling Topco's private label goods to wholesalers, *Topco*, 405 U.S. at 612 ("We

also strike down Topco's other restrictions on the right of its members to wholesale

goods[, which] amount to regulation of the customers to whom members of Topco may

sell"), thereby treating customer allocation among potential competitors as a *per se*

violation of Section 1. *Accord Misle,* 967 F.2d at 1235 & n.4 (sustaining jury instructions

that included customer allocation among *per se* agreements); *Hammes v. AAMCO*

*Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994) (if proven, customer allocation

13

scheme would be *per se* violation); *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990) (*per se* rule rather than rule of reason applied to horizontal customer allocation and collecting cases); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574 (2d Cir. 1961) (holding that *per se* rule applies to customer allocations and therefore "no more need be proved"); *United States v. Village Voice Media, LLC*, No. 1:03 CV 0164, 2003 WL 21659092, at *17-19 (N.D. Ohio Feb. 12, 2003) (final consent judgment and competitive impact statement in which the DOJ condemned as *per se* unlawful a customer allocation agreement included in an asset exchange in which the businesses exchanged were closed).[5]

Per se unlawful agreements to allocate customers include an agreement by competitors not to service or solicit each other's customers:

> A conspiracy to allocate customers is an agreement between two or more competitors not to compete with each other for the business of particular customers. Customer allocation exists, for example, where two or more competitors agree that they will not sell or try to sell to each other's existing customers.

ABA, Model Jury Instructions in Civil Antitrust Cases B-39 (2005) (attached as Ex. H); *United States v. Coop. Theaters of Ohio, Inc.,* 845 F.2d 1367, 1368, 1373 (6th Cir. 1988) (*per se* rule applied to an agreement providing that "Co-Op would not attempt to become

---

[5] *See also Continental Ore*, 370 U.S. at 708 ("[A]n allocation of customers [is a] per se violation[] under § 1 of the Sherman Act"); *United States v. Koppers* Co., 652 F.2d 290, 293-94 (2d Cir. 1981) (affirming jury instruction that "[a]greements among competitors to . . . allocate customers are . . . per se unreasonable restraints of trade and illegal"); *SuperValu Inc.*, 428 F. Supp. 2d at 992 ("An agreement [between SuperValu and another grocery wholesaler] to notify one another of any intent to compete for each other's customers or to refrain from such competition altogether would have been a *per se* violation of the Sherman Act.").

the booking agent for any theater that was already serviced by Tri-State in Ohio and West

Virginia" and vice versa, even though they could compete for new customers); *United*

*States v. Cadillac Overall Supply Co*., 568 F.2d 1078, 1081, 1090 (5th Cir. 1978) (*per se*

rule applied to "an agreement whereby each [defendant] would refrain from encouraging

the other's customers from changing over to it . . . . [and] active[ly] discourage[] the

customer from changing suppliers"); *Village Voice*, 2003 WL 21659092, at *17-19 (DOJ

competitive impact statement condemning as *per se* unlawful an asset exchange

agreement in which the businesses exchanged were promptly closed and the parties

agreed not to solicit each other's advertising customers).

> **C.      Application of the *Per Se* Rule to Defendants' Agreement Not to
> Compete.**

> **1.      Defendants' Agreement Not to Compete is Horizontal.**

It is undisputed that Defendants compete at the same level of the market.  At the

time of the AEA, SuperValu and C&S were competing in New England to provide full-

line grocery wholesale products and services to customers.  *See, e.g.,* Ex. C; July 27,

2009 Beckett Aff. at Ex. P, Dkt. #109-16 (09-CV-00983).  In the Midwest, C&S had

purchased Fleming's Midwest grocery wholesale business and was preparing to compete

in the Midwest.  *See, e.g.,* Ex. D; Ex. E.  Because Defendants' agreement not to compete

is between actual or potential competitors at the same level of the market, the agreement

is "horizontal".  *See Topco*, 405 U.S. at 608 (territorial restraints were "horizontal"

because the grocery chains who agreed to restraints were at the same level of the

market);[6] *Palmer*, 498 U.S. at 49-50 (agreement entered by defendants at same level of

market was horizontal even though one of the defendants had never competed outside of

its home state); DOJ/FTC Guidelines at 2 n.6 ("A firm is treated as a potential competitor

if there is evidence that entry by that firm is reasonably probable in the absence of the

relevant agreement") (Ex. A).

> **2.    Defendants' Agreement Not to Compete is an Agreement to
> Allocate Customers and Territories.**

Defendants entered into a horizontal agreement not to compete with respect to

approximately 1,120 Midwest and New England customers they exchanged, thereby

eliminating competition between themselves in the Midwest and New England for those

customers.  *See* Ex. B at §§ 5.8(a) and 6.2(a), SV00000053-54, SV00000056-57; Ex. B-2;

Ex. B-4.  Defendants' agreement not to compete extended for five years.  *Id.*

Accordingly, Defendants' agreement falls squarely within the definition of a customer

allocation agreement, *i.e.*:  "an agreement between two or more competitors not to

compete with each other for the business of particular customers."  ABA, Model Jury

Instructions in Civil Antitrust Cases B-39 (Ex. H); *accord Coop. Theaters*, 845 F.2d at

1368, 1373; *Cadillac Overall Supply Co.*, 568 F.2d at 1088.  Such horizontal customer

allocation agreements are *per se* illegal.  *Topco*, 405 U.S. at 612; *Suntar Roofing*, 897

F.2d at 473; pp.13 ff, *supra*.

Furthermore, because the customers as to which Defendants agreed not to compete

were located exclusively in the Midwest and New England, respectively, Defendants'

---

[6] The Supreme Court in *Palmer* also noted that the defendants in *Topco* had never
competed in the same market.  498 U.S. at 49.

agreement also constitutes a territorial allocation:  Defendants allocated New England to

C&S and the Midwest to SuperValu.  *See Village Voice*, 2003 WL 21659092, at *17-18

(customer non-solicitation agreement found to be part of illegal territorial allocation).

Allocations of territories, like customer allocations, are *per se* unlawful.  *Palmer*, 498

U.S. at 49-50 ("Here, HBJ and BRG had previously competed in the Georgia market;

under their allocation agreement, BRG received that market, while HBJ received the

remainder of the United States.").

### 3.    Defendants' Agreement Not to Compete Is a Naked Restraint of Trade.

An agreement that would otherwise be a *per se* violation may avoid *per se*

treatment only if it is "ancillary" to some type of efficiency-enhancing integration of

economic activity, *i.e.*, if it "contribute[s] to the success of a cooperative venture that

promises greater productivity and output."  *Polk Bros.*, 776 F.2d at 189.  Such

"cooperative ventures" include joint ventures, partnerships, and distribution systems.

*Polk Bros.*, 776 F.2d at 188.  As Judge Easterbrook explained in *Polk Bros.*:

> If two people meet one day and decide not to compete, the restraint
> is "naked"; it does nothing but suppress competition. If A hires B as
> a salesman and passes customer lists to B, then B's reciprocal
> covenant not to compete with A is "ancillary."  At the time A and B
> strike their bargain, the enterprise (viewed as a whole) expands
> output and competition by putting B to work.  The covenant not to
> compete means that A may trust B with broader responsibilities, the
> better to compete against third parties.

*Id*. at 189.  While "naked" restraints are evaluated under the *per se* rule, "ancillary"

restraints that facilitate cooperative ventures are assessed under the "rule of reason".  *Id*.

The Department of Justice and Federal Trade Commission take the same approach with respect to application of the *per se* rule or the "rule of reason", stating that the agreements that would otherwise fall under the *per se* rule will be analyzed under the "rule of reason" only if "they are reasonably related to, and reasonably necessary to achieve procompetitive benefits from, an efficiency-enhancing integration of economic activity".  DOJ/FTC Guidelines at 4, 8 (Ex. A).  The Guidelines describe such "efficiency-enhancing integration of economic activity" as follows:

> In an efficiency-enhancing integration, participants collaborate to perform or cause to be performed (by a joint venture entity created by the collaboration or by one or more participants or by a third party acting on behalf of other participants) one or more business functions, such as production, distribution, marketing, purchasing or R&D, and thereby benefit, or potentially benefit, consumers by expanding output, reducing price, or enhancing quality, service, or innovation . . . . The mere coordination of decisions on price, output, customers, territories, and the like is not integration, and cost savings without integration are not a basis for avoiding *per se* condemnation.

*Id.* at 8 (emphasis added).  In the case at bar, there was no "integration of economic activity" or the creation of a cooperative venture between Defendants at all.  Defendants' agreement is therefore fully subject to the *per se* rule.

Defendants have previously sought to characterize their agreement as a garden-variety non-compete that is common in business acquisitions in order to preserve the value of the assets being acquired, *i.e.*, "goodwill".[7]  This is incorrect for several reasons.

---

[7] "Goodwill" has been defined primarily as customer loyalty related to a business's name and reputation.  *See Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1122 (8th Cir. 1999) (affirming district court's definition of goodwill: "The goodwill attached to a particular product or business may be symbolized in whole or in part by the consuming public's acceptance and recognition of the business."); *Marathon Petroleum Co. v.*

First, the AEA did not constitute the sale of a product or business.  Neither SuperValu nor C&S acquired the other's name or reputation so any purported preservation of "goodwill" does not apply.  *See* n.7, *supra*.  The AEA also did not create any efficiency-enhancing integration of economic activity by Defendants and so the *per se* rule remains fully applicable.  *See* DOJ/FTC Guidelines at 4, 8; pp. 17-18, *supra*.

Second, Defendants' agreement not to compete cannot be justified as "ancillary" in order to preserve the value of the assets Defendants acquired from each other.  Under the AEA, Defendants exchanged the following assets:  (1) distribution facilities in the Midwest and New England; (2) certain trade names for four retail grocery stores; and (3) customer contracts in the Midwest and New England.[8]  With respect to the distribution facilities, there was no goodwill to preserve since Defendants closed all of these facilities at or shortly after the AEA was executed.  In fact, SuperValu had already made the decision to shut down the Midwest distribution facilities it was acquiring before the AEA even closed.  (Undisputed Material Fact No. 5, *supra*.)  Defendants' agreement not to compete for wholesale customers also cannot be justified as necessary in order to preserve the value of the four retail grocery trade names swapped by Defendants, even assuming these trade names had any meaningful economic value.  There is simply no

---

*Chronister Oil Co.*, 687 F. Supp. 437, 440 (C.D. Ill. 1988) ("good will in the legal sense has come to mean the advantages a business has over competitors as a result of its name, location, and owner's reputation").

[8] The AEA also included the exchange of a few retail centers/retail stores and some miscellaneous equipment (*e.g.*, forklifts).  Defendants' agreement not to compete with respect to grocery wholesale customers has nothing to do with these assets and cannot be justified as ancillary in order to preserve the value of these assets.

connection between the two.  Agreeing not to compete for grocery wholesale customers does not serve to preserve whatever value these retail trade names had.

The only other material assets exchanged by Defendants were each other's Midwest and New England customers, which cannot bootstrap a non-compete agreement with respect to those customers into an "ancillary" agreement.  Defendants' agreement not to compete was not "reasonably related to, and reasonably necessary to achieve procompetitive benefits from, an efficiency-enhancing integration of economic activity." *See* DOJ/FTC Guidelines at 4 (Ex. A).  Defendants' position appears to be that competitors may agree not to compete for each other's customers so long as they exchange them first.  Of course, no such exception exists in the well-settled law condemning customer allocation agreements among actual or potential competitors as *per se* illegal.  *See* pp. 13-15, *supra*.

When goodwill is not part of a sale, non-compete agreements are not necessary to protect the buyer's legitimate interests and such agreements are treated as naked rather than ancillary restraints.  *See, e.g., Village Voice*, 2003 WL 21659092, at *19; *Marathon Petroleum Co.*, 687 F. Supp. at 442 (rejecting ancillarity argument where party "made no showing that the noncompetition agreement is reasonably related to the protection of . . . the good will in the property transferred").  The DOJ's *Village Voice* enforcement action is illustrative.  Just as in the case at bar, *Village Voice* involved an "exchange of assets" between two competing newspaper companies.  *See Village Voice*, 2003 WL 21659092, at *17-18 (final consent judgment and competitive impact statement).  The primary assets of the two competing newspapers – the actual newspaper operations in two markets

affected by the asset swap – were shut down shortly after the swap took place.  *Id.* at *18.

Both parties also agreed to non-competition and non-solicitation provisions.  *Id.*  The

DOJ condemned the transaction as a *per se* unlawful market allocation, reasoning that the

non-compete and non-solicitation provisions were not ancillary to the sale of assets at

issue, especially where none of the assets associated with the operations or goodwill of

the defendants' businesses were sold or integrated into the other defendant's business:

> The anticompetitive restraints at issue cannot be said to be
> ancillary to the sale of assets, given that so few assets were
> actually transferred.  None of the assets associated with the
> actual operations and goodwill of the defendants' two
> shuttered newsweeklies were sold or integrated into the other
> defendant's newsweekly.

*Id.* at *20.[9]

Here, as in *Village Voice*, Defendants' non-compete agreement was not necessary

to protect goodwill in the exchanged distribution facilities or retail trade names.  The only

other material assets "exchanged" were Defendants' customers.  Defendants simply

exchanged customers in the Midwest and New England and agreed not to compete for

---

[9] Utah's *Stericycle* case is also instructive.  *See Utah v. Stericycle, Inc.*, No. 2:03 CV
0049, 2003 WL 24137036 (D. Utah Jan. 13, 2003).  In *Stericycle*, two competing medical
waste collection and disposal companies entered into an agreement to swap customers,
vehicles, equipment, and employees, and entered into a five-year covenant not to
compete for customers in the swapped territories.  *Id.* at ¶¶ 6-11.  One defendant received
customers and assets in Arizona, while the other received customers and assets in Utah
and Colorado.  *Id.*  The Utah Attorney General filed suit, asserting that the agreement
constituted a *per se* unlawful customer and territorial allocation.  *Id.* at ¶¶ 35-45.
Defendants entered into a consent decree for injunctive relief and a $580,000 civil
penalty.  Final Judgment by Consent, *Stericycle*, No. 2:03 CV 0049, 2003 WL 21748940
(D. Utah Jan. 21, 2003) (approving consent decree as "in the public interest").

them.  Defendants' agreement is not ancillary to the protection of any goodwill but simply an allocation of customers and territories.

## II. Summary Judgment on the Issue of *Per Se* Illegality Will Promote Judicial Economy.

A finding now that the Defendants' agreement not to compete is *per se* illegal will streamline this case and narrow the issues to be litigated going forward.  Courts have long recognized that the application of the *per se* rule promotes judicial efficiency and – by avoiding the "rule of reason" analysis – can save years of court time and discovery:

> Application of the *per se* rule results in judicial efficiency by formalizing the legal conclusion that certain business practices are by their very nature anticompetitive, pernicious and without redeeming value.  *Northern Pacific Railway v. U.S.*, 356 U.S. 1, 5 (1958).  The *per se* rule avoids the situation found in many rule of reason cases characterized by documents running into the millions of pages and litigation occupying years of court time.  *Broadcast Music, Inc.*, 441 U.S. at 8, n. 11 (the *per se* rule serves to benefit all concerned by avoiding "the necessity for an incredibly complicated and prolonged economic investigation . . . – an inquiry so often wholly fruitless when undertaken").

*Compact v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 594 F. Supp. 1567, 1580 (M.D. Tenn. 1984).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Partial Summary Judgment should be granted.

Dated this 3rd day of February, 2010.    Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN PLLP


/s/ W. Joseph Bruckner
    W. Joseph Bruckner (#147758)
    Elizabeth R. Odette (#0340698)
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
Tel: (612) 339-6900
Fax: (612) 339-0981
E-mail: wjbruckner@locklaw.com
    erodette@locklaw.com


Richard B. Drubel
Kimberly H. Schultz
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH  03755
Tel: (603) 643-9090
Fax:(603) 643-9010
E-mail: rdrubel@bsfllp.com
    kschultz@bsfllp.com

Anne M. Nardacci
BOIES, SCHILLER & FLEXNER LLP
10 North Pearl Street, 4th Floor
Albany, NY  12207
Tel: (518) 434-0600
Fax:(518) 434-0665
E-mail: anardacci@bsfllp.com

Daniel A. Kotchen
Daniel L. Low
KOTCHEN & LOW LLP
2300 M Street, NW
Suite 800
Washington, D.C.  20037
Tel: (202) 416-1848
Fax: (202) 280-1128
E-mail: dkotchen@kotchen.com
   dlow@kotchen.com

Joel C. Meredith
Steven J. Greenfogel
Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL
 & SKIRNICK PC
1521 Locust Street
8th Floor
Philadelphia, PA  19102
Tel: (215) 564-5182
Fax: (215) 569-0958
E-mail: jmeredith@mcgslaw.com
   sgreenfogel@mcgslaw.com
   dallanoff@mcgslaw.com

***Plaintiffs' Co-Lead Counsel***