IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Wholesale Grocery Products Antitrust Litigation<br><br>This Document Relates to:<br>*All Actions* | Civil No. 09–CV-00983 (ADM/AJB)<br>Civil No. 09–CV-2940 (ADM/AJB)<br>Civil No. 09–CV-2932 (ADM/AJB)<br>Civil No. 09–CV-3191 (ADM/AJB)<br><br>MDL Docket No. 2090 |

**Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel**

FREDRIKSON & BYRON, P.A.
Todd A. Wind (#196514)
Nicole M. Moen (#329435)

200 South Sixth Street – Suite 4000
Minneapolis, Minnesota 55402-1425
Tel.: 612-492-7000
Fax: 612-492-7077

*Attorneys for Defendant
C&S Wholesale Grocers, Inc.*

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Martin R. Lueck (#115548)
K. Craig Wildfang (#117043)
Stephen P. Safranski (#331326)
Damien A. Riehl (#322428)
Heather McElroy (#34168)
E. Casey Beckett (#388214)

800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402-2015
Tel: 612-349-8500
Fax: 612-339-4181

*Attorneys for Defendant SuperValu Inc.*

This case concerns two expired noncompete and nonsolicitation provisions of a 2003 Asset Exchange Agreement between SuperValu and C&S. The noncompete and nonsolicitation provisions apply to specific customers named in the Agreement, and their terms are undisputed.

Defendants produced the 2003 Asset Exchange Agreement to Plaintiffs in 2009. Since that time, Defendants have produced virtually all their documents related to the Agreement and its alleged effects on customers in the Midwest and New England. Thus, Defendants have produced voluminous correspondence between SuperValu and C&S related to their due diligence and negotiations of the asset exchange, their internal due diligence and implementation of the asset exchange, each party's business strategy in entering the asset exchange, and the integration of assets involved in the asset exchange. Defendants have produced documents regarding the proposed transactions that led up to the asset exchange, including the Defendants' prior discussions and their discussions with Fleming. C&S has also produced voluminous documents related to its Fleming acquisition and its dealings with other wholesalers who negotiated to buy parts of the bankrupt Fleming business. Defendants have also produced thousands of contracts and other documents related to their dealings with retail customers, and are in the process of producing massive amounts of internal financial and transactional data detailing Defendants' sales to retail customers going back years. All told, Defendants have produced over 197,000 documents (comprising at least 678,000 pages[1]) and expect to produce several terabytes[2] of transactional data.

---

[1] Given that an electronic spreadsheet of any size counts as only one "page," the number of pages significantly understates the volume of Defendants' production.

[2] A terabyte of data is roughly equivalent to 55 million pages of standard text.

Despite having virtually all documents related to the Asset Exchange Agreement, as well as all documents related to any effects of that Asset Exchange Agreement in the Midwest and New England, Plaintiffs also demand that Defendants search for and produce *unrelated* agreements with other grocery wholesalers, and to conduct an unguided search for communications over a seven-year period that, by Plaintiffs' own admission, are unrelated to the transaction or the noncompete provisions at issue.

This case concerns the reasonableness of two very specific provisions of the Defendants' Asset Exchange Agreement. Plaintiffs should not be allowed to turn the discovery process into a roving inquisition on Defendants' business practices and agreements that have no connection to this case. Defendants' discovery in this case has already been extensive and very burdensome. Plaintiffs cite no authority that supports their off-target requests, and their position is inconsistent with the limitations of discovery set forth in the Federal Rules of Civil Procedure.

## BACKGROUND

As stated above, this case involves certain retail grocers' suits against Defendants SuperValu Inc. and C&S Wholesale Grocers, Inc. Those lawsuits challenge two specific noncompete and nonsolicitation provisions of Defendants' 2003 Asset Exchange Agreement. As explained in greater detail in papers previously filed with the Court, the asset exchange arose from SuperValu's earlier negotiations to sell its New England wholesale business to C&S and SuperValu's effort to buy parts of Fleming Companies' wholesale grocery business, which C&S ultimately acquired in bankruptcy. Under the Asset Exchange Agreement, C&S sold SuperValu its rights to acquire parts of Fleming's wholesale distribution business out of bankruptcy in exchange for SuperValu's wholesale grocery business and

certain retail operations in New England. The noncompete and nonsolicitation provisions at issue in this case were limited to the specific customers of the wholesale grocery businesses that were exchanged in the transaction. And they are both expired. The noncompete provisions expired more than five years ago, and the nonsolicitation provisions expired over two years ago.

Plaintiffs have challenged these noncompete and nonsolicitation provisions under Section 1 of the Sherman Act, claiming that they were an "illegal customer and territorial allocation."[3] Discovery commenced on September 16, 2010. Plaintiffs served their Second Set of Interrogatories on October 8, 2010, and their Second Set of Requests for Production on November 12, 2010.

### A. Demand for Defendants' Agreement with Other Grocery Wholesalers (Interrogatory No. 2 and Document Request No. 2)

While not mentioned in Plaintiffs' brief, Defendants have already provided fulsome discovery regarding the transactions at issue in this case. In response to Interrogatory No. 1 and Request No. 1, for example, Defendants identified and produced all agreements or proposed agreements between C&S, SuperValu, and/or Fleming related to C&S's proposed purchase of SuperValu's New England wholesale business, C&S's purchase of Fleming out of bankruptcy, SuperValu's proposed purchase of Fleming assets out of bankruptcy, and the Asset Exchange Agreement, identified the persons involved in those agreements, and produced all of the drafts, communications, due diligence analyses, and other documents related to those agreements. (Ex. 1[4] at 7-10, Ex. 2 at 8-9, Ex. 3 at 3-7, Ex. 4 at 5-6.) Indeed,

---

[3] Second Amended Consolidated Class Action Complaint ("Second Am. Compl.") ¶¶ 2-3.

[4] Throughout this memorandum, citations to Ex. _ refer to the exhibits

3

Defendants' responses to the Second Set of Interrogatories at issue exceed 170 pages. In total, Defendants have produced nearly 200,000 documents in discovery in this case, including tens of thousands of documents related to the asset exchange transaction and the proposed transactions that led up to it.

In Interrogatory No. 2 and Request No. 2, Plaintiffs demanded the same level of discovery regarding every other agreement that Defendants entered with every other wholesaler in the United States during the better part of the last decade, without any limitation as to subject matter or geography. Plaintiffs demanded that Defendants identify "all agreements or proposed agreements between you and any other grocery wholesaler or grocery supplier" and every person involved in those agreements, and then produce not only the agreements with other wholesalers but all drafts, communications, and every other document related to those other agreements. (Ex. 1 at 10; Ex. 2 at 9-10, Ex. 3 at 7, Ex. 4 at 6.)

Plaintiffs contend that "Defendants have so far refused to provide any information or documents in response to Plaintiffs' requests to identify and produce agreements with other wholesalers or suppliers." (Pls. Mem. at 3.) That is incorrect. Beyond the agreements between SuperValu, C&S, and Fleming discussed above (which are also responsive to these requests), C&S identified and produced numerous agreements with other wholesalers that, while not related to the asset exchange with SuperValu, were related to other parts of the wholesale grocery business that C&S purchased from Fleming. (Exs. 3-4.) Despite the terms of Local Rule 37.2, Plaintiffs exclude that information from their motion, and then redacted

---

attached to the Declaration of E. Casey Beckett filed in opposition to the motion to compel.

that responsive information from Defendants' interrogatory answers filed with their motion.[5]

Defendants do, however, object to Interrogatory No. 2 and Request No. 2 on relevance, overbreadth, and burdensomeness grounds. On their face, those discovery requests would require Defendants to identify and produce not only asset transactions, but voluminous quantities of transactions in the ordinary course of business, including equipment sales, every upstream purchase from other wholesalers, and routine transactions between SuperValu's retail grocery businesses and other wholesalers.[6]

Belatedly recognizing at least some of the facial problems with their requests, Plaintiffs have, in turn, narrowed their demand to (a) all asset swap agreements with other wholesalers, and (b) all agreements with other wholesalers containing

---

[5] Local Rule 37.2 requires the moving party to include a "*verbatim* recitation of each interrogatory, request, *answer, response*, and objection" or at least "a copy of the actual discovery document which is the subject of the motion." D. Minn. L.R. 37.2 (emphasis added). Although Plaintiffs argue that Defendants designated their interrogatory responses "highly confidential," Plaintiffs did not ask Defendants if the responses Plaintiffs wished to excerpt were confidential, nor did they attempt to file the document under seal.

[6] Given that they were producing every agreement even remotely related to the transaction at issue in this case, Defendants objected to the relevance of Plaintiffs' unlimited demand for discovery regarding every agreement with every other wholesaler. Defendants also explained the inordinate burden of searching for all of these agreements, given that SuperValu operates a large retail business that routinely purchases groceries from other wholesalers, and that both Defendants commonly enter into upstream and downstream supply and equipment sale transactions with other wholesalers. (*See* 1/19/11 Letter from Safranski to Henken, Ex. 5; 2/7/11 Letter from Shotlander to Henken, Pls.' Ex. B; 2/10/11 Letter from Shotlander to Henken, Pls. Ex. F; 2/16/11 Letter from Shotlander to Henken, Pls. Ex. H.)

noncompetition provisions. As discussed below, even these revised requests are not directed at relevant evidence.

### B. Demand for Defendants' Communications with Each Other (Document Request No. 4)

Pursuant to Fed. R. Civ. P. 26(g), a party issuing discovery requests must ensure that those requests are "neither unreasonable nor unduly burdensome or expensive." Despite that obligation, Plaintiffs demand that Defendants search for and produce all "documents concerning any communication or proposed communication between C&S and SuperValu relating to wholesale grocery products and/or services." (Ex. 2 at 4, Ex. 4 at 8.) Here too, Plaintiffs inaccurately assert that "Defendants have again refused to produce *any* documents responsive to this request on the grounds that the documents sought are irrelevant and that producing these documents would be unduly burdensome." (Pls.' Mem. at 6 (emphasis added).) To the contrary, Defendants agreed to produce and have produced thousands of responsive documents related to the asset exchange transaction, the proposed sale of SuperValu's New England business to C&S, and the purchase of Fleming wholesale grocery assets. (Ex. 2 at 10-11; Ex. 4 at 8.) Defendants objected, however, to conducting an unlimited search for every communication between SuperValu and C&S with no subject matter limitation whatsoever other than they relate to the wholesale business—the business that both Defendants are engaged in. For example, Defendants also explained that SuperValu operates a retail grocery business that is directly supplied by C&S, and that supply relationship would generate numerous communications that are irrelevant to this lawsuit. (E.g., 2/16/11 Letter from Shotlander to Henken, Pls.' Ex. H.) Plaintiffs have since agreed to eliminate communications with corporate-owned retailers, but that limitation on

6

the *production* of documents does not necessarily reduce the Defendants' burden of searching for, gathering, and reviewing such documents for possible production. In the meet-and-confer process, Plaintiffs also demanded that Defendants identify and describe all the other irrelevant communications that may have taken place between 2002 and 2008. (Feb. 11, 2011 Letter from Henken to Safranski et al, Pls.' Ex. G.) Defendants explained that doing so would involve the very sort of unguided and burdensome search that they were objecting to in the first place. (Feb. 18, 2011 Letter from Shotlander to Henken, Pls, Ex. H.)

## ARGUMENT

Although the Federal Rules permit "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" Fed. R. Civ. P. 26(b), the scope of discovery is not without bounds. As the Eighth Circuit has observed:

> This often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and produce a variety of information which does not reasonably bear upon the issues in the case.

*Hofer v. Mack Trucks*, 981 F.2d 377, 380 (8th Cir. 1992). Accordingly, this Court has been "reluctant to allow any party to roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Bredemus v. Int'l Paper Co.*, 252 F.R.D. 529, 533-34 (D. Minn. 2009) (where plaintiffs claimed injury from exposure to certain chemicals manufactured by defendants, denying discovery regarding different chemicals involved in separate incident despite plaintiffs' argument that those chemicals might have similar health effects) (quotation omitted).

**I.      Plaintiffs Have Not Shown that Asset Transactions and Restrictive Covenants Involving Other Wholesalers Are Relevant to the Claims or Defenses in this Action.**

Plaintiffs have not made any threshold showing that asset transactions or agreements with restrictive covenants involving *other wholesalers* have any bearing on the issues in this case. Plaintiffs have not cited a single case holding that a relevant inquiry in evaluating the legality of a noncompete provision would involve an examination of the defendant's transactions or noncompetes with third-parties.

Instead, Plaintiffs rely on the general Rule-of-Reason standard, which observes that "the history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." (Pls. Mem. at 8 (quoting *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 343 n.13 (1982)). But Defendants' discovery responses provided complete discovery on all of those issues, including the "history, nature, and effect" of the noncompetition provisions at issue. *See Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 280, 387 (8th Cir. 2007). Defendants are providing complete discovery regarding the history of the Asset Exchange Agreement and its noncompetition covenants, including documents related to the transactions and proposed transactions involving SuperValu, C&S, and Fleming that led to the Asset Exchange, documents relating to the evaluation and negotiation of those agreements and the noncompetition provisions in particular. Likewise, Defendants are providing ample discovery regarding the business reasons for both the Asset Exchange Agreement and the noncompetition covenants, including due diligence, valuations, pro formas, board presentations, and other documents regarding Defendants' decisions to enter the Agreement. Defendants are also providing transactional sales data, retailer contracts, and documents regarding their retailer

8

customers and competition in the grocery business – all of which relate to the supposed "effects" of the noncompete and nonsolicitation provisions.

Plaintiffs appear to argue, however, that "the restraint's history, nature, and effect" to be examined under the Rule of Reason does not pertain to the specific restraint at issue, but to all restraints of a similar type, i.e., any noncompetes, that the defendant had entered in the past (or, for that matter, *after* the agreement in question). That is not the law, and Plaintiffs cite no authority for that proposition. To the contrary, although the parties summary-judgment briefing cited many cases examining noncompetes under the Rule of Reason, Plaintiffs have not pointed to any cases that analyzed the validity of a noncompete under Sherman Act § 1 by reviewing other agreements and their ancillary restraints that a defendant may have entered over the years with third parties. *See, e.g.*, *Eichorn v. AT&T Corp.*, 248 F.3d 131, 144-45 (3d Cir. 2001) (upholding noncompete entered in connection with the sale of a business without evaluating whether AT&T entered similar restraints in other transactions); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265-70 (7th Cir. 1981) (same); *see also Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189-90 (7th Cir. 1985) (evaluating noncompete entered as part of joint venture by examining relationship with the procompetitive features of that transaction, not by surveying other agreements with other businesses). Nor have they pointed to any discovery decisions in the numerous cases involving noncompetes that have adopted Plaintiffs' position and found that in a noncompete case, a defendant's unrelated asset transactions and noncompetes with other parties are relevant and discoverable. In sum, although a noncompete in the sale of a business is considered to be the "classic 'ancillary' restraint," with a 300-year old pedigree,[7] that does not

---

[7] *See Bus. Elecs. Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 729 n.3 (1988)

9

mean that an examination of the "history, nature, and effect" of a particular noncompete under the Rule of Reason involves an analysis of all noncompetes that a defendant has ever entered and the surrounding circumstances of those other agreements.

Nor did Defendants place their agreements with other wholesalers at issue by arguing that restrictive covenants are common in the sale of a business. In arguing that noncompetes in the sale of a business are commonly upheld under the antitrust laws, Defendants were not relying on their own agreements—they were relying on judicial precedent. (*See Defs' Mem. Opp. Partial Summ. J.* at 18-19.) Nor is an examination of such agreements relevant to Plaintiffs' ability to "test" whether the noncompete provisions in this case were reasonably necessary to the full enjoyment of the assets that each party acquired. (Pls.' Mem. at 9); *cf. Bus. Elecs.*, 485 U.S. at 729 n.3 (noncompete ancillary when it "enhances the value of the contract, or permits the 'enjoyment of its fruits'") (citing *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 282 (6th Cir. 1898)). That determination will be made based on the facts relevant to the transaction in question.

Rather than facilitating the efficient exchange of relevant information, Plaintiffs' request to open discovery of other asset transactions and ancillary noncompetes involving other wholesalers threatens to mire this case in satellite litigation into the terms, circumstances, and justifications of Defendants' other transactions with other wholesalers. Indeed, using discovery to launch a "fishing expedition" regarding other transactions that are not at issue in this case does not sit well with the Supreme Court's guidance in *Bell Atlantic Corp. v. Twombly*, 550 U.S.

---

(citing *Mitchel v. Reynolds*, 1 P. Wms. 181, 24 Eng. Rep. 347 (1711)).

544 (2007), which required some threshold showing of plausibility before opening the doors of costly antitrust discovery on a particular transaction.

## II. Plaintiffs' Unlimited Demand for "All Communications" Should Be Denied.

To call Plaintiffs' demand for all communications between Defendants related to their wholesale grocery businesses over an seven-year period a "fishing expedition," would disparage the sport of fishing. Virtually unlimited with respect to time and subject matter, this request more resembles an effort to "drain the pond and collect fish from the bottom." *See Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum*, Cause No. 1:04-cv-477, 2007 U.S. Dist. LEXIS 29159 (N.D. Ind. Apr. 18, 2007) (citation omitted).

The request for "all documents concerning any communication or proposed communication" between Defendants over an seven-year period, without any meaningful subject-matter limitation, is overly broad on its face. *See Pharmerica Long-Term Care, Inc. v. Infinia Healthcare Cos., LLC*, Case No. 2:09cv600, 2010 U.S. Dist. LEXIS 83155, at *10 (D. Utah July 30, 2010) (holding that requests for "all correspondence" between defendants were "overly broad on their face" because "they seek *all correspondence* for a four-year period and do not contain appropriate subject-matter limitations," and limiting the production of responsive correspondence "to the underlying transaction between the above-mentioned parties") (emphasis in original); *Gipson v. Southwestern Bell Tel. Co.*, Civil Action No. 08-2017-EFM-DJW, 2009 U.S. Dist. LEXIS 25457, at *25-26 (D. Kan. Mar. 24, 2009) (request for "all correspondence and communications" between plaintiff and defendants' employees and representatives during a five-year period was "overly broad on [its] face," and the responding party was justified in limiting the

11

production to documents that "concern the issues in this lawsuit"); *Stouder v. M&A Tech. Inc.*, Case No. 09-4113-JAR, 2011 U.S. Dist. LEXIS 16068, at *32 (D. Kan. Feb. 17, 2011) (denying motion to compel "[r]equests for 'all correspondence' [between defendant and a specific competitor] for a period of more than five years" because, *inter alia*, they were not "narrowly tailored" to the issues in the case); *C&R Forestry, Inc. v. Consol. Human Res. AZ, Inc.*, Case No. CV 05-381-N-EJL-MHW, 2008 U.S. Dist LEXIS 3752, at *6 (D. Idaho Jan. 17, 2008) (request for "all correspondence and written communications between" defendants was overly broad where it would "require production of materials unrelated to [plaintiff's] allegations"); *Quality Aero Tech. v. Telemetrie Elektronik*, 212 F.R.D. 313, 317 (E.D.N.C. 2002) (request for "any and all correspondence by and between the parties . . . during the period 1995 – present" denied as overly broad and unduly burdensome). And here, Plaintiffs not only make an unlimited demand for all communications between Defendants, they up the ante by also demanding all documents *concerning* any communications or "proposed communications" – whatever that means – again without any limitation as to subject-matter.

Plaintiffs' reliance on *U.S. v. Rajaratnam*, __ F. Supp. 2d __, 2011 U.S. Dist. LEXIS 14817 (S.D.N.Y. Feb. 15, 2011), and *In re Mushroom Direct Purchaser Antitrust Litigation*, 621 F. Supp. 2d 274 (E.D. Pa. 2009), is misplaced. *Rajaratnam* did not involve civil discovery, it concerned a criminal insider trading case, in which the defendant's communications with others *was* the alleged criminal activity. In that context, the defendant's communications were directly at issue, necessitating such discovery. And the *Mushroom Direct Purchaser* decision does not order any discovery. It is a summary judgment decision that refers in passing to an earlier order allowing discovery of "communications between [defendants] and any

12

members of the EMMC and/or the EMMCGA . . . ." – presumably for the purpose of discerning the existence of a conspiracy among those members. *See Mushroom Direct Purchaser*, 621 F. Supp. 2d at 280-81 (ellipses in original). This, however, is not a case of an alleged hidden agreement in which the plaintiffs' proof of an agreement has to be "constructed out of a tissue of [ambiguous] statements and other circumstantial evidence." *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2004). The Asset Exchange Agreement has been publicly known since 2003, and the terms of the noncompete and nonsolicitation provisions are set forth in black and white in a signed document. Defendants have produced that document, and the ultimate question for this Court is the reasonableness of those provisions, not their existence.

It would also impose an undue burden on Defendants to conduct an unguided search for "all documents concerning any communication or proposed communication" over a seven-year period, without any subject-matter limitations to guide that search. Plaintiffs argue that Defendants cannot show an undue burden because "competitors would not normally have so many communications with each other . . . as to be 'unduly burdensome' to search for and produce." (Pls.' Mem. at 10.) That argument misses the point. Even if there were no or very few responsive communications, an unlimited search for them would impose its own unjustifiable burden. Further, C&S and SuperValu have a supplier-customer relationship. Plaintiffs have excluded supplier-customer communications from *production*, but that does not mean that the search for "all documents concerning any communication" between 2002 and 2008 without subject-matter limitations would be any less burdensome. Without any subject matter limitation, Defendants would still need to search voluminous communications to find responsive documents (if

13

any), and such a search would likely yield many communications related to Defendants' retail-supply relationship. Defendants have already conducted a reasonable and appropriately focused search for communications and other documents related to this litigation. They should not be put to the further burden of conducting an unlimited search for all communications over an seven-year period.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Compel Should be denied.

March 22, 2011                                              Respectfully submitted,

**Fredrikson & Byron, P.A.**                                **Robins, Kaplan, Miller & Ciresi L.L.P.**

By: s/Nicole M. Moen                                        By: s/E. Casey Beckett
    Todd A. Wind (#196514)                                       Martin R. Lueck (#155548)
    Nicole M. Moen (#329435)                                     K. Craig Wildfang (#117043)
                                                                     Stephen P. Safranski (#331326)
        200 South Sixth Street – Suite 4000                          Damien A. Riehl (#322428)
        Minneapolis, MN 55402–1425                                   Heather McElroy (#34168)
                                                                     E. Casey Beckett (#388214)
        T: 612–492–7000
        F: 612–492–7077                                              800 LaSalle Avenue
                                                                 2800 LaSalle Plaza
*Attorneys for Defendant*                                       Minneapolis, MN 55402–2015
*C&S Wholesale Grocers, Inc.*
                                                                 T: 612–349–8500
                                                                 F: 612–339–4181

*Attorneys for Defendant SuperValu Inc.*