# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

In re Wholesale Grocery Products
Antitrust Litigation

**MEMORANDUM OPINION
AND ORDER**
Court File No. 09-MD-2090 ADM/AJB

This Order Relates to All Actions

---

Richard B. Drubel, Esq., Anne M. Nardacci, Esq., and Kimberly H. Schultz, Esq., Boies, Schiller & Flexner LLP, Hanover, NH and Albany, NY; Joel C. Meredith, Esq., Steven J. Greenfogel, Esq., and Daniel B. Allanoff, Esq., Meredith Cohen Greenfogel & Skirnick, PC, Philadelphia, PA; Daniel Kotchen, Esq., and Daniel Low, Esq., Kotchen & Low LLP, Washington, DC; and Elizabeth R. Odette, Esq., and W. Joseph Bruckner, Esq., Lockridge, Grindal, Nauen, PLLP, Minneapolis, MN, on behalf of Plaintiffs.

Stephen P. Safranski, Esq., Heather M. McElroy, Esq., Martin R. Lueck, Esq., K. Craig Wildfang, Esq., Jennifer G. Daugherty, Esq., James S. Harrington, Esq., E. Casey Beckett, Esq., and Damien A. Riehl, Esq., Robins, Kaplan, Miller & Ciresi, LLP, Minneapolis, MN and Boston, MA, and Gordon J. MacDonald, Nixon Peabody LLP, Manchester, NH, on behalf of Defendant SuperValu, Inc.

Charles A. Loughlin, Esq., Christopher J. MacAvoy, Esq., and David S. Shotlander, Baker Botts LLP, Washington, DC; Nicole M. Moen, Esq., and Todd A. Wind, Esq., Fredrikson & Byron, PA, Minneapolis, MN, on behalf of Defendant C&S Wholesale Grocers, Inc.

---

# I.  INTRODUCTION

On June 6, 2011, the undersigned United States District Judge heard oral argument on Defendants C&S Wholesale Grocers, Inc. ("C&S") and SuperValu, Inc.'s ("SuperValu") Partial Motion to Dismiss or Stay [Docket No. 113].  Defendants (collectively C&S and SuperValu are "Defendants") move to dismiss, or in the alternative to stay, under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, the claims asserted by Plaintiffs King Cole Foods, Inc. ("King Cole"), Millennium Operations, Inc. ("Millennium"), JFM Market, Inc., MFJ Market, Inc. (JFM Market, Inc. and MFJ Market, Inc. are collectively "Village Market"), and Blue Goose Super

Market, Inc. ("Blue Goose").  For the reasons set forth below, the motion is granted.

## II.  BACKGROUND

This matter consists of multidistrict litigation of four antitrust lawsuits brought by retail grocers against two of the largest wholesale grocers in the United States.  See 2d Consolidated Am. Class Action Compl. [Docket No. 99] ¶¶ 1-3.  Plaintiffs allege that Defendants conspired to allocate customers and territory through a September 6, 2003 Asset Exchange Agreement (the "AEA") and that Defendants used the allocations to charge retailers in the Midwest and New England supra-competitive prices.  Id. ¶¶ 34-44.

Plaintiffs assert their claims as a class action.  See id. ¶¶ 67-75.  The Class Period for this action is December 31, 2004 through September 13, 2008.  Id. ¶ 10.  Plaintiffs are grouped into the "Midwest Class" and the "New England Class," each comprised of retail grocers in their respective regional markets that purchased wholesale groceries in that regional market.  Id. ¶ 67. Plaintiffs further identify a "Midwest Arbitration Subclass" and a "New England Arbitration Subclass" comprised of class members in the Midwest Class and New England Class, respectively, that have arbitration agreements with one of the Defendants.  Id.

Plaintiffs King Cole,[1] Blue Goose,[2] and Millennium are located in Michigan, Illinois, and

---

[1] In the Complaint, Plaintiffs allege that King Cole "has not entered an arbitration agreement with any Defendant." 2d Consolidated Am. Class Action Compl. ¶ 8.  With respect to this motion, however, Plaintiffs do not dispute that King Cole in fact has an arbitration agreement with SuperValu and is properly a member of the Midwest Arbitration Subclass.

[2] Similarly, Plaintiffs had alleged in the Complaint that Blue Goose "has not entered an arbitration agreement with any Defendant."  2d Consolidated Am. Class Action Compl. ¶ 5. Plaintiffs do not dispute that Blue Goose in fact has an arbitration agreement with SuperValu, and may be in the Midwest Arbitration Subclass.  However, Plaintiffs contend that Blue Goose has waived arbitration, and that contention is addressed below.

Minnesota, respectively.  Id. ¶¶ 5, 8, 9.  Each has an operative arbitration agreement with SuperValu, and therefore are members of the Midwest Subclass asserting claims against C&S only.  See id. Count I.  The arbitration agreement between King Cole and SuperValu is a stand alone agreement entered into on April 18, 2005.  Riehl Decl. [Docket No. 129] Ex. 1.  At oral argument, Defendants' counsel represented that the arbitration agreement was executed contemporaneously with the wholesale groceries supply agreement between those parties, and that assertion is not disputed.  The arbitration agreement between Blue Goose and SuperValu is also a stand alone agreement dated January 24, 2008.  Riehl Decl. Ex. 10.  Again, it is not disputed that the arbitration agreement between Blue Goose and SuperValu was entered into contemporaneously with the wholesale grocery supply agreement between those parties.

Millennium's agreement to arbitrate was originally with Fleming Companies, Inc. ("Fleming"), and was part of those parties' "Facility Standby Agreements" dated June 24, 1999 and May 22, 2000.  Riehl Decl. Exs. 2, 3.  The substantive provisions of the Facility Standby Agreements are not of record in this matter because they have been redacted, but the parties do not dispute that they concern the wholesale supply relationship between the parties.  A central issue in the challenged AEA between SuperValu and C&S is that Fleming had entered bankruptcy and C&S had acquired rights to Fleming's property in the bankruptcy proceedings and then sold some of that property to SuperValu.  The parties dispute whether C&S ever was an assignee of the Facility Standby Agreement between SuperValu and Millennium.  Regardless, SuperValu came to be the assignee of that agreement and Millennium and SuperValu subsequently entered into a "Supply Agreement" including arbitration provisions.

Plaintiff Village Market is located in Massachusetts and is a member of the New England

Arbitration Subclass.  2d Consolidated Am. Class Action Compl. ¶ 71.  Village Market entered

into stand alone arbitration agreements with SuperValu on October 1, 1999 and April 15, 2001

that were later assigned to C&S[3] in the AEA.  See Riehl Decl. Exs. 8, 9.  Village Market asserts

claims against SuperValu only.  See 2d Consolidated Am. Class Action Compl. Count I.

Defendants now move to dismiss arguing that King Cole, Blue Goose, Millennium, and

Village Market (collectively, the "Arbitration Plaintiffs") are required to arbitrate all their

claims, notwithstanding that the Arbitration Plaintiffs have asserted claims against only the

Defendant with which they do not have an operative arbitration agreement (the "non-signatory

Defendant").  Defendants rely on the doctrines of equitable estoppel and successor-in-interest.

Plaintiffs oppose the motion, arguing that those doctrines do not apply, and in any event that the

lack of class arbitration requires the Court to hear their claims as a matter of public policy.

### III.  DISCUSSION

**A.    Federal Arbitration Act Standards**

Defendants invoke the Federal Arbitration Act ("FAA" or "the Act"), 9 U.S.C. §§ 1-16,

in their Motion.  The FAA governs arbitration agreements relating to transactions involving

interstate commerce. The Act provides:

> A written provision . . . or a contract evidencing a transaction involving
> commerce to settle by arbitration a controversy thereafter arising out of
> such contract or transaction, or the refusal to perform the whole or any

---

[3] Village Market filed three Affidavits [Docket Nos. 136-138] in this matter disputing the existence of arbitration agreements with C&S.  These Affidavits are untimely and will not be considered by the Court.  L.R. 1.3, 7.1(b).  However, there is no dispute that Village Market executed its arbitration agreements with SuperValu and not C&S.  Whether those agreements were successfully assigned in the AEA to C&S is a challenge to those agreements as a whole and is not a matter for this Court, but rather is for the arbitrator.  See Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772, 2778 (2010).

part thereof, or an agreement in writing to submit to arbitration an existing
controversy arising out of such a contract, transaction, or refusal, shall be
valid, irrevocable, and enforceable, save upon such grounds as exist at law
or in equity for the revocation of any contract.

9 U.S.C. § 2. The Act establishes a "federal policy favoring arbitration," requiring that courts

"rigorously enforce agreements to arbitrate." Shearson/American Express, Inc. v. McMahon,

482 U.S. 220, 226 (1987) (quotations omitted). "Generally, there is a presumption of arbitrability

in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it

may be said with positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute." Telectronics Pacing Sys., Inc. v. Guidant Corp.,

143 F.3d 428, 433 (8th Cir. 1998) (quotation omitted) (alteration in original).  In considering a

motion to compel arbitration, a district court is required to determine (1) whether a valid

agreement to arbitrate exists between the parties and (2) whether the specific dispute is within

the scope of that agreement.  Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 871 (8th Cir.

2004).

Even where a party to litigation is not a signatory to an arbitration agreement, that party

may be compelled to arbitrate its claims under the doctrine of equitable estoppel.  Under

equitable estoppel, arbitration of claims is appropriate where: (1) the claims allege "substantially

interdependent and concerted misconduct" between a non-signatory and a signatory to the

arbitration agreement, and (2) the claims are "intimately founded in and intertwined with" the

agreement at issue.  PRM Energy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 835 (8th Cir.

2010) (quotations omitted).

**B.      Arbitration Plaintiffs Must Arbitrate Claims Under Doctrine of Equitable Estoppel**

Here, the first prong of equitable estoppel is not at issue; the basis of the claims in this case is an alleged conspiracy to violate antitrust laws by allocating territory and customers between Defendants, each of whom is a signatory to an arbitration agreement with at least one of the Arbitration Plaintiffs, through the AEA.  Therefore, the parties only dispute the second prong–the degree to which the agreements to arbitrate and that antitrust conspiracy are intertwined.

The equitable estoppel analysis depends greatly on context.  See JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 178 (2d Cir. 2004) ("[W]e have cautioned that this estoppel inquiry is fact-specific . . . and have had no occasion to specify the minimum quantum of 'intertwined-ness' required to support a finding of estoppel . . . .") (citations omitted).  The claims alleged must be "so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." PRM Energy Sys., 592 F.3d at 835.  In other words, the claims must make reference to or presume the existence of the agreement to arbitrate.  CD Partners, LLC v. Grizzle, 424 F.3d 795, 798 (8th Cir. 2005).

In the context of this case, the agreements to arbitrate between the Arbitration Plaintiffs and the signatory Defendants are sufficiently intertwined with the claims against the non-signatory Defendants to warrant arbitration.  Each agreement to arbitrate was executed either as part of a supply agreement or contemporaneously with a supply agreement and was intended to cover all claims between the signatories.  The agreements to arbitrate, therefore, are a fundamental component of the entire wholesaler-retailer relationship between the signatories.  Further, the broad scope of the agreements evince a clear intent on behalf of the Arbitration

Plaintiffs that disputes regarding that relationship be subject to arbitration.

This is precisely the relationship that is at issue in this litigation.  The Arbitration Plaintiffs allege individually that a non-signatory Defendant conspired with a signatory Defendant to violate antitrust laws.  As a result of that conspiracy, the Arbitration Plaintiffs allege that the signatory Defendant was then able to extract supra-competitive prices through its wholesaler-retailer relationship with Plaintiffs, the very relationship subject to arbitration.  The degree of intimacy and "intertwined-ness" here trigger the application of equitable estoppel.  Furthermore, at least with respect to Millennium and Village Market, the arbitration agreements were swapped in the very AEA that forms the nexus of the alleged conspiracy.  Therefore, the existence of the agreements to arbitrate is presumed by the claims asserted by the Arbitration Plaintiffs because without the agreements no wholesaler-supplier relationship would exist to be exploited by the alleged anti-trust conspiracy and no agreements would exist to be swapped by Defendants.

Indeed, in a case with similar facts, the U.S. Court of Appeals for the Second Circuit stated that there was "no difficulty" in concluding that the arbitration agreements and antitrust claims were sufficiently intertwined.  JLM Indus., 387 F.3d at 178.  In JLM Industries, the owners of chartered boats were non-signatories to arbitration agreements with charter customers that claimed that they were victims of an antitrust conspiracy that extracted supra-competitive prices for boat charters.  Id. at 177.  Nonetheless, the court stated that the agreements were sufficiently intertwined because "it is the fact of [the customers'] entry into the charters containing allegedly inflated price terms that gives rise to the claimed injury."  Id. at 178.

In this case, although the terms of the relationship between the retailer and wholesaler,

including arbitration, were set out in a single document for some parties, and in multiple documents for other parties, all such agreements were intended to form an overarching wholesaler-retailer relationship between the parties.  It would be unfair to allow the Arbitration Plaintiffs to challenge that relationship in this action while simultaneously disregarding the arbitration clauses that formed a part of that same relationship.  Therefore, in light of the Second Circuit's finding of "no difficulty" in similar circumstances and the unequivocal preference of federal courts to resolve ambiguity in favor of arbitration, the claims here are subject to arbitration.

The Arbitration Plaintiffs' reliance on Ross v. Am. Express Co., 547 F.3d 137 (2d Cir. 2008), to distinguish JLM Industries is unavailing.  In Ross, credit card holders sued American Express alleging that it was a member of an antitrust conspiracy with other credit companies that artificially inflated foreign currency transaction fees for cardholders.  Ross, 547 F.3d at 139. American Express argued that equitable estoppel required arbitration of the claims, but the Second Circuit held that equitable estoppel was inapplicable because American Express was a "complete stranger" to the cardholder agreements that included the arbitration clauses at issue. Id. at 148.  Ross is distinguishable from this case because under Second Circuit precedent the relationship between the signatory and non-signatory is a consideration in the equitable estoppel analysis.  See id. at 144 ("[I]n addition to the 'intertwined' factual issues, there must be a relationship among the parties . . . .") (quoting Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F.3d 354, 359 (2d Cir. 2008)) (alteration in original).  However, in this District, under Eighth Circuit precedent, *either* the relationship between the parties *or* the intertwined nature of the arbitration agreement and the claims asserted are considerations.  See CD Partners, 424 F.3d at

798 (discussing the relationship between signatory and non-signatory and the intertwined nature

of claims and arbitration clause as two alternative and distinct grounds for equitable estoppel).

Because the arbitration agreements at issue and the claims asserted are sufficiently intertwined,

as discussed above, the distinct issue of the relationship between the co-conspirators is not

dispositive.

**C.      Agreements to Arbitrate are Enforceable**

The Arbitration Plaintiffs further argue that, notwithstanding the applicability of

equitable estoppel, the arbitration agreements are unenforceable because the lack of a

mechanism for class claims would impose prohibitive costs and therefore preclude arbitration.

While the parties have delegated questions of arbitrability of claims to the arbitrator, the Court

retains authority to pass on the validity of the arbitration provisions at issue in the first instance.

Hill v. Anitoch Co., No. 8:09CV275, 2009 WL 3838251, *3 (D. Neb. Nov. 17, 2009) (citing

Fallo v. High-Tech Inst., 559 F.3d 874, 878 (8th Cir. 2009)).  To invalidate the arbitration

provisions on the ground that arbitration would have prohibitively expensive costs, the

Arbitration Plaintiffs bear the burden of showing the likelihood of incurring such costs.  Cicle v.

Chase Bank USA, 583 F.3d 549, 556 (8th Cir. 2009) (citing Green Tree Fin. Corp.-Al. V.

Randolph, 531 U.S. 79, 92 (2000)).

Here, the Arbitration Plaintiffs have not met their burden of demonstrating that they

would likely incur costs that would preclude them from asserting their claims on an individual

basis in arbitration.  Their entire argument relies on the assertion of their expert, Dr. Jeffrey J.

Leitzinger, that based on his experience the expert fees for a single arbitration could be up to

$1,400,000.00.  Leitzinger Aff. [Docket No. 132] ¶¶ 7-8.  This assertion is conclusory, with no

explanation given beyond Dr. Leitzinger's estimation that these cases would require work "in the upper end" of the typical range for expert fees.  Id. ¶ 7.  Further, by Dr. Leitzinger's own admission, the estimate is entirely speculative at this stage in the litigation.  See id. (stating that the full extent of data to be reviewed by an expert "is not yet clear"); see also Green Tree, 531 U.S. at 91 (refusing to invalidate arbitration agreement where risk of prohibitive arbitration costs was speculative).  Finally, the Arbitration Plaintiffs aver that they each will necessarily bear the full $1,400,000.00 cost due to the confidentiality provisions of the arbitration agreements without explaining why they could not share costs stemming from analysis of public information.  Defendants insist that the Arbitration Plaintiffs may cooperate amongst themselves and other Plaintiffs to share arbitration costs, Defs.' Reply Mem. [Docket No. 134] at 18, and no particular contract provision or rule has been cited to the contrary.  Without a specific showing that the Arbitration Plaintiffs would each likely incur $1,400,000.00 in litigation expenses, the Arbitration Plaintiffs have not carried their burden of proof of showing that arbitration on an individual basis would be prohibitively expensive.  Therefore, the arbitration agreements are enforceable.

**D.    Waiver**

The Arbitration Plaintiffs also argue Defendants have waived arguments related to arbitration with respect to Plaintiff Blue Goose.  "A party may be found to have waived its right to arbitration if it: '(1) knew of an existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by these inconsistent acts.'" Lewallen v. Green Tree Servicing, L.L.C., 487 F.3d 1085, 1090 (8th Cir. 2007) (quoting Ritzel Commc'ns, Inc. v. Mid-Am. Cellular Tel. Co., 989 F.2d 966, 969 (8th Cir. 1993)).  Defendants have not acted

inconsistently with their motion here.  Defendants noted that Blue Goose's claims were subject

to arbitration in their Answers [Docket Nos. 66 & 67] and in their opposition to Plaintiffs'

Motion to Amend the Complaint [Docket No. 87].  Further, no evidence of record suggests that

Blue Goose suffered any prejudice by the delay in seeking arbitration.  Therefore, Defendants

did not waive arbitration with Blue Goose.

**E.     Dismiss or Stay**

        Having decided that arbitration is appropriate, the Court must now decide whether to

dismiss or stay the claims of the Arbitration Plaintiffs.  Dismissal is appropriate "where the

entire controversy between the parties is subject to and will be resolved by arbitration."  Jann v.

Interplastic Corp., 631 F. Supp. 2d 1161, 1167 (D. Minn. 2009) (citations omitted).  With respect

to the Arbitration Plaintiffs, the only claims asserted are subject to arbitration, and therefore are

properly dismissed.  However, the dismissal will be without prejudice.  See id.

## IV.  CONCLUSION

        Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

        1.  Defendants' Partial Motion to Dismiss or Stay [Docket No. 113] is **GRANTED**;

        2.  All claims asserted by Plaintiffs King Cole Foods, Inc., Millennium Operations, Inc.,

JFM Market, Inc., MFJ Market, Inc., and Blue Goose Super Market, Inc. on behalf of the

Midwest Arbitration Subclass and the New England Arbitration Subclass are

**DISMISSED WITHOUT PREJUDICE**; and

        3.  All allegations in the Second Consolidated Amended Class Action Complaint [Docket

No. 99] asserted on behalf of the Midwest Arbitration Subclass and New England

Arbitration Subclass are stricken.


BY THE COURT:

S/Ann D. Montgomery

_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: **July 5, 2011**