1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MINNESOTA

3

4    ------------------------------------------------------------

5                                    )

6    IN RE:  WHOLESALE GROCERY       )   Court File No.

7    PRODUCTS ANTITRUST LITIGATION   )   09-MD-2090 (ADM/AJB)

8                                    )

9                                    )

10                                   )   Minneapolis, Minnesota

11                                   )   June 6, 2011

12                                   )   1:30 p.m.

13                                   )

14   ------------------------------------------------------------

15

16          BEFORE THE HONORABLE ANN D. MONTGOMERY

17          UNITED STATES DISTRICT COURT JUDGE

18          **(MOTIONS TO DISMISS OR STAY)**

19

20

21

22

23

24

25

```
 1    APPEARANCES
        For the Plaintiffs:        BOIES, SCHILLER & FLEXNER, LLP
 2                                 RICHARD B. DRUBEL, ESQ.
                                   26 South Main Street
 3                                 Hanover, New Hampshire 03755

 4                                 KELLEY, WOLTER & SCOTT, P.A.
                                   KEVIN M. MAGNUSON, ESQ.
 5                                 431 S. 7th St., #2530
                                   Minneapolis, Minnesota 55415
 6
                                   LOCKRIDGE, GRINDAL, NAUEN, PLLP
 7                                 ELIZABETH R. ODETTE, ESQ.
                                   100 Washington Ave. S., #2200
 8                                 Minneapolis, Minnesota 55401

 9                                 MEREDITH, COHEN, GREENFOGEL &
                                      SKIRNICK, P.C.
10                                 JOEL C. MEREDITH, ESQ.
                                   1521 Locust St. - 8th Floor
11                                 Philadelphia, Pennsylvania 19102

12      For the Defendants:        ROBINS, KAPLAN, MILLER & CIRESI,
                                      LLP
13                                 STEPHEN P. SAFRANSKI, ESQ.
                                   DAMIEN A. RIEHL, ESQ.
14                                 HEATHER M. McELROY, ESQ.
                                   800 LaSalle Ave, #2800
15                                 Minneapolis, Minnesota 55402

16                                 HOWREY, LLP
                                   CHARLES A. LOUGHLIN, ESQ.
17                                 1299 Pennsylvania Ave. NW
                                   Washington, DC 20004
18
                                   FREDRIKSON & BYRON, PA
19                                 NICOLE M. MOEN, ESQ.
                                   200 S. 6th St., #4000
20                                 Minneapolis, Minnesota 55402

21      Court Reporter:            DEBRA BEAUVAIS, RPR-CRR
                                   300 S. 4th St., #1005
22                                 Minneapolis, Minnesota 55415

23


24         Proceedings recorded by mechanical stenography;
        transcript produced by computer.
25
```

1                       **P R O C E E D I N G S**

2                           **IN OPEN COURT**

3              THE CLERK:  All rise.

4              THE COURT:  Good afternoon.  Please be seated.

5              THE CLERK:  The matter before the Court this

6      afternoon is In Re:  Wholesale Grocery Products Anti-Trust

7      Litigation.

8              Counsel, would you please note your appearances

9      for the record.

10             THE COURT:  Start with the plaintiffs' table.

11     Mr. Drubel.

12             MR. DRUBEL:  Richard Drubel for the plaintiff

13     class, Your Honor.

14             THE COURT:  Mr. Magnuson.

15             MR. MAGNUSON:  Hello, Your Honor.  Kevin Magnuson

16     of Kelley, Wolter & Scott for the plaintiffs.

17             THE COURT:  Ms. Odette.

18             MS. ODETTE:  Elizabeth Odette, Lockridge, Grindal

19     & Nauen.

20             MR. MEREDITH:  Joel Meredith, Your Honor.

21             THE COURT:  Mr. Safranski.

22             MR. SAFRANSKI:  Good afternoon, Your Honor.

23     Stephen Safranski, Robins Kaplan for SuperValu, Inc.

24             MR. LOUGHLIN:  Good afternoon, Your Honor.

25     Charles Loughlin, Baker Botts, LLC on behalf of C&S

1    Wholesale Grocers.

2           MR. RIEHL:  Good afternoon, Your Honor.  Damien

3    Riehl, Robins, Kaplan & Ciresi, also on behalf of SuperValu.

4           MS. McELROY:  Good afternoon.  Heather McElroy

5    with Robins, Kaplan, Miller & Ciresi.

6           THE COURT:  And, Ms. Moen, last.

7           MS. MOEN:  Good afternoon, Your Honor.  I am

8    Nicole Moen, Fredrikson & Byron, on behalf of defendants

9    C&S.

10          THE COURT:  All right.  Good afternoon, counsel.

11   I have been out of the office for two weeks, arrived back --

12   planned one week and a family emergency I had to attend to

13   in Connecticut.  So I'm back and have had only about an hour

14   or so to do a quick read of the briefs.  Obviously, I will

15   work through them more carefully after today's hearing, but

16   rather than cancel the hearing, since I knew we had people

17   coming from out of town, it made sense to hear argument on

18   it at this time.  But I may not be up to my usual level of

19   preparation.

20          Mr. Safranski, am I to assume that you have the

21   first -- since you are closest to the lectern, the first

22   argument here for the defendants with regard to the

23   arbitration aspects of the case?

24          MR. SAFRANSKI:  Your Honor, with the Court's

25   permission, I'd like to put a chart up on the document

1       camera?

2                   THE COURT:  Sure.  Anything that makes it simpler

3       for me is appreciated.

4                   MR. SAFRANSKI:  Okay.  With that in mind, here we

5       go.

6                   THE COURT:  It seems to me this was in your brief,

7       too; was it not?

8                   MR. SAFRANSKI:  It was in the brief.  You may

9       recall the coming attraction, the motion to amend, we had a

10      similar chart that we used; although, I think we tried to

11      simplify things with this one.

12                  Your Honor, this motion is a motion under the

13      Federal Arbitration Act to enforce Arbitration Agreements

14      entered by five of the plaintiff retail grocers in this

15      litigation; King Cole Foods, Blue Goose Supermarket,

16      Millennium Operations, JFM, Inc., and MFJ, Inc.  All five of

17      these plaintiffs are parties to Arbitration Agreements with

18      either SuperValu, C&S, or in some instances with both

19      defendants.  And these agreements were entered as part of

20      their wholesale supply relationships.

21                  Now, each of the Arbitration Agreements at issue

22      require arbitration of "any controversy, claim or dispute of

23      whatever nature between the parties" and whether "such claim

24      existed prior to, arises on or after the execution date of

25      the agreement."

1           Each of these Arbitration Agreements explicitly

2      incorporates the American Arbitration Association's

3      commercial rules and provides that the arbitrator would

4      determine gateway issues of arbitrability, including issues

5      with respect to the scope, the validity, exploration, and

6      other aspects of the agreement.

7           Now, earlier this year, these five plaintiffs came

8      up with a strategy to try to get around arbitration

9      hearings.  The plaintiffs would, in effect, split their

10     antitrust conspiracy claims such that retailers who had

11     Arbitration Agreements with SuperValu would only sue C&S

12     Wholesale Grocers, and those who agreed to arbitrate with

13     C&S would only sue SuperValu.  And yet at the same time,

14     they would try to establish -- they were trying to prove

15     their antitrust claims by showing the pricing terms that

16     they got from a signatory defendant were anti-competitive.

17     And at the same time, these plaintiffs want to be able to

18     avoid the arbitration provisions that govern these supply

19     relationships.  And they want to do this not just on behalf

20     of themselves, but on behalf of every other retailer in the

21     Midwest and in New England that agreed to individual

22     arbitration of their claims.

23          Now, a few of these arbitration plaintiffs, which

24     I'm just going to refer to the five plaintiffs as

25     "arbitration plaintiffs," but some of them simply ignored

1    their Arbitration Agreements and are pursuing claims against

2    both signatory and non-signatory defendants alike.  Now,

3    this strategy that the plaintiffs have adopted would, in

4    effect, render the Arbitration Agreements meaningless and is

5    totally inconsistent with the Federal Arbitration Act.

6         Now, there is a number of issues that we've

7    discussed in our brief, but I want to really spend today

8    focusing on the two central dispositive issues in this

9    motion.

10        Well, first, I'm going to outline the claims in

11   the Arbitration Agreements at issue, and then I'm going to

12   discuss equitable estoppel, which prevents the arbitration

13   plaintiffs from doing exactly what they are doing, trying to

14   thwart the Arbitration Agreements by suing only

15   non-signatories.  Because all five of these arbitration

16   plaintiffs has an agreement with at least one of the

17   defendants, if equitable estoppel applies, that's

18   dispositive of the entirety of the motion.

19        Second, I'm going to discuss the plaintiffs'

20   argument that their Arbitration Agreements are invalid or

21   unenforceable because they cannot provide for class

22   arbitration.

23        Now, there are three Supreme Court cases that have

24   been decided in the last few years that pretty much dispose

25   of that argument.  One is *Rent-A-Center, West v. Jackson;*

1   second is *Stolt-Nielsen v. AnimalFeeds*; and third is *AT&T*

2   *Mobility v. Concepcion*, which I will discuss in a moment.

3            But, first, I want to spend a little bit of time

4   talking about what are the agreements and what are the

5   claims at issue.  Here's where the chart will be helpful.

6            Okay.  So you see I have got the plaintiffs

7   grouped according to the putative class that they represent

8   according to the second amended complaint, then I identify

9   the plaintiffs, and then I identify who they are asserting

10  claims against and who they have got agreements to arbitrate

11  with.

12           So you will notice that within the Midwest class

13  and New England class there's D&G, Inc. and Deluca's, Inc.,

14  who are suing both defendants, and they don't have any

15  arbitration rules.  So no matter what happens in this motion

16  today, the claims on behalf of those plaintiffs and of those

17  putative classes are going to proceed.  So the question here

18  is what about these other plaintiffs who have Arbitration

19  Agreements.

20           So, first, under D&G we have King Cole Foods,

21  which has claims against both SuperValu and C&S, and it has

22  an Arbitration Agreement with SuperValu, which is Exhibit 1

23  to our motion.

24           Below King Cole Foods we have Blue Goose; claims

25  against both defendants.  It has a 2008

1       Mediation/Arbitration Agreement with SuperValu, which is

2       Exhibit 10 to our motion.

3               We have Millennium Operations.  Now, Millennium

4       Operations is one of the ones that tried to basically plead

5       around its Arbitration Agreement.  It has a claim only

6       against C&S.  It has an Arbitration Agreement with SuperValu

7       from December of 2003, which is Exhibit 7 to our motion.

8       Also, at the time of the Asset Exchange Agreement, it was,

9       in effect, a party to Arbitration Agreements with C&S.  You

10      see, before the Asset Exchange, Millennium was a customer of

11      Fleming Companies, which went bankrupt and sold its

12      wholesale business to C&S in July of 2003.  Millennium had

13      Arbitration Agreements with Fleming as part of its Supply

14      Agreements with Fleming.  Those agreements were assigned to

15      C&S in July of 2003.  C&S and SuperValu entered the Asset

16      Exchange Agreement, and those agreements were subsequently

17      assigned to SuperValu in that transaction.  But at the time

18      of the Asset Exchange Agreement, it is clear that C&S had

19      rights to an arbitration agreement with Millennium.

20              And, finally, we have MFJ Market and JFM Market,

21      who also have been referred to as "Village Market."  They

22      are only suing SuperValu.  They have Mediation Agreements

23      and Arbitration Agreements that they originally entered with

24      SuperValu in 1999 and 2001.  Those agreements were assigned

25      to C&S in the Asset Exchange transaction that's being

 1    challenged in this litigation.  So, again, at the time of

 2    the Asset Exchange, SuperValu was a party to Arbitration

 3    Agreements with these plaintiffs.  And these plaintiffs

 4    acknowledge that, at a minimum, they have the same

 5    Arbitration Agreements with C&S, which is why they are not

 6    suing C&S.

 7            THE COURT:  Without going into the context of each

 8    individual Arbitration Agreement, what's the context for the

 9    Arbitration Agreements being signed?  What time periods did

10    that happen in?

11            MR. SAFRANSKI:  Sure.  I can tell you King Cole

12    Foods was 2005.

13            THE COURT:  What was the context, though?

14            MR. SAFRANSKI:  Well, usually when SuperValu

15    enters into either a supply agreement or retailer agreement

16    with a retailer, it often, although not 100 percent --

17            THE COURT:  Not always, okay.

18            MR. SAFRANSKI:  -- it often enters into a

19    mediation/arbitration agreement, which is a separately

20    signed document, and it's executed contemporaneously with

21    the supply agreement.

22            THE COURT:  Without getting into the specifics of

23    each one, that would be true of most of these, there was

24    something else going on when the Arbitration Agreement was

25    signed?

 1            MR. SAFRANSKI:  That is true.

 2            THE COURT:  Are some of these renewals of prior

 3    agreements or something?

 4            MR. SAFRANSKI:  Yes, some of them are renewals of

 5    prior agreements.  In terms of specifics, I'm not quite sure

 6    which ones.

 7            THE COURT:  Okay.  I was just trying to get the

 8    context.

 9            MR. SAFRANSKI:  But they are all basically entered

10    contemporaneously with either a supply agreement or a

11    retailer's agreement, which doesn't have the long-term

12    specificity of a supply agreement, but it's a more general

13    agreement that deals with the terms and conditions of the

14    business.

15            THE COURT:  But they all had ongoing business

16    relationships with each other?

17            MR. SAFRANSKI:  Yes.

18            Okay.  So, now, our briefing addresses why some of

19    these claims are directed against signatory defendants.  I

20    don't think I need to discuss that here because the bigger,

21    more dispositive issue of the whole motion is equitable

22    estoppel.  It is undisputed that each of these five

23    plaintiffs has an Arbitration Agreement with at least one of

24    the defendants.  And the real crux of the plaintiffs'

25    position is they can plead around those agreements by suing

1    non-signatories under a conspiracy theory.  In doing so, the

2    plaintiffs are really trying to have it both ways because

3    they want to be able to pursue claims of overcharges from

4    the signatory defendant under their Supply and Retail

5    Agreements.  They want to prove those claims by relying on

6    the pricing terms under those agreements and the data

7    regarding the prices that they are going to get in discovery

8    from those signatory defendants.  And at the same time, they

9    want to completely avoid having to comply with the

10   arbitration provision that governed those Supply Agreements.

11   And the rule of equitable estoppel simply does not permit

12   that strategy.

13        We cited the Eighth Circuit's decision in *PRM*

14   *Energy Systems v. Primenergy*, which was a 2010 case, and it

15   sets forth the basic test for equitable estoppel.  Two

16   conditions have to be satisfied:  First, the plaintiff needs

17   to allege "substantially interdependent and concerted

18   misconduct by both the non-signatory and one or more

19   signatories"; and, second, the concerted conduct must be

20   "intimately founded in and intertwined with the agreement at

21   issue."

22        *PRM Energy* has some interesting facts.  In that

23   case, the arbitration clause was covered in a 1999 agreement

24   between the plaintiff, Primenergy, and PRM Energy.  With PRM

25   Energy it was a technology licensing agreement.  And the

1    plaintiff brought various tort and unfair competition claims

2    against both signatory and a non-signatory, a third-party

3    named Kobe Steel.  And the allegation was that the

4    defendants entered into this unfair competition conspiracy

5    intended to undermine the plaintiff's rights under the

6    agreement that had the arbitration provision.  And the

7    Eighth Circuit held that equitable estoppel required

8    arbitration against this claim against the third party

9    because the complaint alleged concerted misconduct and that

10   concerted misconduct was directed at the relationship, at

11   the agreement that contained the arbitration provision.

12          And it's important to note that it found equitable

13   estoppel even though the non-signatory, Kobe Steel, had no

14   corporate relationship with the signatory.  It had no

15   contractual relationship with the plaintiffs.  It was not

16   mentioned in the contract containing the arbitration clause.

17   And the third party had no role in the performance of that

18   contract.

19          And the *PRM Energy* decision itself relies on an

20   Eleventh Circuit case called *MS Dealer v. Franklin*, which is

21   a case that the Minnesota Supreme Court has also cited and

22   relied on.  And that case applied to a conspiracy intended

23   to overcharge the purchaser of a car under a service

24   contract.  And they applied it, even though the plain

25   language of the arbitration agreement applied only to

1      disputes between the plaintiff and the dealership from whom

2      the plaintiff bought the car.  And the Eleventh Circuit says

3      that equitable estoppel applies "when the signatory to the

4      contract containing the arbitration clause raises

5      allegations of substantially independent and concerted

6      misconduct by both the signatory and one or more signatories

7      to the contract."  And it found dispositive the fact that

8      the conspiracy claims against both the signatory defendant

9      and the non-signatory defendants were "based on the same

10     facts and inherently inseparable."

11          So let's look at this case.  Here there's no

12     question that the plaintiffs are alleging a single

13     conspiracy, one single act of concerted and interdependent

14     misconduct, which is the Asset Exchange Agreement and the

15     ancillary non-compete provisions.  And they say under their

16     own complaint that that conspiracy is directed at and

17     intertwined with the relationships which are part of the

18     supply relationships that have the agreements contained in

19     the arbitration clause.

20          The gravamen of their complaint is that these

21     plaintiffs were overcharged under their Supply and Retailers

22     Agreements with the defendant, which themselves are governed

23     by the arbitration provision.  They claim that really the

24     principle objective of the Asset Exchange Agreement,

25     according to the plaintiffs, was to allow the defendants to

1      overcharge them for groceries.

2           Now, I expect Mr. Drubel will get up here and he

3      is going to argue, well, no, arbitration is just a matter of

4      contractual intent and a party can't be required to

5      arbitrate with a non-signatory.  An important point here is

6      that each of the five arbitration plaintiffs did consent to

7      arbitration.  And the whole point of equitable estoppel is

8      that it comes into play when the plaintiff is trying to get

9      around that agreement by suing a non-party, a non-signatory.

10     By definition equitable estoppel is extending the contract

11     beyond somebody who is, strictly speaking, a party.

12          The plaintiffs tried to distinguish *PRM Energy* by

13     arguing that, well, in that case the licensing agreement at

14     least anticipated that the signatory might enter into a

15     sublicense with another entity, which turned out to be Kobe

16     Steel.  A couple things:  First of all, the Eighth Circuit

17     didn't say that was the only way in which an agreement to

18     arbitrate could be intertwined with the claims.  But it's

19     also important that the Retailers Agreement and the Supply

20     Agreements all also anticipate the assignment of those

21     agreements to third-party wholesalers.  And that's, in fact,

22     what had happened in the transaction that the plaintiffs are

23     challenging.

24          The plaintiffs rely heavily on *Ross v. American

25     Express*, which is a 2008 case, which held that Ross -- that

1    AmEx could not use equitable estoppel to invoke the

2    arbitration agreements of other credit card companies.  That

3    was an antitrust price-fixing case.  For the Second Circuit

4    the important part was AmEx didn't sign the cardholder

5    agreements, is not mentioned in the cardholder agreements,

6    and had no role in the performance of those agreements.

7         The important thing to note is that *Ross* is

8    distinguishable because, as the Eighth Circuit pointed out

9    in *PRM*, it's enough that there was at least some

10   contemplation of third-party involvement in some capacity,

11   even though it didn't mention the third party by name.  The

12   third party wasn't performing under the agreement.  It

13   didn't negotiate it.

14        But on a more fundamental level, *Ross* is

15   distinguishable because here the Arbitration Agreements by

16   the two would-be class representatives were actually

17   exchanged in the Asset Exchange Agreement.

18        So Mr. Drubel is not going to be able to get up

19   and say that, for example, the Village Market plaintiffs,

20   JFM and MFJ -- he is not going to be able to say SuperValu

21   didn't negotiate those agreements because it did.  He's not

22   going to be able to say SuperValu is not mentioned in that

23   agreement because it was originally a SuperValu agreement.

24   And what the plaintiffs are trying to do is challenge the

25   very transaction that assigned that agreement to C&S.  The

1    same thing is true with Millennium, which had acquired the

2    Arbitration Agreement from Fleming and assigned it to

3    SuperValu in the Asset Exchange.

4            Even the Supply Agreement, the current Supply

5    Agreement between Millennium and SuperValu, mentions C&S by

6    name and references the assignment of that agreement, the

7    previous Supply Agreement from C&S to SuperValu.

8            Mr. Drubel is also probably going to get up and

9    say, well, under *Stolt-Nielsen* the FAA just won't let you

10   apply equitable estoppel to someone who has not agreed to

11   arbitrate.  And there's a couple of things why that's just

12   simply not correct.

13           First of all, *Stolt-Nielsen* only dealt with the

14   issue of whether an arbitration agreement that is silent

15   with respect to class procedures can be interpreted to

16   authorize class action.  The court said it did not.  Two

17   years before -- I'm sorry, the year before *Stolt-Nielsen,*

18   the Supreme Court decided the *Arthur Andersen v. Carlisle* --

19           THE COURT:  *Stolt-Nielsen* was just last year,

20   wasn't it?

21           MR. SAFRANSKI:  Yes, 2010.

22           So in 2009, the Supreme Court decided *Arthur*

23   *Andersen v. Carlisle* which tells us that, in fact, the FAA

24   permits the application of equitable estoppel authorized by

25   state law.  And *Stolt-Nielsen* itself entered arbitration

1    through the application of equitable estoppel in an

2    antitrust case.  So there is simply no basis to argue that

3    *Stolt-Nielsen* somehow precludes the application of equitable

4    estoppel.

5            Now I just want to turn to the plaintiffs'

6    argument that, well, these agreements are all invalid.

7    Their major response is that the agreements are

8    unenforceable under Section 2 of the FAA because they don't

9    allow class action procedures, and it's going to be too

10   expensive to bring individual arbitrations.  And to make

11   that argument they're rely on an expert affidavit that they

12   submitted with their response arguing that for each of these

13   five arbitration plaintiffs, they are going to have to incur

14   1.4 million in expert costs looking at the same --

15           THE COURT:  It doesn't envision any -- it starts

16   with a new ramp-up time in each case, correct?

17           MR. SAFRANSKI:  Well, that's the assumption.  That

18   is the major problem with it.  But the Court doesn't even

19   have to get there because the three Supreme Court decisions

20   that I mentioned earlier completely foreclose this argument.

21           First is *Rent-A-Center, West v. Jackson*, a 2009

22   decision which held that a district court simply can't

23   decide a claim that an arbitration agreement is

24   unenforceable when the agreement itself assigns that

25   decision to the arbitrator.  Here all of the arbitration

1    agreements expressly assign to the arbitrator the --

2              THE COURT:  The scope issues?

3              MR. SAFRANSKI:  -- scope issues.  They expressly

4    say the arbitrator is empowered to decide the validity of

5    the agreement.

6              *Rent-A-Center* is interesting.  It involved an

7    arbitration agreement between plaintiff and her former

8    employer.  The agreement, like this one, provided that the

9    arbitrator would decide questions of enforceability.  The

10   plaintiff claims that certain procedural limitations in the

11   arbitration agreement made it unconscionable.  And the

12   Supreme Court said because the agreement clearly assigned

13   gateway issues to the arbitrator, the district court simply

14   had to honor that assignment, that delegation of authority,

15   and couldn't decide the enforceability issue.

16             And that is the same holding that this Court made

17   in the *Barkl v. Career Education Corporation* case, which was

18   decided late last year, where I believe it was -- that's in

19   our opening brief, but that was an employment case.  And the

20   plaintiff wanted to avoid arbitration by arguing that the

21   agreement was unconscionable and unenforceable for various

22   reasons, and the court found that because the agreement

23   incorporated the AAA rules, it didn't have to address the

24   unenforceability issue.

25             Likewise, any suggestion that the procedural

1   limitations in the agreements themselves are rendered

2   invalid, which is something that the Village Market recent

3   affidavits have suggested, again, that's also for the

4   arbitrator.  And for that we can cite the *Bailey v.*

5   *Ameriquest Mortgage* case by the Eighth Circuit in 2003 and

6   also *PacifiCare v. Book*, another 2003 case from the Supreme

7   Court.

8        Okay.  But moving past that, *Stolt-Nielsen* also

9   holds simply that the FAA forbids the imposition of class

10  arbitration on parties where the agreement doesn't provide

11  for it.  Now, the important thing to note in *Stolt-Nielsen*

12  is that in requiring arbitration class procedures, the

13  arbitration panel was relying on exactly the same type of

14  policy arguments to basically say, well, it wouldn't be

15  effective from a public policy standpoint to have these

16  arbitrations individually, so we were going to impose class

17  arbitration.  The Supreme Court simply rejected that and

18  said the FAA doesn't permit it when the arbitration

19  agreement doesn't provide for it.

20       And, lastly, the very recent decision in *AT&T*

21  *Mobility v. Concepcion* addressed the core issues in

22  *Stolt-Nielsen*, which is does the FAA permit an arbitration

23  agreement to be invalidated because it does not provide for

24  class arbitration.  Again, the answer to that question is

25  no.  There the plaintiffs in that case, the Concepcions,

1    they bought mobile telephone service from AT&T based on the

2    promise that they would get a free phone.  AT&T, I guess,

3    didn't tell them that they still had to pay sales tax on it

4    in the amount, I think, of $30.22.  So they brought a class

5    action based on fraud and false advertising.  But they had

6    an arbitration agreement with a class action waiver.  The

7    court held that even when small dollar claims are at issue,

8    the FAA does not permit courts to condition the validity and

9    enforceability of arbitration agreements based on the

10   availability of class procedures.

11            In fact, the lead case the plaintiffs rely on to

12   support their argument that this agreement is unenforceable,

13   the *AmEx* case from the Second Circuit earlier this year, is

14   now in reconsideration and accepting supplemental briefs on

15   how this is affected by the *Concepcion* case.

16            But, again, the Court doesn't even need to get to

17   this issue because, again, the Arbitration Agreements

18   provide the arbitrator is going to be the one to decide any

19   arguments that the plaintiffs want to make regarding the

20   validity and enforceability.

21            So the conclusion here is that the plaintiffs, who

22   have agreed to arbitrate their disputes, shouldn't be

23   participating in this case.  They should be dismissed so

24   that if they choose, they can participate, pursue their

25   claims in arbitration as contemplated by the agreements.

1          THE COURT:  Okay.  If you're going to have any

2     time left for rebuttal, I think you should probably be done

3     now.  Thank you, Mr. Safranski.

4          Mr. Drubel, are you the proponent of the

5     plaintiffs' position today?  I thought maybe it was going to

6     be Ms. Odette.

7          MR. DRUBEL:  Not today, Your Honor.  Sorry about

8     that.

9          THE COURT:  Not today.  Okay.  No.  Whatever.

10          MR. DRUBEL:  Your Honor, we think there are four

11     key issues for resolution of the defendants' motion in this

12     case and all four of them are for the Court.  One is, is

13     there an applicable arbitration agreement?  Two, is that

14     arbitration agreement valid and enforceable?  Three, what is

15     the effect of any assignment of that arbitration agreement?

16     And, four, does equitable estoppel apply?

17          Ms. Odette, could I have the first chart, please.

18          So I think that what I would like to do, Your

19     Honor, is just -- because we think that these are the

20     important issues for resolution of the defendants' motion, I

21     think it's important to set forth the authority that these

22     are all for the Court rather than, as Mr. Safranski

23     indicated at least for some of them, for the arbitrator.

24          The first one, is there an applicable arbitration

25     agreement?  We don't have any dispute.  The defendants don't

1    dispute it.  They say in their memorandum, their opening

2    memorandum, a district court typically must resolve whether

3    the parties have a valid agreement to arbitrate.

4         The second issue, is the arbitration agreement

5    valid and enforceable?  We cite here in our chart the

6    *Express Scripts* case.  And this is in response to the

7    defendants' citation of *Rent-A-Center*, the case

8    Mr. Safranski mentioned just a minute ago, in their reply

9    brief.  *Rent-A-Center*, the plaintiff failed to challenge the

10   specific provision delegating the issue of arbitrability to

11   the arbitrator.  The Supreme Court held that the provision

12   must be presumed valid unless it's challenged and,

13   therefore, the issue of arbitrability goes to the

14   arbitrator.  However, the Supreme Court also noted, "If a

15   party challenges the validity under Section 2 of the precise

16   agreement to arbitrate an issue, the Federal Court must

17   consider the challenge before or during compliance with that

18   agreement under Section 4."  That's 130 Supreme Court at

19   2778.  And that's exactly what the plaintiffs have done

20   here, Your Honor.  And we have, in fact, challenged

21   specifically the provisions of the arbitration delegation.

22   That's on page 7, footnote 4 of our brief.

23        And the *Express Scripts* case is really the flip

24   side of the *Rent-A-Center* case.  *Express Scripts* is an

25   Eighth Circuit opinion from 2008 in which precisely what the

1    Supreme Court is describing in *Rent-A-Center* as their

2    hypothetical, because the plaintiff in *Rent-A-Center* didn't

3    do that, didn't challenge the express delegation.  And *in*

4    *Express Scripts* the court, the Eighth Circuit in that case,

5    said where the plaintiff had done both, had challenged the

6    entire agreement, plus the delegation provision, that issue

7    then goes to the court for resolution.  And what they held

8    was that a dispute as to whether the parties agree to

9    arbitrate will be resolved by the district court, unless the

10   parties clearly and unmistakably provide otherwise.

11          Here, Your Honor, there is no clear and

12   unmistakable evidence that plaintiffs intended to delegate

13   arbitrability where a stranger seeks to enforce the

14   agreement, as C&S does with respect to some of these

15   SuperValu arbitrations, or the assignor seeks to enforce

16   rights that have already been transferred.  As I said,

17   that's in our brief.  We have, in fact, attacked that.  So

18   this issue about validity and enforceability is for the

19   Court, not for the arbitrator.

20          Could I have page 2.

21          The third key issue, Your Honor, is what is the

22   effect of an assignment of the Arbitration Agreement?  The

23   Eighth Circuit in the *Koch* case held that a dispute over the

24   validity and effect of a purported assignment is for the

25   court.  It's 543 F.3d at 464.  And the reasoning of the

1    court is that if the arbitrator would have to look outside

2    of the circumstances of the contract to decide the issue, as

3    they would in connection with an assignment, that's not for

4    the arbitrator.  That is for the district court.

5             And as we will see when we come to analyzing who

6    has got what Arbitration Agreements, the issue of assignment

7    is very important in analyzing the Arbitration Agreements

8    here.  But that issue is also for the Court.

9             And, finally, the issue of equitable estoppel.  It

10   doesn't sound to me like Mr. Safranski today has said

11   anything other than what's already in his brief -- namely, I

12   think the defendants argue or recognize that this issue,

13   equitable estoppel, is for the Court.  So these four key

14   issues we think will resolve the defendants' motion, and all

15   of them are for this Court to decide.

16            Now let's go back to the first one, is there an

17   applicable arbitration agreement.

18            Could I have the second chart up, please.

19            Now, this is a little different chart than what

20   you saw from Mr. Safranski.  What we had done is take on the

21   first column the plaintiff and where they are located.  On

22   the second column we have what we have now learned are the

23   actual Arbitration Agreements involved in this case, along

24   with the dates, and also with whom the party agreed to

25   arbitrate because, as we know from the Supreme Court's

1    decision in *Stolt-Nielsen* and other cases, a party can limit

2    with whom they agree to arbitrate.  So that you see, for

3    example, with respect to King Cole, and Blue Goose, and

4    Millennium, with respect to their SuperValu Arbitration

5    Agreements, they agreed to arbitrate with SuperValu and any

6    other SuperValu entity.  Nobody agrees to arbitrate with

7    C&S.

8         Now, we got some of the facts wrong about who had

9    what Arbitration Agreement in the complaint, but that

10   shouldn't matter for purposes of this motion because the

11   subclass, which the two arbitration subclasses are defined

12   in the complaint at paragraph 67, turns on the issue of

13   whether or not a party in fact has an arbitration agreement

14   with one of the defendants during the class period.  So, for

15   example, King Cole.  We alleged in the complaint that they

16   had no arbitration agreement.  So Mr. Safranski's chart

17   says, well, they don't have an arbitration agreement, then

18   they must be suing heck, you know, both defendants.  Well,

19   that's not true.  In fact, it turns out that they did have

20   an arbitration agreement with SuperValu.  So under paragraph

21   67 of the second amended complaint that puts them in Midwest

22   arbitration subclass.  And, therefore, and if you look on

23   the fourth column over, the defendant that sued the Midwest

24   arbitration subclass has only brought a claim against C&S.

25        The same is true for Blue Goose.  Blue Goose we

1    didn't allege -- we alleged in the complaint incorrectly

2    that they didn't have an arbitration agreement, but it turns

3    out that they do, which supports the defendants' theory.  I

4    mean, they just need to look at their databases to figure

5    out who they have arbitration agreements with.  These

6    retailers have to check through boxes and file drawers, and

7    sometimes they get it wrong.  But the fact is that they

8    don't have -- they in fact do have Arbitration Agreements

9    with SuperValu, which puts them in the Midwest arbitration

10   subclasses, which means that they have only brought claims

11   against C&S with whom they have no arbitration agreement.  I

12   mean, they don't have one period, they just don't.

13          With respect to Blue Goose, I won't go into more

14   detail about the arbitration being waived, but it is

15   remarkable that 19 months after Blue Goose brought their

16   initial complaint and the defendants litigated with Blue

17   Goose it goes back to a motion to dismiss, document

18   production requests, 84,000 pages of responsive documents

19   from Blue Goose, multiple interrogatories, none of which are

20   allowed under the Arbitration Agreement.

21          THE COURT:  Yes, but, I mean, in the interim, in

22   fairness to them, I did in one of my orders say hold off on

23   that arbitration stuff, that's for another day.

24          MR. DRUBEL:  Oh, that was just recently, Your

25   Honor.  This is all before that.

1        THE COURT:  Oh, okay.  The same discovery issues,

2   which were causing everybody to sort of try to figure out

3   who had agreements with who, obviously, encumbered both

4   sides.

5        MR. DRUBEL:  Well, that may be, Your Honor, but

6   the fact is that well before that issue, before any

7   defendant demanded arbitration with Blue Goose, they served

8   document requests and interrogatories.

9        Now, if you compare that to the discovery they

10  would get under their Arbitration Agreement, the Arbitration

11  Agreement is specifically limited to just the exchange of

12  key documents, that's it.

13       THE COURT:  Well, I suppose there was some are we

14  fighting global warfare and go big picture or do we start

15  honing in on specific things.

16       MR. DRUBEL:  Well, I think it's just a question of

17  whether or not Your Honor feels it is unfair and prejudicial

18  for defendants to litigate the discovery part of this case,

19  including and --

20       THE COURT:  Start down the road and then switch

21  gears.

22       MR. DRUBEL:  -- and then switch gears 19 months

23  later.  Defendants have made absolutely no explanation for

24  why it is they waited so long.

25       THE COURT:  Okay.

1          MR. DRUBEL:  But, in any event, even if there is

2     in fact an arbitration agreement with SuperValu, it simply

3     means that Blue Goose is part of a Midwest arbitration

4     subclass and is suing C&S with whom it has no arbitration

5     agreement.

6          Millennium; we alleged an Arbitration Agreement

7     with SuperValu but omitted an Arbitration Agreement with

8     Fleming.  Mr. Safranski says, well, that Arbitration

9     Agreement was acquired by C&S.  I beg to differ, Your Honor.

10          In looking, in fact, at the bankruptcy orders and

11     in looking at the complete Fleming/C&S Purchase Agreement,

12     it's clear that what happened here was that SuperValu didn't

13     acquire these contracts from C&S.  They actually acquired

14     them directly from Fleming.  And that's, in fact -- as you

15     look at the paragraph in SuperValu's answer, paragraph 35,

16     that's exactly what that indicates.  In any event,

17     assignment of the agreement to SuperValu under the ADA

18     extinguished any C&S arbitration rights going forward.

19          And this is where the issue of assignment becomes

20     important, Your Honor, because what the defendants are

21     trying to do is say, well, even though there has been an

22     assignment of an Arbitration Agreement, the assignor still

23     has all of his rights of assignment, even though those

24     rights of arbitration have been transferred to the assignee.

25     We don't think that -- I mean, that's Black Letter Law that

1     that's not the case.  The defendants haven't cited any case

2     whatsoever that has held that.  In fact, the defendants

3     haven't cited any case whatsoever in which equitable

4     estoppel was used to bring back an assignor who had

5     transferred its arbitration rights to an assignee.

6          So with respect to Millennium and Village Markets,

7     Your Honor, the fact is that for Millennium they have only

8     sued C&S, which is not a party to Millennium's superseding

9     Arbitration Agreement with SuperValu.  And C&S doesn't have

10    -- even if they had rights with respect to the Fleming

11    Arbitration Agreements by assigning them to SuperValu under

12    the ADA, they have lost them.  They were extinguished at

13    least with respect to going forward, not with respect to

14    pre-ADA issues.

15         Village Market is just the reverse.  Village

16    Market had a SuperValu Arbitration Agreement, but they

17    assigned it.  SuperValu assigned it to C&S under the ADA,

18    and that extinguishes SuperValu's arbitration rights.  So

19    when Village Markets sues SuperValu, there is no applicable

20    arbitration agreement there.  There just isn't one.

21         THE COURT:  Tell me again what the main case is

22    that I should look to for this extinguishing with the

23    assignment.

24         MR. DRUBEL:  Well, we cite in our brief, Your

25    Honor, the restatement second of contracts.  I mean, there

1    is --

2                THE COURT:  There is no case that's right on point

3    that's going to help me much with that?

4                MR. DRUBEL:  Your Honor, all the case law that's

5    cited in the restatement -- we, frankly, didn't think it was

6    a matter of real dispute.  An assignor makes an assignment,

7    transfers their rights and, I mean, doesn't get to both

8    transfer and retain their arbitration rights.

9                THE COURT:  I was looking more for the

10   extinguishment.

11               MR. DRUBEL:  Well, but when you transfer it going

12   forward, it extinguishes your rights going forward.  It

13   means that -- for example, if you and I have an arbitration

14   agreement and I assigned it to Mr. Safranski, I don't lose

15   my rights with respect to what happened before, but with

16   what respect -- but with what will happen in the future,

17   post the assignment, I have lost my rights there.  I can't

18   both give Mr. Safranski an assignment of the arbitration

19   agreement and still retain it.

20               THE COURT:  Okay.  I think I understand what

21   you're saying.  I know we have a lot of confusion about

22   Village Market and exactly what their thing is.  I didn't

23   quite get through all of the affidavits that came after the

24   fact.

25               MR. DRUBEL:  Well, Your Honor, the fact is there

1    is no dispute that, in fact, there was an Arbitration

2    Agreement with SuperValu, which was then assigned to C&S.

3    And that's all that matters for the purposes of this motion,

4    because Village Market is in the New England arbitration

5    subclass, which has only sued SuperValu.  And there is no

6    applicable arbitration agreement between Village Markets and

7    SuperValu because SuperValu assigned that Arbitration

8    Agreement to C&S as part of the ADA, which is when all of

9    the -- which is when this cause of action accrued.

10           Remember, the plaintiffs' claims in this case are

11   that the territorial and customers restrictions in the ADA

12   were a violation of the antitrust laws.  So when there is a

13   transfer of these customers and a transfer of their

14   contracts and a simultaneous agreement not to compete for

15   them, that's the basis of our claim.

16           If I could have the third chart, please.

17           Your Honor, we believe that equitable estoppel has

18   absolutely no application here, and it's for two different

19   reasons applied to two different groups of contracts.

20           Let me say a little bit, if I could, about the *PRM*

21   case, which applies to the first group, the King Cole and

22   the Blue Goose group, because the claim by the defendants

23   there is that C&S, which is not a party to any Arbitration

24   Agreements with SuperValu, is entitled as a non-signatory to

25   enforce an Arbitration Agreement that it was not a party to,

1    which under some limited circumstances equitable estoppel

2    teaches us can happen.  We understand that.  And our

3    position is not by virtue of *Stolt-Nielsen* or anything else

4    that there is no such thing as equitable estoppel.  That is

5    not the plaintiffs' position.  However, what is the

6    plaintiffs' position is that equitable estoppel applies only

7    in limited circumstances which don't apply here.

8         In the *PRM* case, which the defendants rely on, the

9    Eighth Circuit said that estoppel typically relies in part

10   on the claims being so intertwined with the agreement

11   containing the arbitration clause that it would be unfair to

12   allow the signatory to rely on the agreement in formulating

13   its claims but to disavow availability of the arbitration

14   clause in that same agreement.  Well, the plaintiff in *PRM*

15   sued a non-signatory, Kobe Steel, for tortious interference

16   with license agreements containing arbitration clauses.  So

17   the plaintiffs there were actually relying on the agreement

18   in their lawsuit which contained the arbitration clause, the

19   license agreements.  Well, the license agreements

20   themselves, which contained the arbitration clause, the

21   Eighth Circuit points out anticipated that an entity, like

22   Kobe Steel, might enter into a licensing agreement with a

23   licensee and that agreement attempted to govern that

24   expected relationship.

25        So the plaintiff is bringing a tortious

1  interference claim claiming that the defendant tortiously

2  interfered with the contract that has the arbitration clause

3  in it.  And those contracts anticipate that someone like

4  Kobe Steel might come along.  The Eighth Circuit cites both

5  of those factors in deciding whether or not equitable

6  estoppel applied.  So the intertwinedness there consisted of

7  the fact that the agreement anticipated someone like Kobe

8  Steel; and, two, that the agreements themselves were the

9  subject of a lawsuit.  That's not true here.  Plaintiffs

10  didn't rely on the Supply Agreements with defendants in

11  formulating their claims.  They are not even mentioned in

12  the complaint.

13         And if you look, Your Honor, at the Supply

14  Agreements and Retailer Agreements that the defendants

15  attach to their motion and their reply, not a one of them

16  mentions pricing, not a one of them.  This is not a case

17  where the plaintiffs are suing under the contract because

18  they are arguing that the prices charged under the contract

19  were too high.  That has nothing to do with it.  The

20  plaintiffs are suing because they were overcharged.  Some of

21  them have Retailer Agreements, some of them don't, but none

22  of those agreements specify prices.  The plaintiffs' claims

23  don't depend at all on whether or not there is a retail

24  agreement or a supply agreement.  In fact, as the Eighth

25  Circuit said, C&S, which is the one who is trying to enforce

1    these particular Arbitration Agreements, C&S did not sign

2    the agreements, is not mentioned in any of them, and

3    performs no function whatsoever relating to their operation.

4    That's *PRM Energy* saying, look, this is very different than

5    the *Kobe Steel* case, this is not what's going on here, and

6    then citing *Ross* with approval.  That's the Second Circuit

7    case that figures prominently in our brief because we think

8    this is very similar to *Ross* where a stranger, C&S, to the

9    Arbitration Agreements with SuperValu is trying to enforce

10   them.

11          Finally, Your Honor, with respect to the

12   Millennium and Village Markets agreements -- those are the

13   ones where the defendants assign them to each other --

14   defendants have cited no case, nor can they cite any case,

15   in which equitable estoppel has ever been applied to an

16   assignor namely to allow the assignor of an arbitration

17   agreement to simultaneously transfer and yet retain its

18   right to demand arbitration; no case, and we're not aware of

19   any such case.

20          THE COURT:  I guess I would like you to conclude

21   by just spending a few minutes with me on the dismiss or

22   stay issue.  Obviously, you seek a stay.  How long would it

23   take to get the result of arbitration, years?

24          MR. DRUBEL:  Well, Your Honor, I really couldn't

25   say.  I really couldn't say.  At this point, I'd just be

1    speculating.  I would think it would be -- I mean, the fact

2    is it's theoretical.

3         The plaintiffs here, the individual plaintiffs,

4    could not possibly afford to proceed in arbitration to try

5    to prove their case.

6         And I will say this -- I only bring it up because

7    Mr. Safranski made the point again and it seemed it might

8    have resonated with Your Honor -- about, well, the

9    assumption is that we would have to start all over, each

10   plaintiff would have to have its own expert, you know, which

11   may not seem to make a lot of sense, but the fact is that

12   the Arbitration Agreements themselves require complete

13   confidentiality.  And when we were having some discussions

14   with the defendants initially about the possibility of

15   mediating these arbitration claims, we suggested that we in

16   fact mediate them all jointly, you know, we representing all

17   of the arbitration claims.  And what we got back was the

18   following:  "Each Mediation/Arbitration Agreement states

19   that the parties agree to keep confidential and not disclose

20   to third parties any information or documents obtained in

21   connection with the arbitration process, including the

22   resolution of the dispute."  The defendants then say, "Under

23   this language, each arbitration retailer and each of their

24   counsel are prohibited from disclosing anything regarding

25   the mediation -- including the mediation's existence to

1    anyone else.  As such, your proposed" -- "your

2    proposed," that is the lawyer's, lead counsel's -- "proposed

3    joint representation of all of the arbitration retailers

4    would be incompatible with this confidentiality provision."

5              THE COURT:  Okay.  I'm sorry I asked the question.

6    I guess I shouldn't have gone there.

7              MR. DRUBEL:  I mean, Your Honor, the fact is that

8    the defendants have made it very clear that joint

9    representation by lawyers, and presumably also experts,

10   would be prohibited under the language of the Arbitration

11   Agreement.  So it doesn't seem fair to me that they should

12   addressed otherwise in front of Your Honor.

13             THE COURT:  Okay.

14             MR. DRUBEL:  Thank you.

15             THE COURT:  Thank you.

16             Mr. Safranski.

17             MR. SAFRANSKI:  Your Honor, I recognize the

18   Court's comment earlier.  How long --

19             THE COURT:  Oh, I will give you five minutes or

20   so.

21             MR. SAFRANSKI:  Five minutes?  Okay.

22             Just a couple points.  If I could respond to that

23   last point first, because it's really kind of beside the

24   point.  The Mediation/Arbitration Agreements provide for

25   confidentiality, but there is nothing in those agreements

1       that prohibits two parties from hiring the same expert.

2              That letter that Mr. Drubel just put up there was

3       talking about mediation.  And, obviously, if you are trying

4       to reach a confidential settlement with individual

5       retailers, there is a need to basically try to negotiate

6       with them individually, not on a joint class-wide or group

7       basis.  But, in any event, I think the confidentiality

8       provision is something that the arbitrators can decide how

9       to interpret it.  But we have never said that they can't

10      have one expert working on different arbitrations.

11      Presumably, that expert is going to be looking at the same

12      data in each of them without the need for third-party

13      disclosure to someone else.

14             Let me just get back to the overarching point that

15      Mr. Drubel raised, which was -- he raised four issues.  He

16      said all of them have to be decided by the Court, and that's

17      simply not true.  The Court's review here is actually quite

18      limited because of the express delegation to the arbitrator

19      of the gateway arbitrability issues.  Really the Court needs

20      to decide one way another whether there is an arbitration

21      agreement.  Clearly, even Mr. Drubel admits that each of the

22      plaintiffs have an Arbitration Agreement that is in force.

23             THE COURT:  At least with one party.

24             MR. SAFRANSKI:  He argues, well, the assignment

25      killed SuperValu's right to arbitration but gave it to C&S.

1    But the first point is that there is an existing Arbitration

2    Agreement.

3         The second issue the Court has to reach is either,

4    one, are they making claims against signatories or, two,

5    does equitable estoppel empower or entitle the non-signatory

6    to enforce the agreement.  All the arguments with respect to

7    the validity, enforceability, all those things have been

8    delegated expressly to the arbitrator.

9         Mr. Drubel cited the *Koch* case from the Eighth

10   Circuit to say, well, some of these issues actually are

11   decided by the court.  It was interesting, in the *Koch* case

12   it didn't have an express delegation clause like this case

13   does.  It didn't have an express clause that says that the

14   arbitrator decides the scope, validity, exploration,

15   termination.  We have cited a number of cases that questions

16   of expiration and termination are decided by the arbitrator

17   when there is an express delegation clause.

18        The other interesting thing about the *Koch v.*

19   *Compucredit* case is that there was a question of whether the

20   agreement was terminated and if the agreement was

21   terminated, could the other party still enforce arbitration.

22   The Eighth Circuit said, "Even if the underlying credit

23   agreement was terminated by the settlement, such a

24   termination doesn't necessarily release the parties from the

25   obligations of that agreement, including the obligation to

1    arbitrate.  To the contrary, there is a presumption in favor

2    of post-exploration arbitration matters, unless negated

3    expressly or by clear implication."  But all that's really

4    beside the point because what we have here is equitable

5    estoppel.

6         Mr. Drubel brought up this idea of this having an

7    arbitration agreement, let's say, between me and Mr. Drubel.

8    Now, if I were to assign that arbitration agreement to your

9    Honor and Mr. Drubel were to sue me, he would take the

10   position -- or were to sue me to challenge the validity of

11   that assignment, he would take the position that claim is

12   not arbitrable, but that is precisely what doctrines like

13   equitable estoppel were brought about to do, is to make sure

14   that parties can't get around their arbitration agreements

15   by, I guess, basically pleading around them.

16         I will just be very brief on the *PRM* case.  *PRM*

17   was not just a tortious interference case.  There was a

18   conspiracy alleged.  And the point was that the conspiracy

19   was targeted at the relationship, an undermining of the

20   plaintiff's rights under the relationship that contained the

21   arbitration clause.  Mr. Drubel argues, well, the Supply

22   Agreements we put into the record don't contain prices.

23   Actually, that's not entirely true.  The Supply Agreements

24   do provide for rebates, which are negotiated, which are the

25   prices -- which go directly to the prices that are being

 1    charged.  The plaintiffs' claim here is that the Asset

 2    Exchange and Non-Compete Agreements effected the market,

 3    gave market power to the signatories of these agreements,

 4    and allowed them to extract higher prices in the agreements

 5    they'd negotiated in the arbitration clauses.

 6              With that, I think I will rest.

 7              THE COURT:  All right.  Thank you, Counsel.

 8              I think I'm going to have to make some of my own

 9    charts, and graphs, and flows as to who has what agreement

10    with whom and sort this out a bit.  And we will try to get

11    you an order as soon as we can.  I'm slightly backed up

12    here, but we will get to you here as soon as we can.

13              Mr. Drubel, it looks like you have something to

14    say.

15              MR. DRUBEL:  I wonder if Your Honor would permit

16    me to hand up the charts?

17              THE COURT:  Anything that was on the screen.

18              Likewise, Mr. Safranski, I think some things I saw

19    in the brief, but just so we have a separate copy, if you

20    would give that to Forest, that would be helpful.

21              MR. DRUBEL:  Thank you, Your Honor.

22              (Court adjourned at 2:30 p.m.)

23                        *      *      *

24

25

1          I, Debra Beauvais, certify that the foregoing is a

2     correct transcript from the record of proceedings in the

3     above-entitled matter.

4

5

6               Certified by:   s/Debra Beauvais
                                Debra Beauvais, RPR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25