# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3768

_____

In re: Wholesale Grocery Products Antitrust Litigation

------------------------------

King Cole Foods, Inc.; JFM Market, Inc.; MJF Market, Inc.

*Plaintiffs - Appellants*

v.

SuperValu, Inc.; C&S Wholesale Grocers, Inc.

*Defendants - Appellees*

------------------------------

The Chamber of Commerce of the United States of America

*Amicus on Behalf of Appellees*

_____

No. 11-3773

_____

In re: Wholesale Grocery Products Antitrust Litigation

------------------------------

Blue Goose Super Market, Inc.; Millennium Operations, Inc., doing business as R.C. Dick's Market

*Plaintiffs - Appellants*

v.

SuperValu, Inc.; C&S Wholesale Grocers, Inc.

*Defendants - Appellees*

------------------------------

The Chamber of Commerce of the United States of America

*Amicus on Behalf of Appellee*
_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis
_____

Submitted: November 13, 2012
Filed: February 13, 2013
_____

Before MURPHY, BENTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Appellants are five retail grocers ("the Retailers"), each attempting to bring class-action antitrust claims against one of two wholesale grocers ("the Wholesalers"). Each Retailer is a customer of only one of the Wholesalers, has an arbitration agreement with only that Wholesaler, and is attempting to use an antitrust conspiracy theory to bring suit against the Wholesaler with whom it neither does business nor has an arbitration agreement ("the non-signatory Wholesaler"). The district court dismissed the Retailers' claims and struck their allegations from the complaint in the

-2-

ongoing[1] lawsuit, holding that equitable estoppel bars the Retailers from bringing suit against the non-signatory Wholesaler and allows the non-signatory Wholesaler to compel arbitration.  The district court certified this as a final judgment under Federal Rule of Civil Procedure 54(b).  In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, 2011 WL 3837107, at *4 (D. Minn. Aug. 30, 2011) (unpublished).  We have jurisdiction under 28 U.S.C. § 1291.  We reverse the district court's ruling that equitable estoppel bars the Retailers from asserting antitrust claims in federal court, and we remand for further proceedings.

## I.

Appellants Blue Goose Super Market, Inc. ("Blue Goose"), Millennium Operations, Inc. ("Millennium"), and King Cole Foods, Inc. ("King Cole") all have supply and arbitration agreements with Appellee SuperValu, Inc. ("SuperValu"). Appellants JFM Market, Inc. and MJF Market, Inc. (collectively "the Village Markets") both have supply and arbitration agreements with Appellee C&S Wholesale Grocers, Inc. ("C&S").[2]  The parties all agree that the Retailers' supply agreements

---

[1]After the Retailers were dismissed from the lawsuit and filed this appeal, the district court denied class certification to the plaintiffs remaining in the lawsuit.  In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, 2012 WL 3031085, at *17 (D. Minn. July 25, 2012) (unpublished).  The district court later granted summary judgment in favor of the Wholesalers on the remaining plaintiffs' claims.  In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, 2013 WL 140285, at *16 (D. Minn. Jan. 11, 2013) (unpublished).  As of February 7, 2013, one of these plaintiffs has filed a notice of appeal of both orders.

[2]The district court noted that the Village Markets actually executed arbitration agreements with SuperValu, that those agreements later were assigned to C&S, and that the Village Markets disputed the validity of the assignment.  In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, slip op. at 4 n.3 (D. Minn. July 5, 2011).  On appeal, the Village Markets have stated that their contracts "were transferred to C&S, as the District Court found."  King Cole Br. 11.  Whether

-3-

with the Wholesalers do not specify price terms.  Millennium's supply agreement with SuperValu specifies Millennium will purchase a certain percentage of its requirements from SuperValu.  The other Retailers' supply agreements do not contain requirements provisions, but rather generally state that the Wholesaler named in the agreement will make products available and that the Retailer named in the agreement will pay the prices stated on any future sales documents.    The arbitration agreements accompanying[3] the supply agreements all generally specify that the signatories will arbitrate any disputes between them.

In September 2003, C&S and SuperValu entered into an Asset Exchange Agreement ("AEA") in which they exchanged certain business assets, including some customer contracts, and agreed not to do business with or solicit any of the exchanged customers for a certain time period.  Some, but not all, of the Retailers' supply and arbitration agreements were among the contracts exchanged as part of the AEA.

After the AEA, all of the Retailers purchased goods from the Wholesaler with whom they had a supply and arbitration agreement ("the signatory Wholesaler"). Each Retailer subsequently brought class-action antitrust claims in federal district court.  In an effort to avoid arbitration, each Retailer brought claims only against the Wholesaler with whom they did not have a supply and arbitration agreement.  Thus, Blue Goose, Millennium, and King Cole, who had contracts and did business only

---

the transfer constituted a valid assignment is a separate issue that we do not address on this appeal.

[3]The parties agree that the supply agreements and the arbitration agreements are actually separate documents—i.e., that each Retailer is a signatory both to a supply agreement and to an arbitration agreement.  The Wholesalers state this in their brief, Appellees' Br. 7, 11-13, as do Blue Goose and Millennium, Blue Goose Br. 6-7.  King Cole and the Village Markets imply the same in their brief, see King Cole Br. 10-12 (referring to "arbitration agreements" rather than to "arbitration clauses"), and in any event, they do not dispute the Wholesalers' assertion.

-4-

with SuperValu during the class period, brought antitrust claims only against C&S. Likewise, the Village Markets, who had contracts and did business only with C&S during the class period, brought antitrust claims only against SuperValu.   The Retailers alleged that the AEA amounted to an illegal antitrust conspiracy between the Wholesalers in violation of the Sherman Act, 15 U.S.C. § 1, artificially inflating prices and causing each Retailer to overpay for their wholesale grocery purchases.

The Wholesalers moved to dismiss the Retailers' antitrust claims.   The Wholesalers argued that the doctrine of either equitable estoppel or successor-in-interest allowed the non-signatory Wholesaler to enforce the signatory Wholesaler's arbitration agreements with the Retailers, thus requiring the Retailers to arbitrate their antitrust claims against the non-signatories.   The Retailers responded that neither the equitable estoppel doctrine nor the successor-in-interest doctrine compelled them to arbitrate, and further argued that even if one of those doctrines did apply, the arbitration agreements were unenforceable for public policy reasons.

The district court granted the Wholesalers' motion to dismiss the Retailers' claims from the putative class action. In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, slip op. at 11 (D. Minn. July 5, 2011).  First, the court held that the non-signatory Wholesaler could invoke equitable estoppel to compel the Retailers to arbitrate their antitrust claims.  Id. at 6.  Second, the court held that the arbitration agreements were enforceable.  Id. at 10.  Because the district court held the Wholesalers could use equitable estoppel to compel arbitration, the court did not address the Wholesalers' argument that they could enforce the arbitration agreements as successors-in-interest.  The Retailers brought the present appeal.

II.

A.

The first issue on appeal is whether the non-signatory Wholesalers can use equitable estoppel to compel the Retailers to arbitrate their antitrust claims. "Where a district court grants arbitration, its application of equitable estoppel presents at least mixed questions of law and fact.  In this circuit, mixed questions of law and fact are reviewed de novo." Donaldson Co. v. Burroughs Diesel, Inc., 581 F.3d 726, 731 (8th Cir. 2009).  Upon de novo review, we hold that the non-signatory Wholesalers cannot use equitable estoppel to compel arbitration.

As a preliminary matter, "state contract law governs the ability of nonsignatories to enforce arbitration provisions."  PRM Energy Sys., Inc. v. Primenergy, L.L.C., 592 F.3d 830, 833 (8th Cir. 2010) (internal quotation marks omitted).  The parties agree that Minnesota law applies here.[4]  The only Minnesota Supreme Court case mentioning equitable estoppel in the arbitration context is Onvoy, Inc. v. SHAL, LLC, 669 N.W.2d 344 (Minn. 2003).  In that case, the court stated the general rule that "arbitration clauses are contractual and cannot be enforced by persons who are not parties to the contract."  Id. at 356.  The court then explained that equitable estoppel is an exception to the rule and "prevents a signatory from relying on the underlying contract to make his or her claim against the nonsignatory."  Id. The court did not reach the issue of whether equitable estoppel applied, however, because it remanded the case on other grounds.  Id. at 357.  One unpublished Minnesota Court of Appeals case has evaluated when equitable estoppel applies in the

_____

[4]C&S, SuperValu, Blue Goose, and Millennium explicitly state that Minnesota law applies.  See Appellees' Br. 21; Blue Goose Br. 18.  King Cole and the Village Markets seem to agree, see King Cole Reply Br. 7 (referencing Minnesota law), and in any event, they do not dispute the assertion.

-6-

arbitration context,[5] but Minnesota law specifies that unpublished cases are not precedential.  Minn. Stat. § 480A.08(3)(c).  Minnesota appears to follow federal law regarding equitable estoppel.  See Onvoy, 669 N.W.2d at 356 ("Federal cases have set out at least three principles on which a nonsignatory to a contract can compel arbitration: equitable estoppel, agency, and third-party beneficiary." (citing MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999), abrogated on other grounds by Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 631 (2009)).  Since we do not have any published Minnesota cases applying equitable estoppel, and since Minnesota appears to follow federal law regarding equitable estoppel, we look to federal law here.[6]

_____

[5]In ev3, Inc. v. Collins, No. A08-1816, A08-1901, 2009 WL 2432348, at *1 (Minn. Ct. App. Aug. 11, 2009) (unpublished), the Minnesota Court of Appeals upheld a trial court's denial of a motion to compel arbitration based on equitable estoppel.  The dissent suggests we follow ev3's analytical approach because "it provides a persuasive indication of how the Minnesota Supreme Court would apply equitable estoppel."  Infra at 17.  It is true that we may look to intermediate appellate court decisions as persuasive authority "when they are the best evidence of what state law is."  Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 534 (8th Cir. 2006).  As explained in section II(A) of our opinion, however, our circuit has developed an approach to equitable estoppel that is based on a different interpretation of the same case analyzed in ev3 and cited in the Minnesota Supreme Court's Onvoy opinion—namely, MS Dealer Serv. Corp. v. Franklin, 177 F.3d 942 (11th Cir. 1999), abrogated on other grounds by Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 631 (2009).  See infra at 10 n.8.  Moreover, while the ev3 court did state that "the principles of equitable estoppel could be applied" to compel arbitration in that case, the court ultimately upheld the district court's decision not to compel arbitration due to the standard of review.  ev3, 2009 WL 2432348, at *6-7.  Thus, given the Minnesota Supreme Court's explicit reference in Onvoy to federal law on this issue, a single non-precedential case which did not ultimately compel arbitration is not a persuasive predictor of how the Minnesota Supreme Court would rule.

[6]Several cases cited in the parties' briefs explicitly apply the law of states other than Minnesota and thus are inapposite.  See Simmons Foods, Inc. v. H. Mahmood J.

-7-

We addressed the doctrine of equitable estoppel in <u>PRM Energy Systems</u>. In that case, we explained:

> [Equitable] estoppel[7] typically relies, at least in part, on the claims being so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.

<u>PRM Energy Sys.</u>, 592 F.3d at 835 (footnote added).  A non-signatory can "force a signatory into arbitration under the [equitable] estoppel theory when the relationship of the persons, wrongs and issues involved is a close one."  <u>CD Partners, LLC v. Grizzle</u>, 424 F.3d 795, 799 (8th Cir. 2005).  For example, as relevant to the instant case, equitable estoppel applies when a complaint involves "allegations of pre-arranged, collusive behavior demonstrating that the claims are intimately founded in and intertwined with the agreement at issue."  <u>PRM Energy Sys.</u>, 592 F.3d at 835 (internal quotation marks omitted).  In contrast, merely alleging that a non-signatory conspired with a signatory is insufficient to invoke equitable estoppel, absent some

---

<u>Al-Bunnia & Sons Co.</u>, 634 F.3d 466, 469 (8th Cir. 2011) (Arkansas law); <u>Lawson v. Life of the S. Ins. Co.</u>, 648 F.3d 1166, 1171 (11th Cir. 2011) (Georgia law); <u>Donaldson</u>, 581 F.3d at 732 (Mississippi law).

[7]In cases such as <u>PRM Energy Systems</u>, we have used the term "alternative estoppel" to refer to the "intertwined with the agreement" theory of when a non-signatory can compel arbitration.  <u>See</u> <u>PRM Energy Sys.</u>, 592 F.3d at 834-35.  We did so to distinguish this theory from a theory that "relies on agency and related principles to allow a nonsignatory to compel arbitration when, as a result of the nonsignatory's close relationship with a signatory, a failure to do so would eviscerate the arbitration agreement."  <u>Id.</u> at 834.  Since the district court, the parties' briefs, and the Minnesota Supreme Court use the term "equitable estoppel," <u>see</u> <u>Onvoy</u>, 669 N.W.2d at 356, we use that term here.

-8-

"intimate[] . . . and intertwined" relationship between the claims and the agreement containing the arbitration clause.  PRM Energy Systems, 592 F.3d at 835.

Examining the facts of cases applying our equitable estoppel test is instructive. First, in CD Partners, CDWI and C.D. Partners signed franchise agreements containing arbitration clauses.  424 F.3d at 797.  C.D. Partners later sued three of CDWI's chief executives for negligence, negligent misrepresentation, and fraudulent misrepresentation in connection with their operation of the franchises.  Id.  The three executives moved to compel arbitration, and the district court denied their motion.  Id. at 798.  We reversed, holding, in relevant part, that the "dispute between signatory C.D. Partners and [the three non-signatory chief executives] arises out of and relates directly to the contractual agreement between the signatories, where the core of the dispute is the conduct of the three nonsignatories in fulfilling signatory CDWI's promises."  Id. at 800.

Second, in PRM Energy Systems, PRM had a contract with Primenergy that granted Primenergy a license to use some of PRM's technology and also allowed Primenergy to enter into sublicense agreements with third parties.  592 F.3d at 832. The contract contained an arbitration clause.  Id.  Primenergy allegedly conspired with a third party, the Japan-based company Kobe Steel, to violate the terms of that contract.  Id.  More specifically, although the contract specified Primenergy could not sublicense PRM's technology to companies in Japan, Primenergy and Kobe Steel allegedly entered into such a sublicense agreement.  Id.  PRM brought suit against non-signatory Kobe Steel for tortious interference and conspiracy, and Kobe Steel moved to compel arbitration.  Id. at 833.  The district court granted Kobe Steel's motion on the basis of equitable estoppel, and we affirmed.  Id.  We explained that equitable estoppel applied because the case involved allegations of violation of the terms of the agreement containing the arbitration clause, and because that agreement "anticipated that an entity such as Kobe Steel might enter into a licensing relationship

-9-

with Primenergy, and the [agreement] attempted to govern that expected relationship." Id. at 836.

Applying this precedent, we hold that the Retailers' claims against the non-signatory Wholesalers are not "so intertwined with the agreement containing the arbitration clause that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." Id. at 835. In both PRM Energy Systems and CD Partners, the plaintiffs' claims arose directly from violations of the terms of a contract containing an arbitration clause. See PRM Energy Sys., 592 F.3d at 832-33; CD Partners, 424 F.3d at 797. Without the contracts in those cases, the plaintiffs would not have had a cause of action. In contrast, the Retailers are bringing antitrust conspiracy claims against the non-signatory Wholesalers. These statutory claims exist independent of the supply and arbitration agreements. See 15 U.S.C. § 1 ("Every . . . conspiracy[] in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."); 15 U.S.C. § 15 ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ."). Moreover, the Retailers' antitrust claims are premised on paying artificially inflated prices, but since none of the Retailers' contracts with the Wholesalers specify price terms, the Retailers' claims do not involve alleged violation of any terms of those contracts. Nor is there any evidence, as there was in PRM Energy Systems, that the contracts explicitly anticipated a signatory would enter into the type of relationship with a non-signatory—here, the relationship being that of antitrust co-conspirators—that ultimately gave rise to the claims. Under these circumstances, we cannot say that the Retailers' claims "rely on"[8] and have an

---

[8]The Wholesalers argue that it is irrelevant whether the Retailers' antitrust claims rely on the terms of the contracts containing the arbitration clause. Appellees' Br. 31-34. Specifically, they argue that under MS Dealer, the Eleventh Circuit case cited in the Minnesota Supreme Court's Onvoy opinion, see Onvoy, 669 N.W.2d at

-10-

"intimate[] . . . and intertwined" relationship with the contracts such that equitable estoppel should apply.  See PRM Energy Sys., 592 F.3d at 835 (internal quotation marks omitted).

In holding that equitable estoppel permits the non-signatory Wholesaler to compel arbitration here, the district court reasoned, "The agreements to arbitrate . . . are a fundamental component of the entire wholesaler-retailer relationship between the signatories . . . . This is precisely the relationship that is at issue in this litigation." In re Wholesale Grocery Prods. Antitrust Litig., No. 09-MD-2090 ADM/AJB, slip op. at 6 (D. Minn. July 5, 2011).  The court further reasoned that "the existence of the agreements to arbitrate is presumed by the claims asserted by the [Retailers] because without the agreements no wholesaler-supplier relationship would exist to be exploited by the alleged anti-trust conspiracy . . . ." Id. at 7.  This analysis, however, focuses too much on the relationship between the signatories, rather than on the relationship between the signatory's claims against the non-signatory and the contract containing the arbitration clause.[9]  As explained above, these antitrust conspiracy

───────────────

356, reliance is unnecessary when the complaint involves allegations of concerted misconduct between a signatory and non-signatory. Appellees' Br. 31-32 (citing MS Dealer, 177 F.3d at 947).  However, in both PRM Energy Systems and CD Partners, we relied heavily on MS Dealer.  See PRM Energy Sys., 592 F.3d at 834-36; CD Partners, 424 F.3d at 798.  Thus, CD Partners and PRM Energy Systems involved our interpretation of MS Dealer, and we do not believe a different result would be warranted under that case.

[9]Similarly, the dissent's analysis erroneously focuses on the terms of the contractual relationship established between the signatories to the arbitration agreements.  See infra at 14-16.  The issue in this case, however, is not the contractual relationship between the signatories.  Rather, the issue is whether the signatory's claims against the non-signatory are of such a nature that the non-signatory should be able to compel arbitration pursuant to the terms of the contract between the signatories, even though the non-signatory was not a party to that contract.

-11-

Appellate Case: 11-3768     Page: 11     Date Filed: 02/13/2013 Entry ID: 4004472

claims do not involve violation of the terms of the contract, the face of the contract does not provide the basis for the alleged injuries, and there is no evidence that the contract anticipated the precise type of relationship giving rise to the claims. Thus, the requisite relationship is lacking here.

B.

Although we hold that the non-signatory Wholesalers cannot use equitable estoppel to compel the Retailers to arbitrate their antitrust claims, this does not fully resolve the question of whether the non-signatory Wholesalers can compel any of the Retailers to arbitrate. The non-signatory Wholesalers also argue they can enforce Millennium's and the Village Market's arbitration agreements as successors-in-interest because those agreements were exchanged as part of the AEA.[10] Since the district court found the equitable estoppel issue dispositive, it did not address the successor-in-interest argument. Accordingly, we remand for the district court to consider this argument in the first instance. See Alliant Techsystems, Inc. v. Marks, 465 F.3d 864, 873 (8th Cir. 2006) ("Because the district court did not decide the merits of these claims, which are heavily fact-based, we decline to consider them in the first instance.").

C.

Finally, King Cole and the Village Markets argue that even if the non-signatory Wholesaler can compel arbitration, the arbitration agreements are unenforceable for

---

[10]The Wholesalers do not make this argument with respect to Blue Goose or King Cole.

-12-

public policy reasons.[11]  With respect to King Cole, this argument is moot because we have held that C&S cannot use equitable estoppel to compel arbitration, and C&S does not make the alternative argument that it can enforce the arbitration agreement as a successor-in-interest.  With respect to the Village Markets, this argument is relevant only if the district court finds that SuperValu can enforce the arbitration agreement as a successor-in-interest.  Since we are remanding for the district court to consider the successor-in-interest argument, we decline to reach the Village Markets' public policy argument as we would risk issuing an advisory opinion.  See United States v. Tyerman, 641 F.3d 936, 936 n.2 (8th Cir. 2011) (declining to reach remaining issues "because it is unknown if and how this case will proceed on remand").

III.

Accordingly, we reverse the district court's holding that the non-signatory Wholesalers can enforce the Retailers' arbitration agreements based on the doctrine of equitable estoppel.  We remand for further proceedings consistent with this opinion.

BENTON, Circuit Judge, dissenting.

Because Minnesota equitable-estoppel law and the text of the arbitration agreements compel arbitration, I respectfully dissent from the court's opinion.  The opinion has two, independent, flaws.  First, the court misreads the arbitration

---

[11]Neither Millennium nor Blue Goose makes this argument.  In any event, the argument would be moot with respect to Blue Goose since we have held C&S cannot use equitable estoppel to compel arbitration, and C&S does not make the alternative argument that it can enforce the arbitration agreement as a successor-in-interest.

-13-

agreement.  Second, the court incorrectly applies choice-of-law principles, thereby omitting an important component of equitable-estoppel doctrine in Minnesota.

I.

The court asserts that this court's precedents preclude equitable estoppel, *ante* at 8-11, *citing* **PRM Energy Sys., Inc. v. Primenergy, L.L.C.**, 592 F.3d 830, 833 (8th Cir. 2010); **CD Partners, LLC v. Grizzle**, 424 F.3d 795, 799 (8th Cir. 2005).  The court correctly describes the factual circumstances of *PRM Energy* and *CD Partners*. The lynchpin of this court's holding here, however, is that the Retailers' claims "exist independent of the supply and arbitration agreements," *ante* at 10.  That statement has no basis in the record, misreads the arbitration agreement, and leads to an incorrect result in this case.

The arbitration agreements in this case apply to any dispute arising between the parties, not solely those arising under a single contract:

> Any controversy, claim or dispute of whatever nature arising between Retailer and SUPERVALU or any other SUPERVALU Entity, as defined below, including but not limited to those arising out of or relating to any agreement between the parties or the breach, termination, enforceability, scope or validity thereof, whether such claim existed prior to, or arises on or after, the Execution Date (a "Dispute"), shall be resolved by mediation or, failing mediation, by binding arbitration.  A "SUPERVALU Entity" is defined as SUPERVALU INC. or any other entity that, directly or indirectly, owns or controls, is owned or controlled by, or is under common ownership or control with, SUPERVALU INC.

Although executed on the same date as the Retail Agreements, the arbitration agreement is a separate document.  It does not make any reference to the Retail

-14-

Agreement.  By its terms, it applies to *any* dispute between the parties, whether or not it involves the Retail Agreement.  Nevertheless, the court apparently concludes that this arbitration agreement is limited to disputes under the Retail Agreement.

This arbitration agreement is not like the arbitration clauses in *PRM Energy* and *CD Partners*.  There, the arbitration clauses applied only to disputes related to the contract containing the clause.  ***PRM Energy***, 592 F.3d at 837 (Beam, J., dissenting) ("The arbitration clause tangentially at issue here purports to cover 'all disputes arising under' a technology licensing agreement between PRM and Primenergy."); ***CD Partners***, 424 F.3d at 797 ("Each franchise agreement contained an identical arbitration clause which stated, in relevant part: 'Except as provided in this Agreement, Franchisor and Franchisee agree that any claim, controversy or dispute arising out of or relating to Franchisee's operation of the Franchised business under the Agreement . . . which cannot be amicably settled shall be referred to Arbitration . . . .'").  The arbitration clauses in both cases were limited to disputes arising under a specific contract.  Therefore, the appropriate inquiry for equitable estoppel was whether the claims were sufficiently "intertwined" with the contract.  *See **PRM Energy***, 592 F.3d at 835.

Not so in this case.  The arbitration agreement here covers *all* disputes "including but not limited to those arising out of or relating to any agreement between the parties."  As the district court correctly ruled, this arbitration agreement covers the entire relationship and course of dealing, and would include, for example, later purchase contracts and purchase transactions.  The antitrust claims from the Retailers – that purchase prices were inflated – are certainly "intertwined" with and "rely on" the terms of those transactions and the course of dealing between the parties.  *See **id.***

The court states: "In both *PRM Energy Systems* and *CD Partners*, the plaintiffs' claims arose directly from violations of the terms of a contract containing an

-15-

arbitration clause," *ante* at 10.  Precisely.  This case presents a broader arbitration agreement that is not tied solely to claims arising under a specific contract.  Yet the court treats them the same.  I would hold that the arbitration agreement here compels arbitration based on equitable estoppel.

II.

The court correctly notes that state law determines whether nonsignatories can enforce arbitration provisions.  ***PRM Energy***, 592 F.3d at 833 (8th Cir. 2010), *citing **Arthur Anderson v. Carlisle***, 556 U.S. 624, 630-31 (2009).  Minnesota has recognized equitable estoppel as one method to enforce an arbitration agreement against a nonsignatory.  ***Onvoy, Inc. v. SHAL, LLC***, 669 N.W.2d 344, 356 (Minn. 2003), *citing **MS Dealer Serv. Corp. v. Franklin***, 177 F.3d 942, 947 (11th Cir. 1999), *abrogated on other grounds by **Carlisle***, 556 U.S. at 631. The Minnesota Supreme Court's only discussion of equitable estoppel – in its entirety – is as follows:

> Federal cases have set out at least three principles on which a nonsignatory to a contract can compel arbitration: equitable estoppel, agency, and third-party beneficiary.  *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999).  Equitable estoppel prevents a signatory from relying on the underlying contract to make his or her claim against the nonsignatory.  *See id.*; Gabriel M. Wilner, *Domke on Commercial Arbitration* § 10.07 (1983).

***Id.***  Not in *Onvoy* – or in any other case – does the Minnesota Supreme Court apply equitable estoppel, announce the appropriate test(s) for it, or provide any further insight into Minnesota equitable-estoppel law.  Nevertheless, this court holds that "Minnesota appears to follow federal law regarding equitable estoppel," *ante* at 7.

Because the Minnesota Supreme Court has not addressed how to apply equitable estoppel, this court must predict how the court would rule.  ***Progressive N.***

-16-

*Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) ("If the highest state court has not decided an issue we must attempt to predict how the highest court would resolve the issue, with decisions of intermediate state courts being persuasive authority.").  Based on the discussion in *Onvoy*, the only appropriate prediction is that the Minnesota Supreme Court would apply equitable estoppel *as expressed in MS Dealer* – the only case that court cites.

*MS Dealer* articulates two separate inquiries for equitable estoppel.  "First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory."  *MS Dealer*, 177 F.3d at 947 (alteration in original), *quoting* **Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.**, 10 F.3d 753, 757 (11th Cir. 1993).  "Second, 'application of equitable estoppel is warranted . . . when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories of the contract.'"  *Id.* (alterations in original), *quoting* **Boyd v. Homes of Legend, Inc.**, 981 F. Supp. 1423, 1432 (M.D. Ala. 1997).

Further, the one Minnesota case applying equitable estoppel is dispensed with by the court because it is unpublished and therefore "not precedential," *ante* at 6-7 & n.5, *citing* **ev3, Inc. v. Collins**, No. A08-1816, A08-1901, 2009 WL 2432348, at *1 (Minn. Ct. App. Aug. 11, 2009) (unpublished); **Minn. Stat. § 480A.08(3)(c)**.  While it may not be precedential, it provides a persuasive indication of how the Minnesota Supreme Court would apply equitable estoppel.  *See* **Marvin Lumber & Cedar Co. v. PPG Indus., Inc.**, 223 F.3d 873, 888 (8th Cir. 2000) (relying, in part, on an unpublished Minnesota Court of Appeals case to justify a predicted outcome of the Minnesota Supreme Court); **Friedberg v. Chubb & Son, Inc.**, 832 F. Supp. 2d 1049, 1059 n.7 (D. Minn. 2011) ("*Bloom* is an unpublished opinion of the Minnesota Court

-17-

of Appeals, but the court finds *Bloom* persuasive in predicting how the Minnesota Supreme Court would interpret the instant policy."). The Minnesota Court of Appeals followed the exact approach I suggest – equitable estoppel as articulated in *MS Dealer*. *ev3*, 2009 WL 2432348, at *3 ("[I]n *MS Dealer Serv. Corp. v. Franklin*, cited by the supreme court in *Onvoy*, the Eleventh Circuit stated that equitable estoppel allows a nonsignatory to compel arbitration in two different situations . . . ."); *see also In re Petters Co., Inc.*, 480 B.R. 346, 361-62 (Bankr. D. Minn. 2012) (explaining that Minnesota courts have adopted these two, separate inquiries for equitable estoppel).

The "relies on" test and the "concerted misconduct" test are separate grounds for equitable estoppel in Minnesota. Under either test, I believe equitable estoppel compels arbitration of the claims in this case.

As discussed in Part I, the Retailers' claims rely on the course of dealing between the parties and the purchase transactions – all of which are governed by the arbitration agreement. But the court's analysis should not stop there.

This court should also consider the "concerted misconduct" test of equitable estoppel. *See MS Dealer*, 177 F.3d at 947. The court claims to have addressed concerted misconduct by discussing *PRM Energy* and *CD Partners* because "in both *PRM Energy Systems* and *CD Partners*, we relied heavily on *MS Dealer*," *ante* at 10 n.8. Even so, this court should be concerned with what the Minnesota Supreme Court's view would be, and not what this court's interpretation has been. *See McDonough*, 608 F.3d at 390.

The Minnesota Court of Appeals held that concerted misconduct is grounds for equitable estoppel. *ev3*, 2009 WL 2432348, at *6. This test is met when the plaintiff alleges "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories of the contract." *MS Dealer*, 177 F.3d at 947. That is what happened here. The Retailers allege that Supervalu and

-18-

C&S acted in concert through the Asset Exchange Agreement to establish separate territories, eliminate competition, and raise prices.

The *PRM Energy* case supports this conclusion:  "PRM specifically allege[d] coordinated behavior between a signatory and a non-signatory" and "[c]ollusive conduct between Kobe Steel and Primenergy allegedly arose from this potential relationship."  ***PRM Energy***, 592 F.3d at 836.  Further, even if concerted misconduct requires the claims to be intertwined with the contract(s) subject to arbitration, that nexus is present, as discussed in Part I.

I would hold that the concerted misconduct alleged in this case also establishes equitable estoppel and compels arbitration.

### III.

Finding that equitable estoppel compels arbitration would require this court to address King Cole's and the Village Markets' argument that the arbitration agreements are unenforceable on public-policy grounds because arbitration would be prohibitively expensive.  This argument is foreclosed by the Supreme Court.  ***AT&T Mobility LLC v. Concepcion***, 131 S. Ct. 1740, 1748 (2011).  *But see* ***In re Am. Express Merchants' Litig.***, 667 F.3d 204, 217-18 (2d. Cir.), *cert. granted sub nom.* ***Am. Express Co. v. Italian Colors Restaurant***, 133 S. Ct. 594 (2012).

* * * * * * *

I respectfully dissent from the court's opinion, and would affirm the judgment of the district court.

_____

-19-