# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:  Wholesale Grocery Products<br>Antitrust Litigation | **MEMORANDUM OPINION<br>AND ORDER**<br>Court File No. 09-MD-2090 ADM/TNL |

Edward T. Dangel III, Esq., Dangel & Mattchen, LLP, Boston, MA, on behalf of Plaintiffs JFM Market, Inc., and MJF Market, Inc.

Stephen P. Safranski, Esq., Lisa Beane, Esq., and Geoffrey H. Kozen, Esq., Robins Kaplan LLP, Minneapolis, MN, on behalf of Defendant SuperValu, Inc.

## I.  INTRODUCTION

This matter is before the undersigned United States District Judge on Defendant

SuperValu, Inc.'s ("SuperValu") Motion to Exclude Expert Testimony [Docket No. 921] and

Motion for Summary Judgment [Docket No. 928], and Plaintiffs JFM Market, Inc. and MJF

Market, Inc.'s (collectively, "Village Market") Motion to Reconsider Pursuant to Rule

23(c)(1)(C) [Docket No. 931]; Motion to Certify Class [Docket No. 1016]; and Motion to

Appoint Counsel [Docket No. 1022].  For the reasons set forth below, SuperValu's Motions are

granted and Village Markets' Motions are denied.

## II.  RELEVANT BACKGROUND[1]

---

[1] The full factual and procedural background of this multidistrict litigation is set forth in previous decisions by this Court and the Eighth Circuit and is incorporated by reference.  See In re Wholesale Grocery Prods. Antitrust Litig., 850 F.3d 344 (8th Cir. 2017); In re Wholesale Grocery Prods. Antitrust Litig., 752 F.3d 728 (8th Cir. 2014), cert. denied (June 8, 2015); In re Wholesale Grocery Prods. Antitrust Litig., 707 F.3d 917 (8th Cir. 2013); In re Wholesale Grocery Prods. Antitrust Litig., 2017 WL 4876277 (D. Minn. Oct. 24, 2017); In re Wholesale Grocery Prods. Antitrust Litig., 2016 WL 4697338 (D. Minn. Sept. 9, 2016); In re Wholesale Grocery Prods. Antitrust Litig., 2013 WL 140285 (D. Minn., Jan. 11, 2013); In re Wholesale Grocery Prods. Antitrust Litig., 2012 WL 3031085 (D. Minn. July 25, 2012); In re Wholesale Grocery Prods. Antitrust Litig., 722 F. Supp. 2d 1079 (D. Minn. 2010).

This multidistrict antitrust litigation arises from an Asset Exchange Agreement ("AEA") between SuperValu and C&S Wholesale Grocers, Inc. ("C&S"), the two largest full-line grocery wholesalers in the United States.  See Second Consol. Am. Class Action Compl. [Docket No. 99] ("Second Am. Compl.") ¶ 1.  SuperValu's business is primarily in the Midwest, and C&S's business is largely concentrated in New England.  Id.  Through the AEA, SuperValu sold its New England wholesale grocery operations to C&S, and C&S sold wholesale grocery operations it had recently acquired in the Midwest to SuperValu.  Id. ¶¶ 1, 35.

Several retail grocers sued SuperValu and C&S, alleging the AEA was motivated by the anti-competitive attempt to allocate customers and territory in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  See id. ¶¶ 34–44, 77–83.  The retailers claimed that the allegedly illegal agreement harmed competition and caused them to pay inflated prices for their wholesale grocery goods and services.  Id. ¶ 3.  Plaintiffs asserted their claims as a class action and sued for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  Id. ¶¶ 67–75, 83.

## A.  Wholesale Grocery Industry

Grocery wholesalers such as SuperValu and C&S act as middlemen in the grocery supply chain, purchasing products from manufacturers, storing those products at distribution centers, and later reselling those products to retail grocers.  Id. ¶ 16.  Prices charged by grocery wholesalers to retail customers include a price for the purchase of a product, transportation fees, fuel surcharges, warehouse fees and other fees.  Id. ¶ 18.

## B.  C&S Pricing

At issue in these Motions are the prices C&S charged its retail customers for grocery delivery.  C&S charged its customers using an "upcharge rate" that consisted of freight, the cost

of warehousing the product, the cost of delivering the product to the customer, and profit.  First

Barstad Decl. Ex. 10 [Docket No. 972] ("Sabbagh Dep.") 26:13–27:11.  This upcharge was

added to C&S's cost to purchase the product from the manufacturer.  First Barstad Decl. Ex. 1

[Docket No. 946], Kozen Decl. Ex. C [Docket No. 1062] (collectively, "First Saia Dep.")

38:13–19.  The upcharge rate was assessed as either a percentage of an order (e.g., five percent

of the total manufacturer's list prices of the products), or on a per unit basis (e.g., ten cents per

case or per pallet).  Wholesale Grocery, 2013 WL 140285, at *2 (citing Johnson Report [Docket

No. 217] Ex. 10 at 30:9–20).  The upcharge rate paid by each retail customer was individually

negotiated with C&S.  First Saia Dep. 38:17–39:1.  Factors influencing the negotiated rate

included the size of a customer's orders, frequency of orders, local market conditions, and

distance from a customer's store to C&S's distribution center.  Id. at 43:17–44:11.  C&S also

negotiated certain price concessions, such as rebates, individually with customers.  Id. at 46:4–6.

When engaging in rate negotiations with individual customers, C&S prepared pricing pro

formas, which were internal C&S documents created on Excel spreadsheets that enabled C&S to

determine the profitability of a customer based upon the costs of servicing that customer.

Dangel Decl. Ex. 16 [Docket No. 974] ("Kingsbury Dep.") 11:13–20; 43:5–19; 86:2–11.

## C.  New England and Midwest Markets, Asset Exchange Agreement

In 2002, SuperValu was C&S's largest competitor in New England, where C&S was the

primary wholesaler.  Wholesale Grocery, 752 F.3d at 729.  Other wholesale distributers

operating in New England included Bozzuto's, Inc. ("Bozzuto's"), Associated Grocers of New

England ("AG New England"), and Associated Grocers of Maine ("AG Maine").  Second

Barstad Decl. [Docket No. 1169] Ex. 31 (Pls.' Resp. Defs.' First Set Interrogs.) at 13–15

(Interrog. No. 7). C&S did not compete with SuperValu in the Midwest, where SuperValu's main competitor was Fleming Companies ("Fleming"). <u>Wholesale Grocery</u>, 752 F.3d at 729–30.

In 2003, Fleming declared bankruptcy, and C&S announced its intention to acquire Fleming's Midwest wholesale grocery distribution business, which would have resulted in C&S becoming SuperValu's major competitor in the Midwest. <u>Id.</u> at 730.

In September 2003, C&S and SuperValu entered into the AEA, which provided that SuperValu would receive Fleming's Midwestern operations, and in turn SuperValu would transfer its New England operations to C&S.[2] <u>Wholesale Grocery</u>, 752 F.3d at 730. The AEA included reciprocal non-compete provisions. <u>Id.</u> Each Defendant agreed not to supply former customers served from a distribution center exchanged in the agreement for two years. <u>Id.</u> Each Defendant also agreed not to solicit those customers for a period of five years. <u>Id.</u> Shortly after completing the transaction, both wholesalers closed down the distribution centers they had acquired through the AEA.

## D. Procedural History

Plaintiffs filed this antitrust action in 2009, alleging that the motivation of the AEA was to allocate customers and territory and to agree not to compete with each other for the customers and territories they exchanged. Second Am. Compl. ¶¶ 1–3, 33, 76–83. Plaintiffs averred the elimination of competition between SuperValu and C&S in regional markets allowed each Defendant to charge supra-competitive prices to their retail customers. <u>Id.</u> ¶¶ 39–40. Plaintiffs asserted their claims as a class action and alleged two broad putative classes: (1) retailers who

---

[2] The assets comprising the Midwest and in New England operations included distribution centers, customer supply agreements, notes, leases, franchise agreements, and customer goodwill. Bruckner Aff. [Docket No. 30] Ex. B ("AEA") §§ 1.1, 1.3, Exs. B-1, B-3.

purchased products or related services from Defendants in the Midwest market (the "Midwest Class"); and (2) retailers who purchased such products or services in the New England market (the "New England Class"). See id. ¶ 67.

During the course of the litigation, class certification was granted for five distribution-center based classes of plaintiffs in the Midwest (the "Midwest Plaintiffs"). Wholesale Grocery, 2016 WL 4697338, at *9–13. The Midwest Plaintiffs had established that the formulaic nature of SuperValu's pricing in the Midwest made it possible to prove class-wide injury with common evidence. Id. Conversely, class certification was denied for a proposed New England Class because C&S's upcharges in New England varied widely among customers, and thus the New England Plaintiffs lacked the ability to prove class-wide impact through common evidence. Wholesale Grocery, 2012 WL 3031085, at *9–13.

On January 11, 2013, summary judgment was granted against the only other New England Plaintiff in this case, DeLuca's Market Corp. ("DeLuca's"). Wholesale Grocery, 2013 WL 140285, at *15. The Midwest Plaintiffs' claims against SuperValu were settled in November 2017. See Order Granting Mot. Final Approval Class Settlement [Docket No. 897]. The Midwest Plaintiffs' claims against C&S were tried to a jury in April 2018. After a 9 day trial, the jury returned a verdict in favor of C&S. See Verdict [Docket No. 1233]. The jury found that the Midwest Plaintiffs had not proven that C&S and SuperValu were competitors or potential competitors who agreed to allocate territories and customers along geographic lines. Id. at 1.[3] The trial was limited to the Midwest Plaintiffs' claims. Thus, Village Market's

---

[3] The Midwest Plaintiffs have appealed the Verdict. See Notice Appeal [Docket No. 1267].

antitrust claim against SuperValu is the sole remaining claim in this litigation.

**E. Village Market**

Village Market operates retail grocery stores in Scituate, Massachusetts. Prior to the AEA, Village Market used SuperValu as its wholesale grocery supplier. In September 2003, Village Market's accounts were acquired by C&S pursuant to the AEA.

**1. Claims**

Village Market alleges that the AEA was a sham transaction, and that the "real point" of the AEA was "eliminating each other as a competitor in the Midwest and New England, allocating the Midwest to SuperValu and New England to C&S." Second Consol. Am. Compl. ¶ 36. Village Market claims that the alleged customer and territorial allocation caused it to pay "higher prices" because "C&S no longer had to engage in intense price competition in New England with SuperValu." Id. ¶ 40. Village Market also claims that its transportation fees increased when C&S closed the SuperValu facilities it had acquired under the AEA. Id. ¶ 43. An arbitration agreement prevents Village Market from litigating claims against C&S. Id. ¶ 10. Thus, Village Market's claim is asserted only against SuperValu. Id. at 28 ("Count I").

**2. Village Market's Pricing Before and After the AEA**

**a. Pre-AEA**

The evidence shows that prior to the AEA—when SuperValu was still competing intensely with C&S in New England—SuperValu charged Village Market a combined fee and freight upcharge of ███████. First Barstad Decl. Ex. 9 [Docket No. 969], Second Barstad Decl. Ex. 29 [Docket No. 1169, Attach. 1] (collectively, "McInnis Dep.") 112:80–114:17; First Barstad Decl. Ex. 8 [Docket No. 967] at 1. SuperValu also provided Village Market with a

volume-incentive rebate of ███████ on all fee-based wholesale purchases if Village Market met an annualized purchase volume of ███████████. First Barstad Decl. Ex. 8 at 3.

### b. September 2003

Upon execution of the AEA in September 2003, Village Market and other SuperValu customers were transferred to C&S. C&S "translated" the fees and freight SuperValu had been charging those customers into C&S's pricing system so that each customer was getting "the same deal" with C&S that it had been getting with SuperValu. First Saia Dep. 123:3–126:12. As a result, Village Market's upcharge rate ████████████████████ upon being transitioned to C&S under the AEA.

The amount C&S charged for freight was included in the customers' upcharge rate and was not charged as a separate fee. Sabbagh Dep. 26:13–21; First Barstad Decl. Ex. 11 [Docket No. 977] ("Second Saia Dep.") at 55:12–13, 173:3–9. In instances where C&S's delivery costs to former SuperValu customers increased after C&S's closure of the former SuperValu distribution centers, C&S absorbed the higher delivery costs and did not pass them on to the customers. First Saia Dep. 145:09–146:23; First Barstad Decl. Ex. 2 [Docket No. 948] ("Weidenheimer Dep.") 46:09–18. As a result, former SuperValu customers, including Village Market, did not experience a change in pricing after C&S closed the SuperValu distribution centers. McInnis Dep. at 78:6–11.

### c. Spring 2004

In the spring of 2004, after the AEA had been in effect for several months, Village Market threatened to switch its business to another wholesale supplier, AG New England. Second Barstad Decl. Ex. 32 [Docket No. 1171]. Also during this time period, Village Market

was solicited by a representative from wholesaler Bozzuto's about "moving forward with a supplier change." First Barstad Decl. Ex. 7 [Docket No. 963]. The Bozzuto's representative identified nine other retail customers who left C&S to join Bozzuto's after being transferred from SuperValu to C&S under the AEA. Id.

C&S responded to Village Market's threat to switch suppliers by offering Village Market a new two-year supply agreement that reduced its upcharge fee from ██████████████and provided it with█████████████████████████. First Barstad Decl. Ex. 12 [Docket No. 980] at 1; McInnis Dep. 83:10–85:7, 187:6–10. C&S offered the new terms so that Village Market would "remain with C&S instead of changing suppliers." First Barstad Decl. Ex. 12 at 1. Village Market also received volume-incentive rebates ████████████████████████████beginning in June 2004. Normann Decl. [Docket No. 1177] ¶ 6.

### d. Summer 2007

C&S reduced Village Market's upcharge rates again in June 2007. In the months leading up to the price reduction, Village Market was experiencing strong sales and volume which lead it to approaching C&S about getting a "better deal." McInnis Dep. 129:23–130:17. C&S initially responded that Village Market was getting a "good enough deal." Id. at 130:10–11. Village Market then obtained a competing offer from AG New England and planned to change suppliers based on that offer. Id. at 25:12.

When Village Market informed C&S that it was considering leaving, C&S was "[f]aced with having to match the deal being offered by AG New England or lose [the] account." First Barstad Decl. Ex. 14 [Docket No. 983] at 1. C&S responded by reducing Village Market's upcharge to████ and increasing the volume-incentive rebate to ███of sales. First Barstad Decl.

Ex. 15 [Docket No. 985] ("June 2007 Supply Agreement") at CS00405942; McInnis Dep. 97:12–15.  This was a more competitive price than AG New England's offer.  McInnis Dep. 97:6–11.  Village Market's upcharge rate remained at ■■■ through the remainder of the damages period.  First Barstad Decl. Ex. 15.

## F.  Dr. Levy's Expert Opinion

Village Market retained economist Dr. Daniel S. Levy, Ph.D. ("Dr. Levy"), to determine whether Village Market and similarly situated grocers in Massachusetts and Rhode Island paid higher prices for the delivery of groceries than they would have paid had there been no AEA with the alleged customer and territorial allocation.  Dangel Decl. Ex. 1 [Docket No. 951] ("First Levy Report") at 2.  Dr. Levy used a "competitive benchmark" methodology to measure the impact of the AEA on Village Market's prices and concluded that although Village Market's delivery costs declined after the AEA, its costs would have declined even further but for the AEA.  Id. at 29.

The competitive benchmark selected by Dr. Levy for demonstrating how Village Market's costs would have changed over time without the AEA was Stop & Shop, the largest retail grocery chain in New England and C&S's largest purchaser of wholesale groceries.  Id. at 21; Gross Decl. [Docket No. 934] ¶ 2.  Dr. Levy chose Stop & Shop because "Stop & Shop's size and ability to self supply limited the impact of any increased market power that C&S obtained from acquiring all of the operations and customers of its next largest competitor [SuperValu] in New England."  First Levy Report at 22.[4]  Dr. Levy "assume[d]" that in a market unaffected by the AEA, the pricing pattern for Village Market and other independent retailers

_____

[4] Dr. Levy defines market power as "the ability to price profitably above the competitive level."  First Levy Report at 21.

9

would have followed that of Stop & Shop.  Id. at 22–23.

Dr. Levy then analyzed the change in monthly prices that Village Market and Stop & Shop's Massachusetts stores paid over time, beginning in November 2003 (the first full month of C&S sales to Village Market).  Stop & Shop's monthly prices were analyzed through December 2008, but Village Market's prices were analyzed only through May 2007, the month that "C&S gave Village Markets a lower rate because Village Markets asserted that another distributor had offered Village Market a lower rate."  Id. at 27, 29.  Dr. Levy defined "price paid" as "the total price a grocer paid to C&S per month divided by the cost of the goods delivered to that grocer by C&S," which he referred to as the "cost of delivery to cost of goods ratio ('CoD/CoG')."  Id. at 25–26.  To control for the change in the mix of items purchased each month, Dr. Levy used the same "market basket" over time.  Id. at 26.

Dr. Levy found that from November 2003 through December 2008, Stop & Shop's prices (i.e., CoD/CoG) declined from ██████, which amounts to a ██ decline.  Id. at 27.  Dr. Levy thus determined that in a but-for world, the prices paid by Village Market and the other putative New England class members would also have declined ██████ during this same time period. Dangel Decl. Ex. 3 [Docket No. 956] ("Levy Dep.") 136:19–137:7.[5]

Dr. Levy found that Village Market's prices also declined from November 2003 through January 2007, but did not decline ████████as Stop & Shop's had.  First Levy Report at 28–29. He concluded that "[i]t is the slower decline in the Village Markets' [prices] compared to what it

---

[5] Dr. Levy did not analyze the reason for Stop & Shop's ██ decline in prices.  He testified in his deposition that "[t]here could be a whole set of reasons that have to do with things that are going on in the market and the change in the market in general, and just the – the change in the nature of retail and grocery industry."  Levy Dep. 164:16–20.  When pressed further on this issue, Dr. Levy responded:  "There are a large set of things.  I don't know which ones they would be particularly."  Id. at 164:21–23.

would have been in the absence of the AEA that is the competitive harm. But-for the market power of C&S, Village Market's [prices] would have declined more than [they] did as reflected by the benchmark grocer which was less subject to C&S's market power." Id. To determine whether the divergence between the decline in Stop & Shop's prices relative to the decline in Village Market's prices was significant, Dr. Levy performed a regression analysis and concluded that the divergence was statistically significant. Id. at 29–32.

Dr. Levy also used the benchmarking methodology to calculate Village Market's damages. He confined his damage calculations to the time period "from January 2005 to May 2007 when Village Markets experienced the differentially worsening CoD/CoG compared to the trend that would have been experienced absent the AEA." Id. at 33. To calculate the additional amounts that he contends Village Market paid but-for the AEA, Dr. Levy "multipl[ied] the but-for increase in the CoD/CoG relative to Stop & Shop's obtained from the regression analysis for each month by the CoG that Village Markets purchased each month." Id. Dr. Levy's computations resulted in total estimated damages of ███████████. Id. at 34.

Dr. Levy repeated this antitrust injury and damages analysis for each member of the putative classes. Id. at 32–39. For independent retailers in Rhode Island, Dr. Levy used Stop & Shop's Rhode Island stores as a benchmark. Id. at 37. Of the 52 independent retailers analyzed, there were "a very small number of independents that did not suffer damages." Id. at 37. Dr. Levy did not opine as to why some independent retailers were not impacted by the change in C&S's market power after the AEA. Dr. Levy states that the number of retailers that did not suffer damages and "the magnitude of their 'negative' damage is so small as to be unimportant to them individually and to the class as a whole." Id. at 37.

Dr. Levy prepared a second report to rebut the opinions of SuperValu's experts, who contended that there is no empirical support for Dr. Levy's assumption that but-for C&S's increased market power, the prices paid by independent retailers would have changed in a fixed ratio to those paid by Stop & Shop. See Dangel Decl. Ex. 2 [Docket No. 952] ("Levy Rebuttal") at 6. Dr. Levy analyzed the price patterns of 11 independent retailers relative to Stop & Shop's price pattern during the eight months prior to the AEA. He stated that the "short time period and the limited number of independents in this [pre-AEA] data make it less than ideal as a pre- and post-AEA benchmark." Levy Rebuttal at 17. Dr. Levy also stated that "the eight months prior to the AEA may not be a good reflection of how a competitive market would function in the absence of the AEA." Id. Nevertheless, he found that "prior to the AEA the independents' upcharges were falling relative to Stop & Shop's," whereas "[a]fter the AEA the independent's [sic] upcharges increased statistically significantly relative to Stop & Shop." Id. at 18.

Dr. Levy also analyzed the price patterns of independent grocers in Connecticut before and after the AEA. Levy Rebuttal at 52–55. Dr. Levy concluded that SuperValu's exit from Connecticut had less of an effect on independent grocers there because Bozzuto's is located in Connecticut. Id. at 55. However, Dr. Levy twice acknowledged that Connecticut is not a "good benchmark" because it is located in the region that was covered by the AEA. Id. at 52, 55.

## G. Present Motions

SuperValu has filed a motion to exclude the expert testimony of Dr. Levy, arguing that his opinion is based on the untested assumption that, but-for Defendants' alleged conspiracy, independent retailers' prices would have followed the same trajectory as Stop & Shop's. SuperValu has also filed a motion for summary judgment, arguing that Village Market has failed

to present evidence of harm to its business or property caused by Defendants' allegedly unlawful

conduct. Village Market has filed a motion reconsider class certification, a motion to certify

class, and a motion to appoint class counsel. Because SuperValu's motions are potentially

dispositive, the Court addresses them first.

### III. DISCUSSION

#### A. **Daubert** Motion

##### 1. **Legal Standard**

The admission of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

When evaluating the admissibility of expert testimony, a trial court serves as the

gatekeeper to ensure that the proffered testimony is relevant and reliable. Daubert v. Merrell

Dow Pharms., Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

137, 141 (1999). To be relevant, the testimony must relate to an issue in the case. Daubert, 509

U.S. at 591. To be reliable, the expert testimony "must be supported by appropriate

validation—i.e., good grounds, based on what is known." Id. at 590 (internal quotations

omitted). A trial court has broad discretion in fulfilling its gatekeeping role. Wagner v. Hesston

Corp., 450 F.3d 756, 758 (8th Cir. 2006). The proponent of the expert testimony bears the

burden of showing by a preponderance of the evidence that the testimony is admissible. Id.

"[R]ejection of expert testimony is the exception rather than the rule," and expert testimony should be admitted if it "advances the trier of fact's understanding to any degree." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006). Doubts about the usefulness of an expert's testimony should generally be resolved in favor of admissibility. Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 758 (8th Cir. 2006).

Although Rule 702 favors admissibility rather than exclusion, the district court must ensure that an expert's testimony "rests on a reliable foundation." Dabuert, 509 U.S. at 597. "Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000) (quotation marks omitted). "[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," the testimony must be excluded. Bonner v. ISP Techs., Inc., 259 F.3d 924, 929–30 (8th Cir. 2001).

To establish antitrust impact in an overcharge case, "an expert is required to construct a hypothetical market, a but-for market, free of the restraints and conduct alleged to be anticompetitive." Blades v. Monsanto Co., 400 F.3d 562, 569 (8th Cir. 2005) (quotation marks omitted). Although benchmarking is a valid tool for predicting but-for price levels and measuring damages, the methodology must correct for "any nonconspiratorial factors that might have caused the prices that are being compared to be different from each other." Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 152 F.3d 588, 592 (7th Cir. 1998). An expert's opinion on antitrust liability must be excluded if it fails to "incorporate all aspects of the economic reality of the [relevant] market and . . . separate lawful from unlawful conduct." Concord Boat, 207 F.3d at 1057.

## 2. Analysis

SuperValu argues that Dr. Levy's benchmark analysis is unreliable because: (1) it is founded on the unvalidated assumption that in competitive markets, independent retailers' prices would follow the same trajectory as Stop & Shop's; and (2) it fails to account for obvious non-conspiratorial factors that may have affected Stop & Shop's fee decline after the AEA.

### a. Underlying Assumption Not Validated

SuperValu argues that the Stop & Shop benchmark is unreliable because Dr. Levy's entire model is premised on the assumption that independent retailers' charges followed the same pattern as Stop & Shop's absent the AEA, yet he has not established that the prices paid by independent grocers and Stop & Shop were correlated in any way before the AEA or in geographic areas unaffected by the AEA. The Court agrees. Dr. Levy's benchmarking model "assume[s]" that the changes in independent retailers' prices over time would "follow roughly" that of Stop & Shop's. First Levy Report at 22. Dr. Levy admitted in his deposition that if the independent retailers' prices behaved differently than Stop & Shop's in the absence of the AEA, his model does not show any impact. Levy Dep. 133:21–134:11.

Dr. Levy 's analysis of pre-AEA pricing trends is not sufficient to validate his assumption. The analysis included only 11 out of 50 proposed class members. Significantly, Dr. Levy conceded that "the limited number of independents in this data make it less than ideal as a pre- and post-AEA benchmark" and that the data was not "sufficient for that purpose." Levy Rebuttal at 17. Moreover, Dr. Levy's pre-AEA analysis shows that the independent grocers' prices did not follow the same trajectory as Stop & Shop's before the AEA. To the contrary, Dr. Levy stated that the independent retailer prices "tended to be improving compared to Stop &

Shop before [the AEA], and degrading afterwards." Levy Dep. 135:18–21; see also Levy

Rebuttal at 18 (stating that "upcharges were falling relative to Stop & Shop's before the AEA").[6]

Thus, Dr. Levy failed to validate the foundational premise of his benchmarking model: that Stop

& Shop's prices are a reliable predictor of the independent grocers' but-for prices. Absent this

validation, there is no basis for assuming that the prices paid by the two would move in tandem

but for the AEA, and no basis to conclude that divergence in those prices demonstrates antitrust

injury or impact. Because Dr. Levy's benchmarking analysis is not "supported by appropriate

validation—i.e., good grounds, based on what is known," his opinions on antitrust injury and

damages are unreliable and must be excluded. Daubert, 509 U.S. at 590.

In an effort to resist this conclusion, Village Market argues that "the Defendants did not

produce sufficient data pre or post the period of study to perform a valid before and during, or

after and during study." Pl.'s Mem. Opp'n Mot. Exclude Expert Test. [Docket No. 1098] at 7–8.

This argument is unavailing. As to pre-AEA data, Dr. Levy acknowledged in his deposition that

most of the putative class members, including Village Market, were SuperValu customers during

the pre-AEA period, yet he does not recall whether he analyzed SuperValu's pre-AEA customer

data. Levy Dep. 24:18–25:4. With regard to post-AEA data, C&S produced transaction data

through December 31, 2009. Second Barstad Decl. Ex. 39 [Docket No. 1169, Attach. 4] at 10

(C&S's production of transaction data from January 1, 2001 through December 31, 2009 in

---

[6] Dr. Levy testified in his deposition that "individually," the improvements in independent retailers' prices compared to Stop & Shop's prior to the AEA were "not statistically significantly different," but "as a combination they are." Levy Dep. 135:1–6.

response to Plaintiff's Document Request No. 7).[7]

Village Market also submitted a March 15, 2018 declaration of Dr. Levy in which he states that he validated his model by showing that Stop & Shop's and independent retailers' prices tracked each other after the AEA in Connecticut, "where the anti-competitive effects of the AEA are expected to be limited or thwarted by the presence of local grocery delivery by Bozzuto's." Levy Decl. [Docket No. 1097] at 25. This statement contradicts Dr. Levy's rebuttal report, in which he found that Stop & Shop's and independents' prices diverged in Connecticut to nearly the same extent as Massachusetts, and concluded that Connecticut was not a "good benchmark" because it was "within the AEA and affected by the exit of SuperValu." Levy Rebuttal at 53–55. Thus, Village Market's arguments do not alter the Court's conclusion that Dr. Levy's benchmarking analysis and resulting opinions on antitrust injury and damages are fundamentally unsupported. Dr. Levy's opinions must be excluded as unreliable.

### b. No Control for Non-conspiratorial Factors

Although Dr. Levy's failure to validate his competitive benchmark is, by itself, a sufficient basis for excluding his expert testimony, the benchmark analysis is unreliable for the additional reason that it does not control for non-conspiratorial factors. An expert opinion on antitrust impact is inadmissible if it fails to "separate lawful and unlawful conduct." Concord Boat, 207 F.3d at 1057.

Dr. Levy did not analyze what factors caused Stop & Shop's post-AEA cost of delivery

---

[7] To the extent that Village Market is suggesting that it is entitled to an adverse inference that the "missing data" would validate Dr. Levy's benchmarking model, no such inference is warranted. Plaintiffs have never alleged, much less demonstrated, any spoliation that would merit an adverse inference.

to decline███ below what they were paying during the intensely competitive pre-AEA period. He surmises that "[t]here could be a whole set of reasons that have to do with things that are going on in the market and the change in the market in general, and just the – the change in the nature of retail and grocery industry."  Levy Dep. at 164:16–20.  When asked if he could be more specific, Dr. Levy responded:  "There are a large set of things.  I don't know which ones they would be particularly. . . .  [T]hings are changing in this industry, and so the point of using a benchmark like this is to capture all of those things . . . ."  Id. at 164:21–165:2.  Thus, Dr. Levy does not consider whether Stop & Shop's dramatically reduced prices were a product of lawful factors unique to Stop & Shop.  Rather, he assumes that but-for the AEA, the already-competitive prices of all retail grocers would have declined by███ due to an unexplained industry trend.

### i.  Stop & Shop Price Reductions Due to Added Business

An example of lawful conduct not controlled for in Dr. Levy's benchmarking analysis is a 2005 arrangement in which C&S reduced Stop & Shop's upcharges in New England in exchange for C&S's contractual right to supply all of the frozen business for nearly 200 Giant of Landover stores owned by Stop & Shop in Maryland, Delaware, Virginia, and Washington, DC. See Gross Decl. ¶¶ 7–8; Gross Decl. Ex. 2 [Docket No. 939]; Gross Decl. Ex. 3 [Docket No. 940].  The agreement provided for declining upcharges every year in New England from 2005 through 2009.  Gross Decl. Ex. 3 at CS00405665.  Dr. Levy's analysis does not control for the effects of this contract-driven price reduction in his benchmark analysis.

Village Market argues that the 2005 agreement with Stop & Shop and Giant of Landover does not impact Dr. Levy's benchmark analysis because C&S was already supplying Giant of

Landover with frozen food.  However, it cannot be genuinely disputed that the significant

additional volume affected the price reductions C&S negotiated with Stop & Shop.  See Gross

Decl. Exs. 2, 3 (December 30, 2005 letter agreements reducing Stop & Shop's New England

upcharges in conjunction with C&S's right to supply entire frozen food requirements for nearly

200 Giant of Landover stores); Gross Decl. ¶¶ 5–7 (stating that Burris Logistics had previously

served as Giant of Landover's primary supplier of frozen foods, and that C&S's agreement to

reduce Stop & Shop's upcharges was "part of a larger deal to obtain Giant's frozen foods

business"); Dangel Decl. Ex. 28 [Docket No. 997] ("Fantasia Dep.") at 230:15–18 (identifying

volume as one of the factors affecting C&S's price negotiations with Stop & Shop).  The failure

of Dr. Levy's methodology to account for this factor, unrelated to the AEA and the alleged

conspiracy, demonstrates the unreliability of his expert testimony.

### ii. Inflation

Still another nonconspiratorial factor contributing to the decline in Stop & Shop's

CoD/CoG compared to Village Market was inflation in food prices.  From November 2003 to

December 2008, the consumer price index for food in the Northeast increased by 22%.  Levy

Rebuttal at 47, n.95.  Stop & Shop paid a fixed cost per case delivery fee.  See Gross Decl. Ex. 1

[Docket No. 937] at CS00405779 ("Schedule of Upcharges").  Therefore, although Stop &

Shop's underlying cost of goods increased, its delivery costs remained fixed, resulting in a lower

percentage upcharge over the cost of goods.  First Barstad Decl. Ex. 21 ("Fantasia Report") at

41–42.  In contrast to a fixed cost per case delivery fee, Village Market and other independent

grocers paid a percentage upcharge on the cost of goods.  Fantasia Dep. 102:8–15.  Thus, their

percentage upcharge over the cost of goods remained the same.  Fantasia Report at 41.

Village Market argues that Stop & Shop was able to negotiate fixed cost per case fees that gave it inflation protection because it "had the ability to walk away." Pl.'s Mem. Opp'n Mot. Exclude Expert Test. at 40 (quoting Levy Dep. 177:6). However, the differing delivery fee structures between Stop & Shop and Village Market predated the AEA. Thus, even when C&S and SuperValu were competing head to head in New England, at a time when Village Market had the ability to walk away, Village Market was unable to negotiate the same inflation protection terms as Stop & Shop. Given the pre-AEA distinction in delivery cost terms impacting inflation protection, Dr. Levy's failure to control for inflation further contributes to the unreliability of his benchmark analysis.

### iii. Unequally Shared Efficiencies

Although not essential to this ruling, the reliability of Dr. Levy's benchmark analysis may also be flawed by the inability to distinguish allegedly unlawful conduct from the unequal sharing of efficiencies that may have resulted from the AEA. The distribution of these efficiencies to Stop & Shop in the form of lowering fees would result in a steeper decline in Stop & Shop's upcharge rates but would not demonstrate antitrust injury. This is because establishing antitrust injury requires Village Market to show that it paid higher prices than it would have in the but-for world, not that its competitor paid less. Blades, 400 F.3d at 569, 573.

Further, to the extent that Village Market argues that reduced fees to Stop & Shop harmed independent retailers that were competing with Stop & Shop, this harm was caused by competition and is not "injury of the type the antitrust laws were intended to prevent." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Congress enacted antitrust laws for "the protection of competition, not competitors." Brown Shoe Co. v. United

Because Dr. Levy's benchmark methodology is unvalidated and fails to separate lawful from unlawful conduct, his expert opinions are unreliable and must be excluded.

## B. Summary Judgment

### 1. Legal Standard

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the nonmoving party "may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." Davenport v. Univ. of Ark. Bd. of Trs., 553 F.3d 1110, 1113 (8th Cir. 2009) (citing Anderson, 477 U.S. at 247–49).

### 2. Analysis

To prevail on their claim under Section 4 of the Clayton Act, Village Market must prove (1) an antitrust violation, (2) injury, (3) a causal relationship between the violation and the injury, and (4) the amount of damages. Concord Boat, 207 F.3d at 1054. The injury element requires a plaintiff "to present evidence from which a jury could reasonably infer that the competitive price was less than the price the plaintiff paid." Blades, 400 F.3d at 573.

Village Market has failed to adduce evidence of antitrust injury caused by the AEA. To the contrary, the unrebutted evidence establishes that Village Market's contractual upcharge rates declined from ███████ before the AEA—when C&S and SuperValu were engaging in intense price competition in New England—to ███████ in 2004, and to ██████ in 2007. Village Market has produced no admissible evidence from which a reasonable jury could infer that these reduced rates would have been even lower but for the AEA. Moreover, there is no evidence that Village Market's transportation costs increased after the AEA, and Village Market's owner admits they did not.

Village Market attempts to avoid these facts by arguing that its "rates rose in 2005 and 2006, peaking at ██████████████ in the middle of the year." Pl.'s Mem. Opp'n Summ. J. [Docket No. 1081] at 11. However, the "rates" Village Market references are the CoD/CoG figures in Dr. Levy's unreliable benchmark analysis, rather than fixed upcharge percentage rates that C&S was charging Village Market during this time period. Dr. Levy admits that Village Market experienced an overall decline in prices. First Levy Report at 29. Moreover, absent a reliable analysis of what Village Market's monthly CoD/CoG would have been but for the alleged antitrust conspiracy, no conclusions can be drawn from the brief upward and downward fluctuations in Village Market's CoD/CoG index.

Village Market also argues that because C&S was capable of reducing Village Market's rate to ████, yet did not do so before Village Market threatened to leave in 2007, competition was lacking from 2005 to 2007 and Village Market was paying supracompetitive prices during this period. This speculative argument cannot withstand the unrebutted evidence to the contrary. Village Market's interrogatory responses state that Bozzuto's, AG New England, and AG Maine

were capable of supplying it "during the relevant period." Second Barstad Decl. Ex. 31 [Docket No. 1169, Attach. 2] at 14 (response to Interrogatory No. 7). Village Market's owner also testified that Bozzuto's and Associated Grocers were competing against C&S for Village Market's business. McInnis Dep. 20:20–24:6. Evidence of competition during the 2005 to 2007 time period also exists in C&S's internal emails from 2006. The emails show that C&S was aware that AG New England had been "courting [Village Market] very heavily." Second Barstad Decl. Ex. 33 [Docket No. 1172] at 2. As a result, C&S attempted to secure a new supply contract with Village Market by offering ███████████████████. Id. Village Market countered with a demand for ████████. Id. at 1. Village Market's counteroffer was approved by C&S "to keep AG New England away for another 5 years." Id. Thus, in 2006 Village Market was leveraging competition by AG New England to demand lower prices from C&S.

Because Village Market has not produced evidence from which a jury could reasonably infer that C&S's prices were supra-competitive, summary judgment for SuperValu is granted.[8]

## C. Village Market's Motions

Based on the conclusion that SuperValu is entitled to summary judgment, Village Market's motions to reconsider class certification, to certify a narrower class of New England retailers, and to appoint class counsel are rendered moot. Even if the motions had not been moot, the Court has reviewed them, along with the evidence submitted in support of the motions,

---

[8] In contrast to Village Market's case against SuperValu, the Midwest Plaintiffs' case against C&S went to trial after Defendants' Daubert and summary judgment motions were denied. The jury was allowed to hear extensive testimony from the Midwest Plaintiffs' expert, Dr. Jeffrey Leitzinger, Ph.D., on the issue of antitrust injury and damages. Ultimately, the jury reached a verdict for C&S after finding that the Midwest Plaintiffs had not proven that C&S and SuperValu were competitors or potential competitors who agreed to allocate territories and customers along geographic lines. See Verdict.

and concludes that no new facts have been discovered that warrant revisiting the issue of whether a class of New England retailers should be certified.  The purportedly "new" evidence discovered by Village Market relating to C&S's pricing methods does not alter the Court's earlier conclusion in this case that C&S's pricing was individualized rather than standardized, and that class certification is inappropriate because class-wide impact and harm cannot be shown with common evidence.  See Wholesale Grocery, 2012 WL 3031085, at *9–14 (denying class certification for putative New England class due to failure to meet predominance requirement of Fed. R. Civ. P. 23(b)(3)); Blades, 400 F.3d at 574 (affirming denial of class certification because antitrust plaintiff failed to show that "injury could be proven on a classwide basis with common proof").

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant SuperValu, Inc.'s Motion to Exclude Expert Testimony [Docket No. 921] is **GRANTED**;

2.  SuperValu's Motion for Summary Judgment [Docket No. 928] is **GRANTED**;

3.  Plaintiffs JFM Market, Inc. and MJF Market, Inc.'s Motion to Reconsider Pursuant to Rule 23(c)(1)(C) [Docket No. 931] is **DENIED**;

4.  JFM Market, Inc. and MJF Market, Inc.'s  Motion to Certify Class [Docket No. 1016] is **DENIED**; and

5.  JFM Market, Inc. and MJF Market, Inc.'s Motion to Appoint Counsel [Docket No. 1022] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


 s/Ann D. Montgomery
ANN D. MONTGOMERY
Dated: July 27, 2018                    U.S. DISTRICT JUDGE